# UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

**TOMMY GIGUERE**

PLAINTIFF-
APPELLEE

v.

**Case No. 25-1831**

**STACY TARDIF**,

DEFENDANT-
APPELLANT

**THE APPELLANT, STACY TARDIF'S, MOTION TO STAY THE LOWER COURT JUDGMENT DATED AUGUST 26, 2025 (TALWANI, J.) REQUIRING THE RETURN OF THE MINOR CHILDREN TO CANADA AND SUPPORTING MEMORANDUM OF LAW**

### I. EXPEDITED REQUEST FOR STAY OF JUDGMENT

NOW COMES the Respondent-Appellant, Stacy Tardif (hereinafter "Mother"), in the above-captioned matter and moves this Court on an expedited basis to Stay the District Court Judgment dated August 26, 2025 requiring Mother to return the children to Canada pending the adjudication of the Mother's appeal.

### II. MOTION TO STAY INITIALLY SOUGHT IN THE DISTRICT COURT

On August 29, 2025, the Mother filed a motion to stay the Judgment pending her appeal with the District Court. That same day, the District Court temporarily stayed the Judgment for one week and Petitioner-Appellee (hereinafter "Father") was ordered to file an Opposition by September 3, 2025. On August 31, 2025, the Father filed his Opposition.

On September 1, 2025, the Mother's Motion was denied. In denying the Mother's Request for a Stay, the District Court ordered the children to be returned to Canada no later than September 9, 2025. In support of its decision, the District Court found Mother made no showing of a likelihood of success on her appeal, will not be irreparably injured if the Stay is not granted, claimed the Stay is not in the best interests of the children, and that Mother did not address the public interest factor.

## III.    PERTINENT FACTUAL BACKGROUND

This case presents a rather unusual set of circumstances for a petition pursuant to the Hague Convention. The parties married in Canada and share two minor children, MG1 (age 5) and MG2 (age 3). Mother and the children reside in Salisbury, Massachusetts. The parties and their children moved as a family from Canada to Massachusetts on December 27, 2022. At the time the parties moved to Massachusetts, MG1 was 2 ½ years old, and MG2 was 6 months old. When the family first moved to Massachusetts, neither of the children spoke English. The parties explained to their family and friends that moving to Massachusetts would be a good opportunity to launch a business.

Initially, the family lived in an apartment in Haverhill, MA. Prior to moving to Massachusetts, the parties owned a home in Quebec, Canada which they sold in May 2023. Upon the sale of their home in Canda, the parties searched for a home to purchase in Massachusetts. On September 8, 2023, the parties purchased the marital home, a condominium in Salisbury, Massachusetts. At that time, they shipped all of their furniture and personal belongings to the United States. All of the parties and the children's personal possessions are in the marital home in Salisbury, except for the Father's necessities.

In January 2023, both children began attending daycare at Shelly's Family Daycare in Haverhill, Massachusetts. MG2 was enrolled full time and MG1 was enrolled three days per week. Neither the daycare director, nor the children, spoke French. The children adapted and the daycare director observed no issues with children's integration.

The children continued to attend the daycare after the family moved from Haverhill, MA to Salisbury, MA. The family attended events with the daycare director's family and other families, including trick-or-treating in 2023 and birthday parties of their classmates. Mother made friends with the children's parents.

The parties and children obtained medical insurance in Massachusetts in January 2023. The children have a pediatrician in Massachusetts and have attended numerous appointments.

The parties filed non-resident tax returns in Canada for calendar year 2023. The parties filed federal and state tax returns as residents of Massachusetts for calendar year 2023. The parties opened a joint bank account in Massachusetts, which their income from the business was deposited into.

In May 2024, the Father imported and registered his Ford Explorer in Massachusetts. Together, on August 4, 2024, the parties enrolled MG1 at Milestones Childcare and Preschool for the 2024-25 school year. When the children arrived in the US, neither of them spoke English. The children adapted quickly and now speak better English than French.

Father resided in Massachusetts from December 27, 2022 until he abruptly left to return to Canada on or about August 27, 2024 after the parties' marriage began to break down. Father left his house keys and business keys on the counter of the home while Mother was at work and

the children were at daycare. Mother continues to reside in the parties' home in Salisbury with the parties' children.

Mother filed for divorce in Massachusetts on September 4, 2024 in Essex County Probate and Family Court under Docket No. ES24D1750DR. Father voluntarily accepted service of the Summons on Mother's Complaint for Divorce on October 11, 2024. On October 22, 2024, the Father filed an Answer and Counterclaim to for Divorce. In his counterclaim for divorce, the Father specifically requested the MA Court grant him custody of the children, and allow him to remove the children to Quebec, Canada.

Prior to accepting service of the summons or filing his Answer and Counterclaim, the Father entered into a Stipulation whereby he had parenting time with the children in Canada from September 20, 2024 through September 22, 2024.

On October 23, 2024, the Father filed his own Verified Motion for Temporary Orders in the Probate and Family Court, which was signed by him under the pains and penalties of perjury. In Father's Motion, he wrote: "the best interests of the minor children require that they be allowed to stay *in their Massachusetts home* with Father during Father's parenting time in Massachusetts." The Father did not seek the children be returned to Canada in his Motion.

On November 21, 2024, the parties entered into another Agreement for Temporary Orders in the divorce action whereby the parties agreed, in pertinent part, to have shared legal custody of the minor children, with Mother having primary physical custody of the minor children. The parties further agreed Father's parenting time with the children would be every-other weekend, with one weekend per month to be spent in Canada. The Massachusetts Probate and Family Court issued a Temporary Order on December 2, 2024 (Black, J.) incorporating the

Stipulation dated November 21, 2024 into its Order. Throughout the pendency of the District Court action, both parties operated under the provisions of their Agreements and Court orders in the Massachusetts divorce action.

On January 21, 2025, Father filed an Application to the Central Authority in Quebec, Canada seeking the return of the children under the Hague Convention. In February 2025, Father's Application was transmitted to the United States, and on February 26, 2025, the Father filed a Complaint for Return of the Minor Children to Canada. The Mother filed a motion to dismiss on March 24, 2025 which was denied on May 5, 2025. The Father filed a motion to restrain the Mother from enrolling the children in Massachusetts schools which was also denied on May 5, 2025. A three-day evidentiary hearing was held on July 16, 17, and 24, 2025.

On August 26, 2025, a Judgment and Order entered requiring the children be returned to Canada. Mother is now appealing the Judgment. Mother initially sought a Stay in the District Court as outlined above.

## IV.   **ARGUMENT**

Mother respectfully requests an expedited stay of the District Court's August 26, 2025 Judgment pending the conclusion of her appellate proceedings. The District Court exceeded the authority granted under the  Hague Convention on the Civil Aspects of International Child Abduction, as codified by the International Child Abduction Remedies Act (ICARA), (Hereinafter: "Hague" or "Hague Convention") in multiple aspects. The District Court further erred in determining Canada was the children's habitual residence under the totality of circumstances when the children have lived in Massachusetts the majority of their lives. Additionally, the District Court failed to determine under these circumstances how Mother's

conduct is "wrongful" under the Hague and erred in not finding Father had consented to or acquiesced in the children's residence in Massachusetts over the past three years.

In order to prevail on a motion to stay, the movant must show the following: (1) the likelihood of success on appeal; (2) the threat of irreparable harm if the stay or injunction is not granted; (3) the absence of harm to opposing parties if the stay is granted; and (4) any risk of harm to the public interest. F.T.C. v. Mainstream Marketing Services, Inc., 345 F.3d 850, 852 (10th Cir.2003). Ultimately, whether to grant a stay and delay the return of the child is within the Court's discretion. Walsh v. Walsh, 221 F.3d 204, 213 (1st Cir.2000).

The Mother's request for a stay of the judgment requiring the children to return to Canada should be granted as the Mother has a superior likelihood of success on appeal; there is no harm to the Father in granting the stay pending the appeal; there is extraordinary harm to the Mother and the children if the stay is not granted if and when the Mother is successful on her appeal, and finally, public interest warrants a stay of the Judgment pending Mother's appeal.

I.      **The Mother has a superior likelihood of success on appeal**

    A. **The District Court incorrectly applied the principles of the Hague Convention**

The Judgment on its face is in clear error as it violates fundamental principles of the Hague Convention. United States v. Nunez, 852 F.3d 141 (1st Cir. 2017). A threshold question left unaddressed by the District Court in clear error is whether the Mother's conduct can be considered "wrongful" as the Father is the one who voluntarily left Massachusetts in August 2024, over a year after the District Court found the intentions of the parties diverged regarding remaining or staying in the United States. The wrongful retention of a child "is a singular and not a continuing act." Marks ex rel. SM v. Hochhauser, 876 F.3d 416, 420 (2d Cir. 2017). The

fixing of the decisive date in cases of wrongful retention should be understood as that on which the child ought to have been returned to his or her custodians or on which the holder of the right of custody refused to agree to an extension of the child's stay in a place other than that of its habitual residence. <u>Swett v. Bowe</u>, 733 F. Supp. 3d 225, 274 (S.D.N.Y.). This is not what happened here as there was no "fixed date" in which the child we to be returned as the parties disagreement occurred two years prior to the Father's filing of a petition under the Hague and months after orders were entered by the Massachusetts Probate Court in the divorce action of the parties and custody of the children.

Further, the Hague Convention does not determine who is entitled to seek custody of a child. The Hague Convention applies only to determine whether a child should be returned and does not empower the court to make determinations regarding custody. <u>Diaz-Alarcon v. Flandez-</u>Marcel, 944, F.3d 303, 305-06 (1st Cir. 2019). Second, it does not establish where jurisdiction for a child custody determination is made. Third, it does not provide rules for resolving competing claims for jurisdiction in international custody disputes. And fourth, it does not contain procedures for obtaining recognition and enforcement of foreign judgments or orders governing child custody.

The District Court errs within the Judgment as it suggests the Canadian court is the appropriate court for jurisdiction by writing: "the return of the Children to Canada for a custody adjudication to proceed in the appropriate Canadian court." (See Judgment pg 1) This is a fundamental misapplication of the provisions of the Hague Convention, which precludes the District Court from determining custodial jurisdiction. Children may be wrongfully removed from one country and then be ordered by a Court to be returned under the Hague Convention to a country that may not have jurisdiction under the standards that are substantially similar to the

UCCJEA to make a custody order. See Robert J. Spector, *International Abduction of Children: Why the UCCJEA is Usually a Better Remedy than the Abduction Convention,* 49(3) FAMILY LAW QUARTERLY 386 (Fall 2015). Thus, the District Court presumes Canada is a court of competent jurisdiction, which is impermissible under the Hague.

Furthermore, the District Court, in further clear error, holds the "Respondent shall allow [Father] to take temporary custody of the Children so that he may return the Children to Quebec, Canada." Diaz-Alarcon v. Flandez-Marcel, 944, F.3d 303, 305-06 (1st Cir. 2019). This grant is clear error and beyond the power granted under the Hague. The District Court is only permitted to order the return of the children to Canada but not empowered here to issue custody determinations. Id. For example, the Mother could return to Canada with the children and thereafter, seek custody of the children. Both of these errors contained with the judgment are clear error and should allow for a stay of the judgment pending the Mother's appeal. Walsh v. Walsh, 221 F.3d 204, 213 (1st Cir.2000).

### B. The Father did not establish Canada was the habitual residence of the children

Removal under the Hague Convention is only appropriate if the child is being retained in a country *other than* his or her place of habitual residence. Mendez v. May, 778 F.3d 337, 344 (1st Cir. 2015). The place where *a child is at home, at the time of removal or retention, ranks as the child's habitual residence.* Monasky v. Taglieri, 589 U.S. 68, 77 (2020) A child's habitual residence is the place where he or she has been physically present for an amount of time sufficient for acclimatization, and which has a degree of settled purpose from the child's perspective. Darin v. Olivero-Huffman, 746 F.3d 1, 11 (1st Cir. 2014). The required degree of settled purpose does not necessarily entail an intention to stay in the place indefinitely. Id. A

settled purpose with respect to residence could be education, business or profession, employment, health, family or mere love of the place. Id.

In Monasky v. Taglieri, 589 U.S. 68 (2020), the Supreme Court clarified the determination of a child's "habitual residence" under the Hague does not depend on an actual agreement between the parents about where to raise the child. Instead, habitual residence is determined based on the "totality of the circumstances." Id. The critical factors for examination include the child's integration into a family and social environment, the age and maturity of the child, parental intentions, changes in geography, duration of stay, and connections to the location Id. No single fact, however, is dispositive across all cases and common-sense dictates that some cases will be straightforward: where a child has lived in one place with her family indefinitely, that place is likely to be her habitual residence. Id.

The findings of the District Court support Canada was not the habitual residence of the children under the totality of circumstances. First, the children began living in the Commonwealth on December 27, 2022. MG1 had spent nearly half of her life and MG2 had spent most of her life residing in Massachusetts where their parents purchased a new martial home in Salisbury on September of 2023. The establishment of a habitual residence includes an actual change in geography, the passage of an appreciable amount of time and the parties taking steps to set up a regular household. Koch v. Koch, 450 F.3d 703 (7th Cir. 2006).

The First Circuit has held a new residence can be formed without the intention of staying in the place indefinitely as the Father claimed. Darin v. Olivero-Huffman, 746 F.3d 1, 11 (1st Cir. 2014). A settled purpose can be temporary with respect to residence, and could be for reasons such education, business or profession, employment, or health,. Id. This is precisely the

facts as the parties arranged for employment, housing, and childcare in Massachusetts among other things all supporting a temporary settled purpose. Id. As further support, the parties imported and registered their vehicle in Massachusetts and obtained visas to allow them to live and work legally in the United States. The parties secured medical care for themselves and the children, who were provided for by a Massachusetts pediatrician. They opened a joint bank account in Massachusetts and filed both state and federal taxes as Massachusetts residents, while filing as non-residents in Canada. Critically, the parties sold their home in Canada and moved the contents of their home and their belongings to their new home in Massachusetts. As a result, the facts clearly demonstrate a clear relinquishment of Canadian residence and their intentions to make Massachusetts their habitual residence.

Further, there is extraordinarily strong evidence of the children's acclimatization to the Commonwealth, which precludes the granting of the petition. Neergaard-Colon v. Neergaard, 752 F.3d 526 (1st Cir. 2014). A child's acclimatization to a location reflected with the passage of a meaningful period of time is a key factor in the habitual-residence analysis. Sanchez-Londono v. Gonzalez, 752 F.3d 533, 542 (1st Cir. 2014).

The children have lived in Massachusetts the majority of their young lives. Monasky v. Taglieri, 589 U.S. at 78. MG1 has spent nearly half her life and MG2 has spent the majority of her life residing in Massachusetts. The children's daily routines including daycare, schooling, medical care, and social activities are in Massachusetts, demonstrating substantial integration into the local environment. Id. Starting in January 2023, both children began attending daycare at Shelly's Family Daycare in Haverhill, MA. Neither the daycare director, nor the children, spoke French. The children adapted and now speak English fluently. Mauvais v. Herisse, 772 F.3d 6, 14 (1st Cir. 2014).

In addition, the children have friends and participate in social activities within the community. The family attended events with the daycare director's family and other families, including trick-or-treating in 2023 and birthday parties of their classmates. Moreover, all of the children's belonging are in the former marital home in Massachusetts. It can be reasonably inferred from all these pertinent facts that from the perspective of the children –despite the parties' disagreement-- were acclimatized to the United States over the past three years. Mauvais v. Herisse, 772 F.3d 6, 14 (1st Cir. 2014).

In Mauvais v. Herisse, 772 F.3d 6, 14 (1st Cir. 2014), the Court found the children were acclimatized to Canada after living there for two years. The children attended daycare, primary school there, attended church, developed Canadian accents, the children spent almost their lives there. The Court could not find that the children were acclimatized to any other country. The facts here are strikingly similar and on-point. In addition, a child can lose its habitual attachment to a place even without a parent's consent ... if the objective facts point unequivocally to a person's ordinary or habitual residence being in a particular place....' . Mauvais v. Herisse, 772 F.3d 6, 14 (1st Cir. 2014).

Massachusetts was undoubtedly the children's habitual residence for the past three years and as result, there can be no wrongful retention in the United States. Accordingly, the Father failed to establish a prima facie case of improper removal or retention. Therefore, the Court erred in granting the Father's Petition. As a result, the stay should be granted due to the strong likely success of the Mother's appeal. F.T.C. v. Mainstream Marketing Services, Inc., 345 F.3d 850 (10th Cir. 2003).

## C. **Father consented to the removal of the children from Canada and then acquiesced to the retention of the children in Massachusetts**

The Father's petition is further precluded because Father both consented to and acquiesced in the children's relocation to Massachusetts. Consent and acquiescence are two separate and analytically distinct affirmative defenses to a petition for return of a wrongfully removed child under the Hague Convention. 22 U.S.C.A. § 9003(e)(2)(B). Padilla v. Troxell, 850 F.3d 168 (4th Cir. 2017).

The consent defense addresses whether the petitioner agreed to the child's removal or retention beforehand, while the acquiescence defense concerns whether the petitioner accepted or agreed to it afterward. Padilla v. Troxell, 850 F.3d 168 (4th Cir. 2017). Consent may be evinced by the petitioner's statements or conduct, which can be rather informal. Nicolson v. Pappalardo, 605 F.3d 100, 105 (1st Cir. 2010). Acquiescence tends to require more formality than consent— e.g., testimony in a judicial proceeding, a convincing written renunciation of rights, or a consistent attitude over a significant period of time. Darin v. Olivero-Huffman, 746 F.3d 1, 16 (1st Cir. 2014).

The District Court in error failed to determine the Father consented to or subsequently acquiesced in the removal of retention of the children. The consent defense involves the petitioner's conduct *prior to* the contested removal or retention, while acquiescence addresses whether the petitioner subsequently agreed to or accepted the removal or retention. Moura v. Cunha, 67 F. Supp. 3d 493, 501 (D. Mass. 2014). The key inquiry to the consent defense is the petitioner's subjective intent, including the nature and scope of the intent, *prior* to the alleged wrongful retention. In re Kim, 404 F. Supp. 2d 495, 516 (S.D. N.Y. 2005).

In In re Kim, the District Court held in order to establish a consent defense, respondent must establish by a preponderance of the evidence that petitioner had the subjective intent to permit Respondent to remove and retain the child for an indefinite or permanent time period. Id. The focus must be on the parents conduct *prior* to August 2024. Darin v. Olivero-Huffman, 746 F.3d at 15.

Consent is an inquiry that may be evinced by the petitioner's statements or conduct, which can be rather informal. Nicolson, 605 F.3d at 105. As the Third Circuit has held, in examining a consent defense, it is important to consider what the petitioner actually contemplated and agreed. Baxter v. Baxter, 423 F.3d 363, 371 (3d Cir.2005).

The District Court found the intentions of the parties to remain in Massachusetts went in differing direction in 2023 while the Father claims the alleged wrongful retention then occurred in August 2024. The objective and undisputed facts surrounding the family's relocation to the United States need not be repeated. However, it is important to note that Father does not contend that any of those actions were taken against his will. Strikingly, to the contrary, the Father was an active participant in the relocation process from Canada to the United States from 2022 until 2024 and only objected after he alone returned to Canada, leaving Mother and children in Massachusetts, and the Mother filed for divorce. This was also long after the District Court found the Father and Mother disagreed as to their intention to stay or leave the United States.

The Father's actions are instructive. The Father actively facilitated the relocation to Massachusetts. He participated in arranging housing, employment, daycare, medical care, and legal documentation necessary for the family to reside in Massachusetts. He imported the family vehicle, registered it locally, and took part in opening bank accounts and filing taxes as a

Massachusetts resident.  It was not until the marriage between the parties started to breakdown that the Father no longer consented to living in the United States and sought to relocate back to Canada.  All of the Father's actions clearly demonstrate his prior consent to the remain in Massachusetts and for a significant period of time.  Nicolson v. Pappalardo, 605 F.3d 100, 105 (1st Cir. 2010).

Further, the parties moved together as a family unit and lived together for two years, even selling their home in Canada home and purchasing a new marital one in Massachusetts.  Thus, this matter is not one where one party moved with the children without the other parent. Nicolson,  605 F.3d at 106.

The District Court also found Father explained to his family and friends that moving to Massachusetts would be a "good experience."  The District Court found Father told his sister and his friend Melanie that he wants to start a company in the United States and see if the business would work. The District Court found a mutual friend recalled the parties discussed a "long term project" in the US. There actions are all indicative of the Father's consent to move to the United States.

Moreover, it would have been impossible for Mother to unilaterally move the family to another country without Father's active cooperation and participation. Father both participated in and helped plan for the move.  The parties applied for E-2 visas and the family was granted E-2 visas on November 10, 2022.  As part of their preparation for the move, the parties jointly entered the US the next day on November 11, 2022, to obtain their I-94 numbers in connection with their visas.  A consent inquiry focuses on the time prior to the retention and the focus must be on the parties' conduct prior to Father's relocating back to Canada and filing this petition.

Darin v. Olivero-Huffman, 746 F.3d 1, 15 (1st Cir. 2014). All the Father's actions prior to the breakdown of the marriage evidenced his consent to living and raising the children here. Any reasonable analysis of Father's conduct indicates he consented to the parties relocating to Massachusetts. Nicolson, 605 F.3d at 105.

In addition, the defense of acquiescence pertains only to what happens "post-retention." Baxter, 423 F.3d at 371. The relevant period that must be considered is after the Father's alleged date of Mother's wrongful retention of August 2024 to the time the Father filed his petition to return the child, on February 26, 2025. Id.

Acquiescence tends to require more formality than consent—e.g., testimony in a judicial proceeding, a convincing written renunciation of rights, or a consistent attitude over a significant period of time. Id. When attempting to characterize ambiguous conduct as a basis for inferred acquiescence, courts employ a pure subjective intent inquiry Id.

Father further acquiesced by fully participating in litigation in Massachusetts. Larbie v. Larbie, 690 F.3d 295 (5th Cir. 2012). Consent for a tribunal to make a final custody determination, which may be established by entry of a temporary custody order, is sufficient to establish an affirmative defense under the Convention. Larbie v. Larbie, 690 F.3d 295, 298 (5th Cir. 2012). The Father gave clear and unequivocal consent for the Massachusetts court to make a final custody determination, and also for the Mother to continue to have primary physical custody of the children in Massachusetts. Id.

The Court in Larbie v. Larbie, 690 F.3d 295 (5th Cir. 2012), found the Mother gave clear and unequivocal consent for Texas court to make final custody determination as mother answered divorce suit in Texas and filed counterpetition seeking affirmative relief. Id.

Likewise, the Father here gave clear and unequivocal consent for the Massachusetts court to make a final custody determination. Larbie v. Larbie, 690 F.3d 295, 298 (5th Cir. 2012). He filed an answer and his own counterclaim for divorce, sought his own temporary orders, and engaged with the Massachusetts courts regarding the children's custody and care. By voluntarily invoking the jurisdiction of Massachusetts courts and litigating in the Massachusetts Probate Court, the Father manifested his acceptance of the children's presence and residence in the Commonwealth. Therefore, the Father in filing this petition is essentially engaging in international forum shopping which the Convention seeks to prevent. Larbie v. Larbie, 690 F.3d 295, 298 (5th Cir. 2012).

Furthermore, the Father willfully, knowingly, and voluntarily agreed to several temporary custody orders, which were made orders by the Probate Court.[1] There was nothing ambiguous about the agreements entered into by the parties, and both parties have had the benefit of legal counsel at all relevant times in the divorce proceedings. The parties had equal bargaining power at the time the Stipulation was executed, and Father's signing was completely voluntary and uncoerced. Darin v. Olivero-Huffman, 746 F.3d at 17. Within these orders, the Father specifically agreed Mother would continue to have primary physical custody of the minor children. The Father did not seek the return of the children to Canada in his Motion before the Probate and Family Court. The Stipulation was also executed by the parties and entered by the Probate Court as an Order. A clear and formal consent order by the non-U.S. parent agreeing to let a state court decide final custody would, both linguistically and for policy reasons, warrant

---

[1] The District Court mischaracterizes these within the judgment as the Stipulation was entered by the Probate and Family Court as Orders.

treatment as acquiescence under the Hague Convention. <u>Nicolson,</u> 605 F.3d at 107.  This is precisely the affirmative conduct by the Father here.

Finally, not only did the Father recognize and obey the orders entered by Massachusetts, but he did not seek any relief from any court in Canada.  In fact, the Father sought relief to remove the children from their home state in Massachusetts to Canada. There is nothing in the record to reflect that Father disagreed that Massachusetts was not the proper forum for child custody.   <u>Larbie v. Larbie</u>, 690 F.3d 295, 309 (5th Cir. 2012)  Notably, Father filed his petition before this Court *after* he had already agreed to allow Mother to continue to have custody and after he filed a counterclaim for divorce in the Massachusetts court.

The Father's agreement to temporary orders and filing of his own counterclaim for custody and divorce reflects Father's voluntary submission to the jurisdiction of Massachusetts for determination of child custody, and this Court erred in holding otherwise.  The petition filed by Father is nothing more and nothing less than impermissible forum shopping and wrongful use of the principles of the Hague Convention.   <u>Kufner v. Kufner</u>, 519 F.3d 33, 38 (1st Cir.2008). Therefore, for the reasons outlined herein, the Mother has a strong likelihood of success on appeal such that a stay of the order to return the children to Canada pending the Mother's appeal should be granted.

**II.**      **There is extraordinary harm to Mother and children if the stay is not granted, and little harm to Father**

In the absence of a stay, the children will return to a place they have not lived  for the majority of their young lives and removing them from their place of residence would certainly cause irreparable injury to both the children and the Mother.

MG1 was scheduled to begin Kindergarten this week in the Salisbury, Massachusetts where she has resided for the past three years. Forcing her to return to Canada pending the outcome of this appeal would not only disrupt her education but cause unnecessary emotional and developmental harm. Should Mother ultimately prevail on appeal, MG1 will have lost valuable time integrating into her local school community and may be required to start school later than her peers, placing her at an academic and social disadvantage. This disruption is not in the child's best interest and undermines the stability she has come to rely upon during her formative years.

Further, it is highly unlikely Canada will have jurisdiction in order to make a custody determination. First, the children have lived the majority of their lives in Massachusetts; Mother is the historic primary custodial parent; there is a case pending in Massachusetts for both custody and divorce. As a result, the matter is likely to be returned to the Probate Court in Massachusetts.

Furthermore, the Father would not suffer irreparable harm if a stay if granted, as by his own agreement, he may continue to have parenting time every other weekend with the children from Friday at 4:00 pm until Sunday at 4:00 pm with one weekend being in Canada, which he has had for over a year, and may continue to have during the pendency of the appeal.

III.     **There is no harm to the public interest in granting the stay as the public interest warrants a stay of the Judgment pending Mother's appeal**

Finally, to the extent the public interest could be affected by this request to stay, no harm would be done by continuing the current state of affairs pending the Mother's appeal. The Father already has parenting time with the children every other weekend, which would continue throughout the pendency of the appeal. The public interest would also be harmed as the Father's

behavior in engaged in impermissible forum shopping is specifically prohibited under the Hague Convention.  Kufner v. Kufner, 519 F.3d 33, 38 (1st Cir.2008).  The Father's agreement to temporary orders and filing his own counterclaim for custody reflects his voluntary submission to the jurisdiction of Massachusetts.  As a result, Father engaged in impermissible forum shopping contrary to the principles articulated by the Hague Convention.   Thus, there is harm to the public in not allowing a stay when there has been impermissible forum shopping.  Id.

In summary, the procedures of the Hague Convention are not designed to settle international custody disputes, but to restore the "status quo" prior to any wrongful removal or retention.  Karkkainen v. Kovalchuk, 445 F.3d 280 (3d Cir. 2006).   The "status quo" is the children have resided in Massachusetts for almost three years. The salient fact is the Father voluntarily returned to Canada without the children, agreed to litigate in the Probate Court in Massachusetts and only two years from the disagreement over residence as found by the District Court filed under the Hague.  Therefore, there is no harm to grant a stay and allow the "status quo" to remain pending the Mother's expedited and highly likely successful appeal.

For all these reasons, Mother respectfully requests the District Court Judgment and Order to return the Children to Canada be stayed during all appellate proceedings.

Dated: September 5, 2025                    Respectfully Submitted,

                                            STACY TARDIF,
                                            By her Attorney,


                                            /s/ Matthew P. Barach
                                            Matthew P. Barach, Esq.
                                            Bar No. 1164888
                                            Attorney for the Appellant
                                            Barach Law Group LLC
                                            40 Speen Street, Suite 205

Framingham, MA 01701
P: 617-694-9700 / F: 508-318-6329
mbarach@barachfamilylaw.com

**CERTIFICATE OF SERVICE**

I certify that on September 4, 2025, a true and correct copy of the foregoing was served upon all parties of record via the Court's CM/ECF system and via email directly to Petitioner-Appellee's Counsel.

Dated: September 5, 2025          */s/ Matthew P. Barach*
                                  Matthew P. Barach
                                  Attorney for the Appellant
                                  Barach Law Group LLC
                                  40 Speen Street, Suite 205
                                  Framingham, MA 01701
                                  P: 617-694-9700 / F: 508-318-6329

**EXHBITS AND RELEVANT RECORD IN SUPPORT OF RESPONDENT-APPELLANT'S MOTION TO STAY**

1. Father's Complaint for Return of Minor Children to Canada
2. Mother's Motion to Dismiss and Affidavit in Support
3. Father's Opposition to Motion to Dismiss and Affidavit in Support
4. District Court Memorandum and Order dated May 5, 2025
5. Mother's Response to Father's Complaint for Return of Minor Children to Canada
6. Findings of Fact and Conclusions of Law
7. Judgment dated August 26, 2025
8. Mother's Motion to Stay filed in the District Court on August 29, 2025
9. Order allowing Temporary Stay
10. Father's Opposition to Mother's Motion to Stay filed on August 31, 2025
11. Order dated September 1, 2025 denying Motion to Stay

UNITED STATES DISTRICT COURT
for the DISTRICT OF MASSACHUSETTS

No. 2025-

TOMMY GIGUÈRE,

Petitioner,

v.

STACY TARDIF,

Respondent.

## VERIFIED COMPLAINT FOR
## RETURN OF MINOR CHILDRENTO CANADA
## PURSUANT TO THE APPLICABLE HAGUE CONVENTION and
## FEDERAL LAW, and other associated relief
## FILED UNDER SEAL

## 1.0    JURISDICTION AND VENUE.

1.1    <u>Jurisdiction</u> is based on the **Convention on the Civil Aspects of International Child Abduction** (hereafter **Convention**) (**Exhibit 1**), done at the Hague on 25 October 1980, effective in these United States on July 1, 1988 as published in the Federal Register, Vol. 53, No. 122, Friday, June 24, 1988, p. 23843. [FN1] The Petitioner also asks this Honorable Court to take Judicial Notice of the

---

[1]The objects of the Convention are:

Article 1(a) to secure the prompt return of child wrongfully removed to or retained in any Contracting State; and

Article 1(b) to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States.

Article 3 provides that the removal or the retention of a child is to be considered wrongful where "(a) it is in <u>breach of rights of custody</u> attributed to a person ... under the law of the State in which the child was habitually resident immediately before the removal or retention;" and "(b) at the time of the removal or retention <u>those rights were actually exercised</u> either jointly or alone, or would have been so exercised but for the removal or retention." (Emphasis supplied).

Complaint - Page **1** of 19

"**Analysis of Hague Convention,**" prepared by the U.S. State Department (**Exhibit 2**).

1.2    Both the USA and Canada have been signatories (Contracting States) to the Convention at all relevant times.

1.3    <u>Jurisdiction</u> is also based on the **International Child Abduction Remedies Act** (hereafter **ICARA**), 42 U.S.C. 11601, 11603(a) (**Exhibit 3**), [FN 2] which establishes procedures for implementation of the Convention in the United States. ICARA states at §11601:

> (b)(1)    It is the purpose of this chapter to establish procedures for the implementation of the Convention in the United States.
>
> (b)(2)    The provisions of this chapter are in addition to and not in lieu of the provisions of the Convention.
> ***
> (b)(4)    The Convention and this chapter empower the court in the United States to determine <u>only rights under the Convention and not the merits of any underlying child custody claims.</u> (Emphasis added).

---

[2]The **International Parental Kidnapping Crime Act** (IPKCA), 18 U.S.C. 1204 (1993) makes it a federal felony to remove a child from the USA or to retain a child (who has been in this country) outside the USA with intent to obstruct the lawful exercise of parental rights, it does not pertain to a parent bringing a child into the USA and retaining the child here against the language of a clear order from another country which gives a parent in that other country parental rights. However, the core values enunciated by IPKCA are clearly applicable to the case at bar.

1.4    The Petitioner asks this Honorable Court to take Judicial Notice of the **ICARA Regulations**, 22 CFR Part 94 - International Child Abduction (**Exhibit 4**).

1.5    As described in detail below, the Parties temporarily relocated to Massachusetts in 2022 in order to assist Respondent's parents with a business endeavor.  At the time of the temporary relocation, the habitual residence of the Parties and their two **CHILDREN** was Quebec, Canada.  The **CHILDREN'S** habitual residence did not change during their temporary stay in Massachusetts and, their habitual residence continues to be Quebec, Canada.  During their temporary stay in Massachusetts the **CHILDREN** returned to their habitual residence in Quebec, no fewer than thirty-four (34) times between December, 2022 and August, 2024.  Indeed, from the time of their entry into Massachusetts for temporary residence while assisting with the company opening, the family used every opportunity to return to Canada where the family ties remained.

1.6    On or about August 28, 2024, the parties' **CHILDREN** were wrongfully retained by the Respondent in Massachusetts without the Petitioner's consent which wrongful retention became more apparent on November 2, 2024 when the Respondent unilaterally renewed the **CHILDREN'S** i94 numbers without the Petitioner's knowledge or consent.  Indeed, Petitioner made clear his objection to the **CHILDREN** remaining in Massachusetts after his permanent return to Quebec,

Canada in August, 2024. Nevertheless, despite Petitioner's clear objection to the **CHILDREN** remaining away from their habitual residence of Quebec, Canada, Respondent renewed the **CHILDREN'S** i94 numbers on November 2, 2024.

1.7    Because the Respondent continues to wrongfully retain the parties' **CHILDREN** in Massachusetts, today, February 25, 2025, the Petitioner is herewith filing this civil action, seeking a return of the **CHILDREN** to their habitual residence in Quebec, Canada and other associated relief.

1.8    The Petitioner's actions, as described in ¶¶ 1.6 and 1.7, respectively, are each sufficient to comply with the Convention's one-year jurisdictional requirement.

1.9    Before the parties' **CHILDREN** were wrongfully retained in the United States, Petitioner was exercising his rights to custody. The **CHILDREN** lived together with both parties in Quebec, Canada until December 27, 2022, and thereafter in Massachusetts until August 26, 2024 during which time both parties provided care to the **CHILDREN.**

1.10    Venue is based on the presence of the children in this District at 207 Beach Road, Unit D-1, Salisbury, MA 01952, as of the commencement of this action.

## 2.0    SUMMARY OF RELIEF REQUESTED.

2.1    This complaint seeks the immediate return to Quebec, Canada of the

parties' minor children, ████████████ who was born in Quebec, Canada and is now age 4 (hereafter referred to as **MG1**) and ████████████, who was born in Quebec, Canada and is now age 2 (hereafter referred to as **MG2**) and who were wrongfully retained in Massachusetts, United States by the Respondent.

2.2    This complaint asks this court to not take plenary or subject matter jurisdiction over issues of child custody, visitation or support, but jurisdiction only for the purpose of entering of: (a) an order the **CHILDREN** be returned to Quebec, Canada, which is the **CHILDREN'S** habitual residence; and (b) all necessary collateral orders.

### 3.0    PARTIES.

3.1    The Petitioner, **TOMMY GIGUÈRE** (hereafter **FATHER**), now age 33 [FN3] was born in Canada and lived in Quebec, Canada until December 27, 2022 when he resided temporarily in Massachusetts, USA. The **FATHER** returned, permanently, to Quebec, Canada on August 26, 2024 where he continues to live. **FATHER'S** address is ████████████████████████ ████████████

---

[3] The dates of birth of the parties and their children are not set forth in this complaint in order to comply with applicable Privacy Rules.

3.2    The Respondent, **STACY TARDIF** (hereafter **MOTHER**), now age 28, was born in Canada. Mother lived in Quebec, Canada until December 27, 2022, when she temporarily moved to the United States. She has lived continuously in the United States ever since. **MOTHER** has been living in Massachusetts with the parties' **CHILDREN**. **MOTHER'S** address is ███████████████████ ██████████

## 4.0    FACTUAL BACKGROUND.

4.1    The parties were married on October 16, 2021 in Quebec, Canada. The parties were both born in Canada and lived there until December 27, 2022. The **FATHER** permanently returned to Quebec, Canada on August 26, 2024. The **MOTHER** has remained in Massachusetts, USA.

4.2    The parties have two children, **MG1**, born in April, 2020 in Saint-Georges, QC, Canada and **MG2,** born in April, 2022 in Saint-Georges, QC, Canada.

4.3    The **CHILDREN** are, by virtue of their births, citizens of Canada.

4.4    The **CHILDREN** have been issued passports from Canada.

4.5    The family lived together in Quebec, Canada until December 27, 2022.

4.6    **FATHER** and **MOTHER** both cared for the **CHILDREN** and exercised their custodial rights.

4.7    Around July 2021, the **MOTHER** informed the **FATHER** of her parents' intention to launch a transport business in the United States. The parties decided to take part in launching the project and applied for non-immigrant visa e2 in 2022, the maximum length of which is five (5) years, with mandatory renewal of the i94 admission numbers every two (2) years, forcing the family to leave the United States territory at the end of the two (2) years in order to renew the i94 admission numbers if they wished to extend their stay.

4.8    The parties agreed that they and the **CHILDREN** would return to Quebec, Canada at the latest at the end of five (5) years. However, it was also agreed upon by the parties that the **CHILDREN** would return to Quebec, Canada sooner should one of the parties make such a request, for any reason whatsoever. Since every renewal of the **CHILDREN'S** i94 admission numbers and the parties' own would be subject to both parties' consent, the lack of consent of one or the other would automatically trigger a return of the **CHILDREN** and the parties to their habitual residence of Quebec, Canada. Further, the issuance of the parties' and the **CHILDREN'S** visas were conditional on providing proof of the parties' intention to depart at the end of the duration they were legally authorized to stay.

4.9    On November 11, 2022, the parties and the **CHILDREN** entered the United States and obtained their i94 numbers, which were to expire on November 10,

2024.  On December 27, 2022, the Parties and their **CHILDREN** temporarily relocated to Massachusetts.

4.10   When the family entered the United States on December 27, 2022, the trip was to be temporary in nature, as agreed upon by the parties and as evidenced by their non-immigrant visas, which authorized a maximum length of stay of five (5) years in the United States and mandatory renewal of i94 admission numbers every two (2) years to extend the parties' and the **CHILDREN'S** stay in the United States.

4.11   During the temporary move to the USA, the habitual residence of the parties and their **CHILDREN** remained Quebec as evidenced by the Parties' continuing to hold Quebec issued driver's licenses (**FATHER** renewed  his Quebec driver's license while temporarily residing in Massachusetts), continuing to maintain Quebec medical insurance cards (something only available to people who reside in Quebec for more than six months of the year), and the family traveling to Quebec for every long weekend and holiday during their slightly less than two year temporary residence in Massachusetts.  Further, the **CHILDREN** have maintained close ties to family and friends in Quebec while only making minimal new ties to Massachusetts. For example, the family first lived in a Haverhill apartment leased by the **MOTHER'S** parents' company for nine (9) months before purchasing a temporary residence in Salisbury in September, 2023.  The Salisbury home was purchased strictly

as a financial investment because of the high cost of rent in Massachusetts.

4.12    As soon as March 2023, the **FATHER** voiced his wish that he, the children, and the **MOTHER** return to Canada.   Following discussion with the **MOTHER**, the **FATHER** accepted that the family would remain in Massachusetts until the expiration of their i94 numbers in November 2024.  A condition of Father's agreement that he and the **CHILDREN** remain in Massachusetts until November, 2024 with **MOTHER** was agreement that the family move to a place outside of **MOTHER'S** parents' control.[4]   At that time, **FATHER** made clear that he did not agree to renew the i94 admission numbers in November 2024 but that the parties would have a further discussion in November 2024 and if **FATHER** still wished for the family to return to Canada at that time, they would return.

4.13    Thereafter, in March, 2024, **FATHER** reiterated his position that the family return to Quebec before the end of 2024.  Between March and August, 2024 **MOTHER** continued to try to talk **FATHER** into changing his mind and remaining longer in Massachusetts.  While **FATHER** always listened to **MOTHER**, he never changed his mind.  The **FATHER** told the **MOTHER** on August 17, 19 and 27,

---

[4] **MOTHER'S** parents' constant presence became an issue in the parties' marriage when they arrived in Massachusetts.  The Parties were living in an apartment paid for by **MOTHER'S** parents' company and thus under **MOTHER'S** parents' control.  Because rent was so expensive in Massachusetts and the real estate market so strong, the Parties ultimately agreed to sell their marital home in Quebec and use the sale proceeds to purchase a temporary home in Massachusetts in hopes of the home appreciating in value during their temporary residence and thus becoming a good

2024 that he wanted the **CHILDREN** to return to Quebec, Canada with him immediately.

4.14 **FATHER'S** wish to return to Quebec was relayed to **MOTHER** multiple times leading up to and during August 2024. **FATHER** moved back to Quebec, Canada on August 26, 2024 and expected **MOTHER** and the **CHILDREN** to join him in Quebec for Labor Day weekend. On August 28, 2024, while the **FATHER** was in Canada, the **MOTHER** informed the **FATHER** that she wanted to remain in the United States and that neither she nor the **CHILDREN** would be returning to Quebec at that time. Since August 2024, the **MOTHER** has actively attempted to restrict the **FATHER'S** time with the **CHILDREN** and limit the **CHILDREN'S** travel back to their habitual residence in Quebec, Canada.

4.15 The **MOTHER** filed a Complaint for Divorce in Massachusetts on September 4, 2024. Thereafter, **MOTHER** only permitted **FATHER** to have parenting time with the **CHILDREN** by entering stipulations and court orders in her Massachusetts divorce case specifically outlining what time the **FATHER** may spend with the **CHILDREN** in Canada and Massachusetts. If **FATHER** wanted to spend time with the **CHILDREN,** he had no choice but to participate in the process **MOTHER** initiated. Accordingly, the Parties entered into a Stipulation in

---

financial investment to be capitalized upon when they returned permanently to Quebec.

**MOTHER'S** divorce action dated September 19, 2024 which permitted **FATHER** to have parenting time September 20 – 22, 2024. Thereafter, on October 7, 2024, the **MOTHER** filed a motion to establish temporary orders including certain financial issues and establishing custody / parenting time. **MOTHER** did not permit **FATHER** further parenting time after September 22nd despite **FATHER'S** repeated efforts, until October 11th at which time **FATHER** had to abide by **MOTHER'S** restrictions and demands if he wanted to see the **CHILDREN**.

4.16  On October 22, 2024, in response to the Complaint for Divorce the **FATHER** filed an answer and counterclaim seeking removal of the **CHILDREN** back to Quebec, Canada. At the time of his filing, **FATHER** was unclear about the proper avenues to seek the return of the children and believed a counterclaim seeking removal was his only option. **FATHER** was unaware of the Convention until November, 2024 which was after he had filed his answer and counterclaim in the divorce action.

4.17  On October 23, 2024 **FATHER** filed a verified motion with the Probate and Family Court for parenting time along with a Motion for Short Order of Notice and Speedy Hearing as he was told his Motion would not be heard until January 2, 2025. **MOTHER** continued to refuse **FATHER'S** efforts to see the children over FaceTime on a regular schedule and made Facetime calls particularly

challenging[5]. On November 21, 2024 the Parties entered into a Further Stipulation in **MOTHER'S** divorce action which provided **FATHER** with regular parenting time with the **CHILDREN**, every other weekend, one weekend in Canada and one in Massachusetts each month. **MOTHER** did not agree to **FATHER'S** request for regular FaceTime calls with the **CHILDREN**.

4.18   In October 2024, the **FATHER** again reiterated his wish that the **CHILDREN** return to their habitual residence of Quebec, Canada. **FATHER** was not satisfied that his answer and counterclaim for removal back to Quebec was his best option and continued to seek information about other avenues for the return of the **CHILDREN** to their habitual residence in Quebec, Canada.

4.19   On November 2, 2024, without the **FATHER'S** consent, the **MOTHER** proceeded to renew the i94 admission numbers for herself and the **CHILDREN** and has continued to wrongfully retain the **CHILDREN** in Massachusetts since that date.

4.20   **FATHER** continued to research in an effort to try to find a way to have the **CHILDREN** returned to Quebec, Canada as had been the Parties agreement

---

[5] At times, **MOTHER** ignored or refused Facetime requests. More frequently, she made the process overly complicated refusing to keep to a schedule. Instead, **MOTHER** would insist on Facetiming **FATHER** when the children were asleep showing him that they were sleeping, or traveling by car, making it impossible to have a meaningful engagement with the **CHILDREN** at such times. **MOTHER** has argued that a regular Facetime schedule would be too restrictive on her life.

when temporarily relocating to Massachusetts. It wasn't until November, 2024 that **FATHER** came to understand the Convention and how it applied to his situation. At that point he began an earnest search for counsel well versed in this area.

4.21  On January 21, 2025 **FATHER** filed an Application to the Central Authority in Quebec, Canada, seeking a return of the **CHILDREN** under Article 8 of the **Convention (Exhibit 5)**. On or about February 14, 2025 the Application was transmitted to the United States Central Authority. This petition follows.

4.22  In sum, **MOTHER** has violated the Convention and ICARA and **FATHER** seeks the Return of the **CHILDREN** to Quebec, Canada.


## 5.0    CURRENT CONTROVERSY.

5.1  In August 2024, **MOTHER** wrongfully retained **CHILDREN** in the United States in violation of the parties' agreement to return to Quebec, Canada and, on November 2, 2024, unilaterally renewed **CHILDREN'S** i94 numbers to extend their stay in the United States without **FATHER'S** advance knowledge or consent a further confirmation of **MOTHER'S** ongoing wrongful retention **(Exhibit 6)**.

5.2  Prior to the wrongful retention of the **CHILDREN** in the United States, **FATHER** exercised custody of the **CHILDREN**, with **MOTHER,** for all of their lives.

5.3    The **CHILDREN** are being wrongfully retained by **MOTHER** in this District. The **CHILDREN** are being wrongfully retained at a condominium occupied by **MOTHER** in Salisbury, Massachusetts.

5.5    **MOTHER** has restricted **FATHER'S** time with **CHILDREN** and the **CHILDREN'S** travel to their habitual residence in Quebec, Canada.

5.6    **MOTHER'S** conduct constitutes wrongful retention of **CHILDREN** in the United States within the meaning of Article 3 of the Convention.

## 6.0    IRREPARABLE HARM.

6.1    **MOTHER**'s wrongful retention of **CHILDREN** from **FATHER** and from their habitual residence in Quebec, Canada has caused immediate and irreparable harm to both **CHILDREN** and **FATHER**.

6.2    **MOTHER**'s violation of the Convention has attempted to divest the courts of Quebec, Canada of their exclusive jurisdiction over issues of **CHILDREN'S** legal and physical custody, to the irreparable harm of **CHILDREN** and **FATHER**.

6.3    The above-described conduct of **MOTHER** continues to cause irreparable harm to both **CHILDREN** and **FATHER**.

6.4    **MOTHER'S** wrongful retention of **CHILDREN** in this District has

improperly interrupted and minimized the **CHILDREN'S** time with **FATHER** attempting to sever the close and loving relationship between **CHILDREN and FATHER**.

6.5    An Order of Notice and a speedy hearing are required to ameliorate the irreparable harm to **CHILDREN** and **FATHER** and, as well, to comply with the Convention and ICARA.

## 7.0    THE LAW OF QUEBEC, CANADA RELEVANT TO THIS MATTER.

7.1    In Quebec, Canada both parents have legal rights and responsibilities for minor children (Quebec Civil Code, Title Four, Section 599 and 600), including the right to decide children's place of habitual residence which comes from parental authority, absent a judgment to the contrary.    **MOTHER** did not have a right to unilaterally keep the **CHILDREN** from their habitual residence of Quebec, Canada without the consent of **FATHER**. Indeed, Quebec Civil Code Title Four, Section 602 states "No unemancipated minor may leave his domicile without the consent of the person having parental authority." In this case such a leave would have to be agreed upon by both parties as they have joint parental authority. In the event of a disagreement between parents about **CHILDREN'S** residence, "the person having

parental authority may refer the matter to the court, which will decide in the interest of the child after fostering the conciliation of the parties." (Quebec Civil Code, Title Four, Section 604).

## 8.0    RELIEF REQUESTED.

**WHEREFORE, FATHER** respectfully requests this Honorable Court:

8.1    Issue an Order of Notice.

8.2    Upon the Return of the Order of Notice to find:

a.    that **MOTHER's** conduct constitutes a wrongful retention of **CHILDREN** in the United States; and

b.    that, at the time of the wrongful retention, **FATHER** was exercising his custodial, parenting and visitation rights (as defined under the laws of Quebec, Canada) within the meaning of Article 3 of the Convention.

8.3    Upon the Return of the Order of Notice to enter orders:

a.    for the immediate return of **CHILDREN** back to their habitual residence in Quebec, Canada;

b.    authorizing **FATHER** to immediately travel to the location of **CHILDREN** and bring them back to Quebec, Canada;

c.    requiring **MOTHER** to immediately deliver **CHILDREN'S**

Canadian passports to the Clerk of this Court and to order that the said Clerk, in turn, deliver said documents to **FATHER** in order to transport the **CHILDREN** back to Quebec, Canada;

       d.     that **MOTHER** may not apply for any United States passports or new Canadian passports for **CHILDREN**;

       e.     that **MOTHER** may not apply for any new visas, i94 numbers or other immigration related documents or changes of status for the **CHILDREN**; and

       f.     to provide certified copies of the Order(s) to the US Department of State, Office of Passport Policy and Advisory Services, 1111 19th Street N.W., Suite 260, Washington, D.C. 20522-1705 and to the appropriate Canadian authorities;

    8.5     to hold a prompt hearing on the prayers of this Complaint;

    8.6     to order that all matters relating to **CHILDREN**, including custody, care, control, access, abuse prevention, and visitation be heard in Quebec, Canada, pursuant to the applicable provisions of Federal law, including the Hague Convention and specifically staying that portion of **MOTHER'S** divorce complaint and **FATHER'S** counterclaim now pending in Essex Probate and Family Court Docket No. 24D-1750DR relating to the custody, care, control, access, abuse prevention, and visitation of the **CHILDREN**;

    8.7     to restrain **MOTHER** from commencing any further court action

concerning **CHILDREN** in any United States court, including restraining her from filing any further action in any Massachusetts state court for any reason relating to **CHILDREN** or **FATHER**;

8.8    to order **MOTHER** to pay **FATHER's** expenses, costs and legal fees as required by ICARA, 42 U.S.C. 11607 (b) (3); and

8.9    to make such further orders as this Honorable Court deems mete and just.

February 25, 2025                              Respectfully submitted,

                                              **Tommy Giguère,**
                                              By his attorneys,


                                              By: *Wendy O. Hickey*
                                              Wendy O. Hickey, BBO #657457
                                              Brick, Jones, McBrien & Hickey LLP
                                              250 First Ave. Suite 201
                                              Needham, MA 02494
                                              P: (617) 494-1227
                                              wendy@brickjones.com

Complaint - Page **18** of **19**

## VERIFICATION

I, Tommy Giguère, state that the facts contained within this complaint are true to the best of my knowledge and belief, and as to those upon belief, I believe them to be true.

Signed under the pains and penalties of perjury this 25th day of February, 2025.

*Tommy Giguère*
ID rnMVgJ4kRlgTwZlSEwdNiY5g

Tommy Giguère

# eSignature Details

| | |
|---|---|
| **Signer ID:** | **rnMVqJ4kRtqTwZtSEwdNiY5q** |
| Signed by: | Tommy Giguere |
| Sent to email: | tommgiguere1991@gmail.com |
| IP Address: | 142.169.77.137 |
| Signed at: | Feb 25 2025, 12:10 pm EST |

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

### CIVIL ACTION NO. 1:25-CV-10468-IT

TOMMY GIGUÈRE,
     Petitioner

v.

STACY TARDIF,
     Respondent

## RESPONDENT'S MOTION TO DISMISS
## PETITIONER'S VERIFIED COMPLAINT
## FOR RETURN OF MINOR CHILDREN TO CANADA
## AND INCORPORATED MEMORANDUM OF LAW

Respondent, Stacy Tardif ("Mother"), by her undersigned attorney, pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6) files this Motion to Dismiss Petitioner's Verified Complaint for Return of Minor Children to Canada with Incorporated Memorandum of Law because the Complaint for Return fails to state a claim upon which relief may be granted, and this Court lacks subject matter jurisdiction. For the reasons set forth herein, Petitioner's Complaint for Return must be dismissed.[1]

## I. INTRODUCTION

On February 26, 2025 the Petitioner, Tommy Giguère (the "Father") filed a Verified Complaint for Return of Minor Children to Canada pursuant to the

---

[1] Mother reserves the right to respond to the Petition and does not waive any responses or affirmative defenses that she may elect to assert in the event her Motion to Dismiss is not granted.

Convention on the Civil Aspects of International Child Abduction, done at the Hague on October 25, 1980 (the "Hague Convention" or "Convention") and the International Child Abduction Remedies Act, 22 U.S.C. §§ 9001-9011 ("ICARA"), incorrectly alleging that the Mother is wrongfully retaining the parties' minor children, M.G.1 and M.G.2[2], in Massachusetts. On March 3, 2025, the Mother was served with Father's Complaint.

## II.    FACTS

The facts listed below are not exhaustive but are intended to illustrate the dates that the parties took objectively verifiable actions in furtherance of relocating their family from Canada to the United States and establishing their life in Massachusetts. The Respondent files her Supplemental Affidavit herewith in further support of her Motion to Dismiss.

2.1.    The parties were married in Quebec, Canada on October 16, 2021.

2.2.    The parties share two minor children, M.G.1 (age 4) and M.G.2 (age 2). Both children have birthdays next month (April).

2.3.    The parties and children relocated from Quebec to Massachusetts on December 27, 2022.

2.4.    Upon relocating to MA, both parties were employed by Dercy, Inc., a transportation company owned by Mother's parents.

---

[2] Abbreviations for the children mirror those used in the Petitioner's Complaint.

2.5.    The children have health insurance in Massachusetts.

2.6.    The children see a pediatrician in Massachusetts as their primary care provider.

2.7.    The parties sold their home in Vallèe-Jonction, Quebec, Canada on May 12, 2023.

2.8.    The parties loaded the contents from their home in Canada into a shipping container and moved the container to the business location in Salisbury, MA while they looked for a home to purchase.

2.9.    The parties purchased a condominium at 207 Beach Road, Unit D-1, Salisbury MA on September 8, 2023.

2.10.    The Petitioner registered his vehicle (the Ford Explorer) in Massachusetts in May 2024.

2.11.    M.G.1 attended daycare at Shelly's Family Daycare in Haverhill, MA beginning on January 3, 2023.

2.12.    M.G.2 attended daycare at Shelly's Family Daycare in Haverhill, MA beginning on January 3, 2023.

2.13.    The parties enrolled M.G.1 at Milestones Childcare and Preschool for the 2024-25 school year on August 4, 2024, with the consent and signature of both parties, where she began attending on September 3, 2024.

2.14.   The Petitioner left the marital home in Salisbury, MA in August 2024 by leaving his house keys and business keys on the counter while the Wife was at work and the children were at daycare.

2.15.   The Petitioner returned to the marital home several weeks later with his father and removed only his own personal belongings from the marital home.

2.16.   The Petitioner made no plans for moving the rest of the family's belongings back to Canada, did not speak to a realtor about listing the marital home for sale or as a rental property, and did not inquire about forwarding mail from the marital home in Massachusetts to Canada.

2.17.   The Petitioner made no arrangements for the children to attend preschool in Canada or take any other action whatsoever to advance his alleged plan for the family to return to Canada in August 2024 or at any time before or since.

## III.  STANDARD FOR GRANTING A MOTION TO DISMISS

"In deciding a motion to dismiss for lack of subject matter jurisdiction, where the complaint's factual allegations are 'illuminated, supplemented, or even contradicted by other materials in . . . record, the Court need not confine its jurisdictional inquiry to the pleadings and may consider those other materials." *Felder* v. *Ponder*, Civil Action No. 12-11192-DJC, at *2 (D. Mass. July 30, 2012) (quoting *Aguilar* v. *U.S. Immigration & Customs Enforcement Div. of the Dep't of Homeland Sec.*, 510 F.3d 1, 8 (1st Cir. 2007)). "The plaintiff bears the burden of

establishing the existence of subject matter jurisdiction." *Id.* (see *Aversa* v. *United States*, 99 F.3d 1200, 1209 (1st Cir. 1996)), see also Fed. R. Civ. P. 12(b)(1).

To survive a motion to dismiss for <u>failure to state a claim</u>, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp.* v. *Twombly*, 550 U.S. 554, 570 (2007)); see also Fed. R. Civ. P. 12(b)(6).

The *Iqbal* evaluation requires two prongs of analysis. First, the Court must "identify [ ] and disregard [ ]" statements in the complaint that are mere legal conclusions or threadbare recitals of the elements of the cause of action. *Ocasio-Hernandez* v. *Fortuno-Burset*, 640 F.3d 1, 12 (1st Cir. 2011). Second, the Court considers the remaining factual allegations "to evaluate whether, taken as a whole, they state a facially plausible legal claim." *Id.* at 11. A claim may only survive a motion to dismiss if the factual allegations (that are entitled to the presumption of truth) state a plausible claim for relief. *Iqbal*, 556 U.S. at 679.

## IV.  THE HAGUE CONVENTION AND HABITUAL RESIDENCE

"The Convention's procedures are not designed to settle international custody disputes, but rather to restore the status quo prior to any wrongful removal or retention, and to deter parents from engaging in international forum shopping in custody cases." *Karkkainen* v. *Kovalchuk*, 445 F.3d 280, 287 (3d Cir. 2006) (quoting *Baxter* v. *Baxter*, 423 F.3d 363, 367 (3d Cir. 2005)).

"[E]very Hague Convention petition turns on the threshold determination of the child's habitual residence; all other Hague determinations flow from that decision." *Redmond* v. *Redmond*, 724 F.3d 729, 742 (7th Cir.2013). "In determining a child's habitual residence, this circuit looks first to the shared intent or settled purpose of the persons entitled to determine the child's permanent home; as a secondary factor, we may consider the child's acclimatization to his or her current place of residence. *Mendez* v. *May*, 778 F.3d 337, 344 (1st Cir. 2015). "The term "habitual residence" is not defined by the Hague Convention, but this court—in keeping with the approach of several of our sister circuits— "begins with the parents' shared intent or settled purpose regarding their child's residence." *Neergaard-Colón v. Neergaard*, 752 F.3d 526, 530 (1st Cir. 2014) (quoting *Nicolson v. Pappalardo,* 605 F.3d 100, 104 (1st Cir.2010)).

The Supreme Court simplified and clarified that "a child's habitual residence depends on the totality of the circumstances specific to the case", and that "[t]he place where a child is at home, at the time of removal or retention, ranks as the child's habitual residence." *Monasky* v. *Taglieri*, 140 S. Ct. 719, 723, 726 (2020).

## V.    THE HAGUE CONVENTION/ICARA DOES NOT APPLY, THEREFORE THE COURT LACKS SUBJECT MATTER JURISDICTION

As a threshold matter, there has been no "wrongful removal" or "wrongful retention," and therefore, neither the Hague Convention nor ICARA applies, and this Court lacks subject matter jurisdiction. Therefore, this matter must be dismissed.

A removal or retention of a child is considered to be "wrongful" in the meaning of the Hague Convention where,

> "(a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
>
> (b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal and retention."

Convention, Article III. As will be discussed further herein, Mother neither wrongfully removed the children from Canada nor wrongfully retained them in Massachusetts, as Massachusetts, not Canada, was their place of habitual residence immediately before the alleged "wrongful removal or retention." Further, the Petitioner consented to the relocation and acquiesced to the children remaining in the United States "against his wishes" beginning as early as March 2023.

"[W]rongful removal or retention claims under Article 3 of the Convention typically raise four questions: (1) When did the removal or retention at issue take place? (2) Immediately prior to the removal or retention, in which state was the child habitually resident? (3) Did the removal or retention breach the rights of custody attributed to the petitioner under the law of the habitual residence? (4) Was the petitioner exercising those rights at the time of the removal or retention?" *Karkkainen*, 445 F.3d at 287.

The retention or removal of a child under the Convention can be wrongful only if "the child to whom the petition relates is `habitually resident' in a State

signatory to the Convention and has been removed to or retained **in a different State**." *Gitter* v. *Gitter*, 396 F.3d 124, 130 (2d Cir. 2005). (emphasis added).

## VI.   THE CHILDREN'S HABITUAL RESIDENCE IS THE UNITED STATES

There are several ways that the Court could review the case at bar and reach the conclusion that the children's habitual residence is Massachusetts. The Petitioner's Complaint and Affidavit fail to support jurisdiction under the Convention, and in fact, support the direct opposite conclusion of the relief he requests.

**The parties shared the intent to relocate to the United States for an indefinite period when they moved to Massachusetts on December 27, 2022.**

The parties relocated to the United States in support of the Respondent's parents' business. Although Petitioner alleges that the relocation was "temporary," the actions of both parties can support only one conclusion - that the relocation was for an indefinite period of time.

The parties applied for non-immigrant visas with a maximum length of five (5) years. After living in an apartment and determining that the business was viable, the parties sold their home in Canada on May 12, 2023. The parties moved all of their belongings and household furnishings to the United States in a shipping container that remained in the yard at the family's business in Salisbury, MA until they closed on their house in Salisbury in September 2023.

The parties made a mutual decision for their family to relocate to the United States. Mother did not make a unilateral decision to abscond with the children from Canada, and the parties lived their life in Massachusetts for nearly two years before Petitioner had a change of heart and returned, on his own, to Canada. He was free to do so, but could not have had a realistic expectation that the rest of his family would abandon their home, life, and livelihood with no planning or preparation at a moment's notice as he demanded. See Pet. Aff. ¶35,42.

The Petitioner's affidavit and complaint are littered with contradictions between his alleged desire to return to Canada and actions he took to make Massachusetts the family's home.

**It is impossible to reconcile Petitioner's alleged requests to return to Canada with his subsequent actions.**

<u>March 2023 Requests to Return to Canada</u>

The Petitioner avers that he first expressed his wish to return to Canada in March 2023. (See Pet. Aff. ¶12,17). After further discussion with the Respondent, the Petitioner alleges that he agreed to stay in the United States until November 2024. (Pet. Aff. ¶14). It is difficult to understand that despite his alleged expected, definitive departure date, the parties sold their home in Canada just a few months later. Then, instead of renting for the remainder of their "temporary" stay and cutting ties with Massachusetts, the parties purchased their home in Salisbury, MA in September 2023, just more than a year from when they would need to depart for their return to Canada.

Petitioner attempts to recast their family's home purchase in Massachusetts as an "investment property" that they purchased due to the high cost of rent in the area. (Pet. Aff. ¶16). If this was, in fact, an investment property, the Petitioner expected the parties to pack up and abandon it on a moment's notice with no plan to rent it as a source of income on their supposed investment.

March 2024 Requests to Return to Canada

The Petitioner alleges that after a visit to Canada in March 2024 he informed the Mother that he wanted the family "to return to Canada before the end of the year." (Pet. Aff. ¶18, ¶58). Petitioner states that he "never changed his mind" after March 2024 that he wanted the family to return to Canada by the end of 2024. (Pet. Compl. ¶4.13). If this was a formal and permanent objection to remaining in the United States after March 2024, Petitioner took several actions after this date that objectively undermine the credibility of his statements. Petitioner's actions after this date indicate that he either abandoned this objection and agreed to remain in Massachusetts or he never actually objected in the first place.

In May 2024, two months after his alleged formal notice of objection to Mother, Petitioner registered his vehicle with the Massachusetts Registry of Motor Vehicles. Petitioner's Massachusetts registration is still valid through May 2025, and his vehicle remains insured in his name using the marital home in Salisbury as the mailing address.

On August 5, 2024, the parties enrolled M.G.1 at Milestones Childcare and Preschool in Salisbury, MA, where she started on September 5, 2024. Both parties

signed the "Authorized Pick-Up List" form, which listed both parties' address as the marital home in Salisbury. Also included in the information packet for the school was a form identifying M.G.1's pediatrician as located in Newburyport, MA.

The Petitioner states that in March 2024 he requested that the family return to Canada by the end of the year, however, he does not allege that there was any planning, let alone any conversations, regarding M.G.1's enrollment or transfer to a preschool in Quebec. The Petitioner also does not allege that there was any planning or discussion whatsoever regarding the ongoing operation of the successful, growing business that Mother continued to manage. If Petitioner actually intended for the family to return to Canada by the end of 2024, he took no action and did no planning to put such a plan in motion after his alleged declaration in March 2024.

<u>August 2024 Request to Return to Canada</u>

The Petitioner's requests to return to Canada in August 2024 were certainly more consistent than his prior requests. Again, however, his demands and expectations defy common sense. The Petitioner does not explain how the family would continue to pay the mortgage on the martial home in Salisbury, MA if the Respondent were forced to immediately resign her employment in Massachusetts. The Petitioner fails to offer any alleged plan for moving the family's furniture and belongings, selling the marital home, and where the family would reside upon their return to Canada (except to say that there was room for them at his parents' house).

**Petitioner voluntarily agreed to the Massachusetts Probate and Family Court deciding matters as to the care and custody of the children by actively participating in the state court proceedings.**

Mother filed for divorce in Massachusetts (Essex County Probate and Family Court, Docket No. ES24D1750DR) on September 4, 2024. Father voluntarily accepted service of the summons on said Complaint for Divorce on October 11, 2024. Prior to accepting service of the summons, on September 19, 2024, Father voluntarily entered into a stipulation whereby he had parenting time with the children in Canada that weekend, and Mother drove to meet him midway between Salisbury. MA and Quebec to exchange the children.

On October 22, 2024, Father filed his Answer and Counterclaim to Mother's Complaint for Divorce. In his counterclaim, Father asked the Court to grant him custody of M.G.1 and M.G.2, and to allow him to **remove the children to Quebec, Canada**. Notably, Father did not object to the jurisdiction of the Massachusetts courts over the divorce action or to determining the custody rights of the parties relative to M.G.1 and M.G.2. Further, he sought an order from the state court to allow him to remove/relocate the children to Canada.

On October 23, 2024, Father, through counsel, filed a Verified Motion for Temporary Orders, which he signed under the penalties of perjury. In his Verified Motion, Father states that:

> 4. Mother currently resides in the ***marital home*** located at 207 Beach Road, Unit D-1, Salisbury, MA 01952.
> 12. The best interests of the minor children require that they be allowed to stay ***in their Massachusetts home*** with Father during Father's parenting time in Massachusetts.

(emphasis added). Father asked the Court to grant the parties joint legal custody of the minor children, that the Court order a regular and holiday parenting schedule for Father and the minor children, and to grant Father exclusive use and occupancy of the marital home during his parenting time in Massachusetts.

On November 21, 2024, the parties entered into a further agreement whereby they agreed to share legal custody of M.G.1 and M.G.2, and Mother would have primary physical custody. In addition, they established a parenting schedule for Father of every-other weekend with the minor children, one of which could be exercised in Canada, as well as a schedule for vacations and holidays.

On December 2, 2024, Judge Black entered an order that Mother would have exclusive use and occupancy of the marital residence, and that she would also be responsible for payment of the mortgage on the property.

ICARA grants to "courts of the States and the United States district courts […] concurrent original jurisdiction of actions arising under the Convention." 22 U.S.C. § 9003(a). A "person seeking to initiate judicial proceedings under the Convention for the return of a child or for arrangements for organizing or securing the effective exercise of rights of access to a child may do so by commencing a civil action by **filing a petition for the relief sought in any court which has jurisdiction** of such action **and which is authorized to exercise its jurisdiction in the place where the child is located at the time the petition is filed**." 22 U.S.C. § 9003(b).

There are active and open proceedings in the Massachusetts court, and Father requested the state court to allow him to relocate the children to Canada. (Pet. Aff. ¶26). Father makes no argument as to why he cannot proceed in the state court matter, or why the state court is not better situated to address the issues of custody of the minor children. Father is forum shopping and mounting a collateral attack on the state court agreements and orders that he is subject to based on his voluntary participation in the divorce matter.

The Petitioner alleges that he was "not informed" of the Hague Convention and learned of it himself in November 2024. (Pet. Aff. ¶30). It is notable that the Petitioner was represented by counsel at all times in the Massachusetts divorce action. Counsel for the Petitioner did not file a special appearance in that matter and challenge the Court's personal jurisdiction over him. To date, the Petitioner has not directly challenged the Massachusetts court's subject matter jurisdiction to determine care or custody of the children.

The Petitioner relies heavily throughout his pleadings on the assertion that the parties had an agreement to return to Canada immediately upon the request of either party, "for any reason whatsoever." (Pet. Aff. ¶7). The reality of such an agreement strains credulity and common sense. In Petitioner's view, he expected that upon making his unilateral demand to return to Canada, the family would throw away the life they spent two years establishing in Massachusetts simply because he decided he wanted to return. It is notable that the Petitioner does not allege that the children had needs that were not being met in Massachusetts, or

that there was any danger or harm to the family remaining in Massachusetts. The simple fact is that the Petitioner voluntarily left the family to return to Canada without planning or financial support demonstrates that he was making a decision for his own interests.

## VII.  MASSACHUSETTS IS THE ONLY VENUE WITH SUBJECT MATTER JURISDICTION OVER THE PARTIES' DIVORCE.

The Petitioner asks this Court to order that the parties' children be returned to Canada so that "all matters relating to [their] custody, care, control, access, abuse prevention, and visitation be heard in Quebec, Canada." (Compl. ¶8.6). If this Court were to order the return of the children to Canada, the Canadian courts would be unable to accept jurisdiction of the parties' divorce (or custody).

The Canada Divorce Act at § 3(1) grants jurisdiction to a court in a province where "either spouse has been habitually resident in the province for at least one year immediately preceding the commencement of the proceeding." Without addressing whether habitual residence in this context aligns with the Convention, it would be impossible to demonstrate that the parties could somehow meet this jurisdictional requirement based on the owning a home in Massachusetts and carrying on their daily activities in the United States from that home.

The Petitioner refers to the Quebec Civil Code and indicates that both parents have legal rights and responsibilities for minor children, and the right to determine children's place of habitual residence. This appears to be a mischaracterization of the Quebec Civil Code, as it does not use the words 'habitual

residence,' and certainly does not ascribe to parents the right to change a child's habitual residence within the meaning of the Convention on a whim.

The Petitioner ignores several relevant and vital sections of the Quebec Civil Code:

> Quebec Civil Code Section 75: "The domicile of a person, for the exercise of his civil rights, is at the place of his principal establishment."
>
> Quebec Civil Code Section 76: "Change of domicile is effected by a person establishing his residence in another place with the intention of making it his principal establishment. The proof of such intention results from the declarations of the person and from the circumstances of the case."
>
> Quebec Civil Code Section 77: "The residence of a person is the place where he ordinarily resides; if a person has more than one residence, his principal residence is considered in establishing his domicile."
>
> Quebec Civil Code Section 395: "The spouses choose the family residence together. In the absence of an express choice, the family residence is presumed to be the residence where the members of the family live while carrying on their principal activities."

All of these provisions, viewed with simple common sense, allow the single conclusion that the parties and the children would not be subject to the Quebec Civil Code because they live and carry out their principal activities in Massachusetts. The parties changed their domicile and intended to make the United States their principal establishment.

Father now seeks to mount a collateral attack on the jurisdiction of the Massachusetts court, but to what end? If Father is granted the relief that he seeks, the courts of Canada will not have jurisdiction over the children or the ability to decide custody matters between the parties because they would be unable to meet the residency requirements in Canada.

The Father voluntarily agreed to accept service of Mother's Complaint for Divorce in Massachusetts, and has willingly and actively participated in the proceedings in Massachusetts. He has been represented by counsel in the Massachusetts divorce action from the time he accepted service. Father has voluntarily entered into agreements concerning the custody and parenting time of their children in the Massachusetts divorce action. Those agreements and orders give the Petitioner 'access rights' to his children that he claims are currently being withheld from him.

### REQUEST FOR AWARD OF ATTORNEY'S FEES

ICARA provides for attorney's fees to be awarded to successful petitioners in Hague Convention cases, but unfortunately does not apply to costs incurred by respondents in defending claims that are dismissed on a respondent's motion. The Respondent has incurred significant counsel fees in defending against the Petitioner's complaint, which lacks a factual foundation for the relief he seeks.

The Respondent asks this Court for an award of attorney's fees pursuant to M.G.L. c. 231 § 6F, which provides that if the Court, in any civil action, finds "that all or substantially all of the claims […], whether of a factual, legal or mixed nature, made by any party who was represented by counsel during most or all of the proceeding, were wholly insubstantial, frivolous and not advanced in good faith," that an award of reasonable counsel fees is appropriate. If the Court grants the Respondent's request, the Respondent respectfully requests that she be permitted to file a supplemental affidavit in support of the amount of attorney's fees incurred.

## VIII. CONCLUSION

The Petitioner has failed to demonstrate that the children were habitually resident in Canada immediately before he alleges that the Respondent improperly retained the children in the United States, therefore, this Court does not have subject matter jurisdiction to determine the proper venue for custody proceedings involving the parties' minor children.

The Petitioner has custody and access rights to his minor children pursuant to the Massachusetts divorce proceedings, where he voluntarily, and actively, participates. The Petitioner has failed to establish that the Respondent has breached the rights of custody attributed to him or wrongfully removed the children or retained them in a State other than where the children were habitually resident immediately before he alleges his custody rights were breached. The Petitioner has failed to state a claim for which this Court may grant relief, therefore, his Complaint must be dismissed.

It is difficult to conceive of a set of facts that more conclusively demonstrates that the parties jointly decided to relocate their family to another country. The actions of the parties, viewed objectively, clearly establish that the parties planned to relocate from Canada to the United States, and proceeded to establish their life in Massachusetts. The alleged agreement to return to Canada on a moment's notice at either party's request defies logic and common sense, and the Petitioner rests his entire argument on that notion.

The simple definition of habitual residence explained by Justice Ginsberg in *Monasky* as "[t]he place where a child is at home" points to Massachusetts. 140 S. Ct. at 726. Application of the Quebec Civil Code supports the Respondent's position that the parties deliberately changed the place of their principal establishment to the United States. Under the requirements for jurisdiction over the parties' divorce proceedings under both the Canada Divorce Act and Massachusetts law, Massachusetts is the proper forum. The reality is that the Petitioner decided to leave his family in Massachusetts to return to Canada. He cannot now concoct facts in retrospect to support jurisdiction under the Convention when all objective evidence clearly demonstrates that the parties relocated to the United States, and over the course of the last two years established their habitual residence in Massachusetts.

Respectfully submitted,
Date: March 24, 2025

Brian Waller, BBO #685672
Turco Legal, P.C.
29 Water Street, Suite 301
Newburyport, MA 01950
(978) 225-9030
brian@turcolegal.com

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

### CIVIL ACTION NO. 1:25-CV-10468-IT

TOMMY GIGUÈRE,

                    Petitioner

v.

STACY TARDIF,

                    Respondent

## RESPONDENT'S AFFIDAVIT
## IN SUPPORT OF RESPONDENT'S MOTION TO DISMISS
## PETITIONER'S VERIFIED COMPLAINT
## FOR RETURN OF MINOR CHILDREN TO CANADA

I, the undersigned, Stacy Tardif, of my own personal knowledge, on oath depose and state as follows:

1. I reside at 207 Beach Road, Unit D-1, Salisbury, MA, 01952.
2. I am the mother of M█████ and M█████ Giguère.
3. I have been married to their father, Tommy Giguère since October 2021.
4. I am the Operations Manager at Dercy Inc in Salisbury, MA
5. In the spring of 2017, we started dating and both had the same common goals.
6. Tommy worked with his father at the Excavation company, Gravière Giguère, located in Vallée-Jonction, QC and I worked with my parents at Transport Dercy Inc, in Beauceville, QC.
7. Both of us had the goal of taking over the family business.
8. Tommy had a harder time working with his father due to their toxic relationship at work, which made him uncertain about his career plans.
9. In March 2021, we decided that we needed to take a break and review our plans together.

10. Tommy didn't think he was capable of taking over his father's family business alone.

11. For my part, I was working with my family, but at that point, I didn't yet have any sentimental attachment to the business.

12. So, I offered Tommy the chance to take over his father's family business with him.

13. Tommy and I discussed it with my parents, as my plan was to continue working with them, and at the same time to work with Tommy and his family, to learn their way of working and their work ethic.

14. The goal was for me to take over the accounting for both family businesses, and he would have been in charge of operations at his father's company.

15. Everything could have worked out. With my parents, I showed them how it could have been possible, and they were ready to let me try and make the choice I wanted if the time ever came to lean more towards one of the two family businesses if the workload became too high.

16. After discussions, we had decided to take a weekend away from family, friends and work to reconnect, the two of us, and make a decision for our future.

17. In conclusion, Tommy had decided not to take over his father's family business, mentioning his lack of desire to work with his father as well as in excavation, as he no longer had any interest in this profession.

18. Not knowing what he wanted, I was still confident that he would find a new career in which he would be happy.

19. Following his decision not to continue towards the succession of his father's family business, I simply continued to work with my family with the aim of taking over the trucking business.

20. One evening, we were having dinner at my parents' house and discussing the life decisions we had made for ourselves.

21. During the discussion, the topic came up about everyone's interest in moving to the United States, how much we would like to have more opportunities and

my father mentioned that he had always wanted to start a business in the United States, and Tommy mentioned that his father had also always made comments about how much easier life would be if the state of Quebec was part of the United States, and that they were American.

22. Later that evening, on the way back home, Tommy and I were discussing the real potential possibility of moving to the United States, because even though it was lighthearted, we knew that we had the opportunity due to several of my parents' business connections.

23. We decided to take a moment to ask my parents and see if there was any possibility they could help us achieve our goal, and from there began our planning to relocate to the United States.

24. My parents had connections at the professional level as well as at the immigration level, so we began the process of starting a business.

25. As a new married couple, excited to undertake our new dream together, to achieve our goal and raise our family in the United States, we were happy together and eager to try and see if we could succeed.

26. In April 2021, when the company was officially established, Tommy and I began the visa application process.

27. Now it's time for my husband, our daughters and I to move towards a better future.

28. In November 2022, we went to the embassy and had successfully completed the first major step of the process. We officially had our work visa!

29. On December 27, 2022, we officially moved to Haverhill, Massachusetts to an apartment offered at my parents' expense while we settled in the United States and got to know the place.

30. We had kept our house in Canada, and therefore our mortgage, and my parents had offered to pay for the apartment for the first year, so that we would have the chance to put money aside, give us time to explore the surrounding cities, neighborhoods, schools and build relationships within the

community in order to settle in an environment that we would choose and be comfortable with our family.

31. In addition, my father wanted us to keep our house in Vallée-Jonction, because we had no idea if the business would be successful and in the case of failure, he did not want us to have to return to Canada and start all over again.

32. This gave us a certain security and peace of mind.

33. In January 2023, we started working in the US, the children started daycare at Michelle MacArthur's daycare (owner), and we were super excited about our new life.

34. In January, we had 1 truck and a storage yard.

35. I go to meet several new potential clients, Tommy takes care of the yard and transport, we acquire a second truck, hire our first employee in March, our clientele increases and so does the demand.

36. In May 2023, seeing the growth as well as the demand we have at the business level, Tommy and I decide to sell the house in Canada and start looking to buy a house in Massachusetts by the end of the year, because we love our life and we are achieving our goals.

37. We announced to our family that we are selling our house in Canada.

38. My family is happy for us. My father is a little stressed, because he wants us to be sure of our choice, but is happy that we love and support our choices whatever they are.

39. For their part, his family doesn't really have a reaction; they're happy that we're happy, but nothing more.

40. We sold our house in Vallée-Jonction, QC on May 12, 2023.

41. We packed all of our furniture and belongings from our house in Canada with the help of family and friends, who helped us load everything into a shipping container.

42. We took the shipping container to the US and it remained at the business yard (in Salisbury, MA) until we purchased a home.

Affidavit of Respondent                                              Page 4 of 10

43.  On September 8, 2023, we closed on our new condominium in Salisbury.

44.  We unloaded the shipping container and moved all of our furniture and belongings into our new home in Salisbury and finally felt settled.

45.  At the end of 2023, we're extremely proud of our progress. In just one year, we now have three trucks and two full-time employees. The company is growing, and we're proud of our success and achievements.

46.  The children are already bilingual, we bought our house in Salisbury, the girls love their daycare and friends, we are lucky to be well surrounded, to have new friends and we feel supported by everyone.

47.  We feel included and very welcome by our new friends, acquaintances, employees, customers, babysitters, and neighbors.

48.  We are invited to several occasions (children's parties, family/friends events) and our new friends really care about our inclusion and want to introduce us to more people to expand our circle of acquaintances in the surrounding area.

49.  We visit Tommy's family frequently in Canada on weekends and during our holidays, because they want to see our children, they rarely come to visit us in Salisbury.

50.  My family comes to visit us frequently in Salisbury and sometimes when we are in Canada, we go to visit them.

51.  Traveling to Canada is becoming more and more tiring, because of the routine and the children, it takes a lot of time and we therefore have less time for ourselves.

52.  Tommy wants to visit his family, and for my part I am starting to get tired of always having to make the effort and being forced to travel so that his family can see our children, but in return, the effort is less on their end.

53.  We leave on Fridays and arrive late in Canada and come back on Sundays from Canada and arrive after dinner time in Salisbury. No time to take care of the house, the grocery and our family as well as our relationship.

54.  I continue to do it for him and his family, but ask if it is possible that we go there a little less often and try to take some quality time for ourselves.

55. In March 2024, we are going to spend the weekend in Canada, Tommy's sister is about to give birth, we are excited about the arrival of our nephew.

56. On Saturday, Tommy's mother, the girls and I are going sliding, while Tommy and his father go away for the afternoon. On Sunday we have a sugar shack lunch with his family and then we head home.

57. When we arrive in Salisbury, I feel that Tommy seems in his mind and I feel like we should talk because he looks like there is something bothering him.

58. He doesn't talk to me and is very cold. So we sit in the living room and I ask him what's going on. He tells me that his father confided in him that he had no successor, that he was worried about being forced to sell to strangers and therefore had offered to let Tommy come back and sell us the business without fees or interest.

59. Tommy is taken by feelings, even though he had mentioned that he no longer wanted to work in the excavation industry.

60. I don't really understand his intentions. Tommy bragged to everyone how great the United States was and that he would never go back to Canada and in one weekend he became unsure due to the persuasion and persistence of his family, pulling at his heart strings and manipulating him emotionally.

61. I asked him what his plan is. He has none, I tell him about my unwillingness to abandon everything we have achieved so far and start all over again from scratch in an industry he doesn't really want to be a part of. As if that is his real desire, we must find a way to make everything work and both be happy.

62. He asks me to give up the business in Salisbury, terminate it and return to Canada without plans for our family or our future and without any certainty that this is really what he wants.

63. He tells me that he is not sure that he really wants to take over his father's business, but would perhaps like to start his own business and buy his own truck and low-bed trailer to transport machinery. I encourage him in his plans and am even willing to contact Wyatt Pepe, one of our acquaintances

who does this type of transport, so that Tommy can discuss it with him and see what opportunities he could offer him.

64. Tommy tells me that he does not know exactly where he stands, but that he will think about it. We had always said that if the business did not work as planned, that we would be willing to return to Canada and review our plans.

65. Now that the business is established very successfully and he is asking me to give up everything, I don't understand.

66. At the end of April or beginning of May 2024, we took steps to clear the Canadian vehicle through customs of the United States and then register it in Massachusetts.

67. Then the summer passed, several friends and family members came to visit us in Salisbury, we went to visit his family in Canada again, but the subject of acquiring his father's company did not come back on the table.

68. The company in Massachusetts continues to grow, we are acquiring more trucks, new storage yards, we now have more employees and owner-operators, we are motivated and have several motivating factors.

69. On August 5, 2024, we enroll M███ in Pre-School, with the goal that she begins attending the school system a little before entering kindergarten in September 2025.

70. On August 19, 2024, we have a talk, because he still mentions his interest in having a truck and a low-bed, but now tells me that if he buys that it is in Canada and nowhere else.

71. We discuss and come to the conclusion that he will take a week for himself, to go to Canada and see if his project is viable. That afterwards, depending on what comes out, we will find a solution to adjust, that we will stay in Salisbury, but if he goes to work in Canada for the week and comes back on the weekend, it could work, as I could go join him on the weekend with the girls in Canada as well.

72. We had to find a plan, and I was still confident that we could make it work. For his part, he didn't really know and didn't talk to me. He was very silent.

Affidavit of Respondent

73. I mention to him that it is not my real desire to live separately during the week, but that I am also not opposed to the idea if it makes him happy. We both have family doing this and they both have beautiful families and it seems to be working, so I'm willing to give it a try.

74. On August 20, 2024, I entered the house, with difficulty, because all the interior and exterior doors were locked. When I finally open the kitchen door, all his house keys, post office keys, personal belongings related to the company (fuel card, truck keys, forklift keys, office keys, yard keys) are on the counter and he is gone.

75. I am surprised, because he had never come up with the subject that he was officially leaving. It was supposed to be only for the week.

76. He left with almost all his clothes, coats, as well as several tax papers, but I didn't notice anything until the following Saturday, because I was convinced he was still coming back.

77. On August 24, 2024, I received a call from a member of his family to tell me how sorry she was, that she had learned that Tommy and I were getting divorced and that she hoped the girls and I were doing well. That they were thinking of us a lot and love us very much.

78. Stunned by this news, not really knowing where this information came from and why we had reached this point, I called Tommy.

79. The whole week that he was in Canada, he had talked to me normally and never let show anything. At that point, on the phone, he didn't say much, just that rather than coming back and discussing our future and new plans like we had agreed, he would tell me later when he would come back, and that he would gather his things and leave on the same day.

80. I was so upset, and in such incomprehension.

81. On August 26, he arrives home with his father and a trailer and collects all his personal belongings. He mentions that he's leaving before the end of the day, and I ask him again if he can stay so we can talk, alone, without his

father... and also to see M████, because all last week she'd been asking me where her father was and when he was coming back.

82. I wanted her to be able to see him and for me to have a chance to talk with him to understand what was happening and still try to find a solution for us.

83. We picked up M████ and M██████ from daycare. The evening passed, he remained very silent, giving only a few answers to my questions. The next day, he picks up his backpack, hugs me while crying, wishes the girls a good day, and leaves on his motorcycle to return to Canada.

84. I understand that our chances are nonexistent. He abandoned everything, and even if I have been trying hard to find solutions, he is not willing to do the same.

85. Therefore, our marriage will never see this through, because he decides to walk away instead of talking to me.

86. I knew things were over, so I found an attorney and filed for divorce on September 4, 2024.

87. We've settled here, we enjoy our life here, the girls enjoy their life here, and I'll do anything to always offer them the best and help them open doors and opportunities in their lives.

88. The company is a resounding success, having doubled its expected turnover in the second year. Our efforts paid off and we were so proud of it.

89. We worked really hard to achieve our goal and are succeeding, but I resent that it is still not enough for him.

90. He has no answers for me, and tries really hard to have me terminate the business on the grounds that his mom now has Alzheimer's and his dad could die from a heart attack at any time because he is very not healthy and he wants to be beside them.

91. Making up lies about his parents' health, made it obvious to me that he was being delusional, that he had no plans, but was willing to try everything, even lying to me.

92.   His alcoholism was also part of our marriage, and always has been. After having M███, he created an incident while drinking while living in Canada and I agreed to support him and stay beside him, for our daughter, but that I was not agreeing to it and he had to get this fixed.

93.   He did better for a couple months and got back into it, making it hard for our family. Again, since we had kids and were married, it was my obligation to support him in trying to fix it.

94.   Many things happened due to it, with family, friends and even at work and he was now lying to me about his drinking, thinking I would not know.

95.   It was really not easy, and I mentioned that it was the last chance I was giving him. That our girls did not deserve this life, I had an alcoholic grandfather that I never really had the chance to know because of that, and I did not want a life like that.

96.   Through much coaxing from his parents to return into QC, Tommy had a hard time prioritizing his family values. They didn't support him, or us being here.

97.   One day, I came back home, everything was gone, here I was with the girls with no attempts to resolve.

98.   Since he has been gone, never have I refused any phone calls, Facetime calls or for him to see the girls. I even encouraged him to call them, because he was not very involved in their life.

99.   He walked away and left us behind, did not offer any financial assistance or in any way to take care of his children until the court ordered him to do so.

Signed under the penalties of perjury this 24th day of March, 2025.

*Stacy Tardif*
Stacy Tardif (Mar 24, 2025 13:04 EDT)

Stacy Tardif

# Affidavit v3

Final Audit Report                                                    2025-03-24

| | |
|---|---|
| Created: | 2025-03-24 |
| By: | Brian Waller (brian@turcolegal.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAA6ZogLmp4nb44eW5xxmpncg2xXpkgS4Iw |

## "Affidavit v3" History

📄 Document created by Brian Waller (brian@turcolegal.com)
   2025-03-24 – 4:27:23 PM GMT

📧 Document emailed to tard2096@gmail.com for signature
   2025-03-24 – 4:27:57 PM GMT

📄 Email viewed by tard2096@gmail.com
   2025-03-24 – 4:39:43 PM GMT

✒️ Signer tard2096@gmail.com entered name at signing as Stacy Tardif
   2025-03-24 – 5:04:46 PM GMT

✒️ Document e-signed by Stacy Tardif (tard2096@gmail.com)
   Signature Date: 2025-03-24 - 5:04:48 PM GMT - Time Source: server

✅ Agreement completed.
   2025-03-24 – 5:04:48 PM GMT

 Powered by
Adobe
Acrobat Sign

UNITED STATES DISTRICT COURT
For The
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 1:25-CV-10468-IT

TOMMY GIGUERE,
          Petitioner

v.

STACY TARDIF,
          Respondent

## PETITIONER'S OPPOSITION TO RESPONDENT'S MOTION TO DISMISS

### I.    OVERVIEW.

Now comes the Petitioner, Tommy Giguere ("Father") and respectfully requests that this Honorable Court deny the Respondent, Stacy Tardif's ("Mother's") Motion to Dismiss for lack of subject matter jurisdiction and failure to state a claim upon which relief may be granted (Federal Rules Civ. Pro. 12(b)(1) and 12(b)(6)).

### II.    STANDARD FOR MOTION TO DISMISS.

"While a complaint attacked by a ... motion to dismiss does not need detailed factual allegations ... a plaintiff's obligation to provide the `grounds' of his `entitle[ment] to relief' requires more than labels and conclusions .... Factual allegations must be enough to raise a right to relief above the speculative level ... [based] on the assumption that all the allegations in the complaint are true (even if

**Page 1 of 9**

doubtful in fact)...." *Bell Atlantic Corp. v. Twombly,* 127 S.Ct 1955, 1964-1965 (2007). What is required at the pleading stage are factual "allegations plausibly suggesting (not merely consistent with)" an entitlement to relief, in order to "reflect[] the threshold requirement of [Fed. R. Civ. P.] 8(a)(2) that the `plain statement' possess enough heft to `sho[w] that the pleader is entitled to relief.'" *Id.* at 1966.

## A. Failure to State A Claim Upon Which Relief May be Granted.

The Mother's motion is premised on the faulty conclusion that the mere temporary relocation to explore a business opportunity constitutes an automatic abandonment of the family's Habitual Residence in Québec in favor of a new one in Massachusetts. That is just not an accurate reflection of the law.

The issue of Habitual Residence is a mixed question of fact and law which needs to be considered on a case-by-case basis, in view of the totality of the circumstances. *Monasky v. Taglieri*, 140 S.Ct.719 (2020). Father, admittedly, did not include all of the applicable details of the family's situation in his complaint, but he is not required to do so as additional evidence is gleaned during the discovery process and presented at an evidentiary hearing. To survive a motion to dismiss, Father need only state sufficient factual allegations in his complaint to plausibly suggest his statements possess enough heft to show he is entitled to relief. Father's complaint, on its face, addresses each of the requisite elements of a wrongful retention as defined in the Hague Convention applied to the facts of this case. Father's complaint is verified

and he also provided a sworn statement (Exhibit 5 to Father's Hague Petition) with certain back up documents reflecting many facts which support his assertion that Québec remains the habitual residence of the parties and their children including, but not limited to:

1. Both parties maintain their Québec driver's licenses and Father even renewed his on November 22, 2023 some eleven months after temporarily relocating to Massachusetts (Hague Petition Exhibit 5);

2. Both parties maintain an address in Québec to which they returned regularly until August, 2024 when Mother essentially stopped returning and Father resumed living as a full-time home.  The parties continue to receive mail at their Québec address including statements from their Québec banks (Hague Petition Exhibit 5) and their Québec voter ballots for the upcoming national election;

3. As recently as July 25, 2024 Mother was depositing her paycheck into her bank account in Québec (Hague Petition Exhibit 5);

4. The children continue to have Québec health insurance;

5. The children continue to be patients at their Québec pediatrician's office including receiving multiple vaccinations at that office after their temporary relocation to Massachusetts (Hague Petition Exhibit 5)[1];

---

[1] Father acknowledges the children also have a pediatrician in Massachusetts.

6.  The Parties and Children, all Canadian citizens, temporarily entered the USA on E2 Visas which have to be renewed every two years and carry maximum of 5 year duration, and which requires a signed attestation that the relocation is only temporary; and

7.  The children have routinely traveled home to Québec between their arrival on their temporary E2 Visas in December, 2022 and August, 2024 when the Father contends the wrongful retention began (Hague Petition Exhibits 5 and 6). Indeed, it was the rare occasion when the family did not return to Québec in a given month and in many months, they traveled back and forth between Québec and Massachusetts multiple times.

All of the above facts, among others, support Father's reasonable belief that the family did not change their habitual residence during their temporary stay in Massachusetts while they helped Mother's parents launch a business endeavor. Father acknowledges there are factors which point in both directions. However, given that these are young children, who are not yet in school and whose lives and ability to acclimate are directly linked to their parents' decision making, the parties' actions and agreements in this case are particularly relevant to the habitual residence inquiry. "Because children, especially those too young or otherwise unable to acclimate, depend on their parents as caregivers, the intentions and circumstances of caregiving

parents are relevant considerations.  No single fact, however, is dispositive across all cases." *Monasky,* at 727.

Father plead sufficient facts in his Hague Petition to meet the other Convention requirements including that under Québec law the parties have joint rights of custody of their children, that the parties had been living together as a family with their children in Québec, and later temporarily in Massachusetts, which arrangement continued until August, 2024 when the initial wrongful retention occurred making clear that Father had been exercising his custodial rights.  All of these facts, taken as a whole, contain sufficient heft to show Father is entitled to relief under the Hague Convention.

Father does not agree with Mother's claim that Québec does not have jurisdiction to make custody orders if the children are returned.  Such a claim by Mother certainly does not warrant a dismissal of Father's Hague Petition.  But, even if Mother's claim were sufficient grounds to dismiss this case, Mother's is an inaccurate summary of Québec law.  Indeed, Article 3142 of the Civil Code of Québec foresees that Québec authorities have jurisdiction to decide as to the custody of a child, provided he is domiciled (i.e. habitually residing) in Québec.  At bar, since their birth, the children have been domiciled in Québec. In order for Québec to decline jurisdiction, the Mother would have to convince the court that the children have acquired a domicile elsewhere. The process of the acquisition of a new domicile

involves two factors in Québec, – (a) the acquisition of residence in fact in a new place and (b) the intention of permanently settling there.  The very nature of the temporary USA E2 Visa, debunks any notion that there was an intention of settling in the USA permanently.  Furthermore, there is no strict rule in Québec that after a certain time outside of Québec your domicile or habitual residence is lost. Therefore, the habitual residence of the children remains in Québec.

Even in cases where the children are not domiciled yet in Québec but do reside or are present there, the court can take jurisdiction under different articles of the Civil Code including the following:

- **3136.** Even though a Québec authority has no jurisdiction to hear a dispute, it may nevertheless hear it provided the dispute has a sufficient connection with Québec, if proceedings abroad prove impossible or the institution of proceedings abroad cannot reasonably be required.

- **3138.** A Québec authority may order provisional or conservatory measures even if it has no jurisdiction over the merits of the dispute.

- **3140.** In cases of emergency or serious inconvenience, Québec authorities may also take such measures as they consider necessary for the protection of a person present in Québec or of the person's property if it is situated there.

While Father acknowledges the Québec Court might not have jurisdiction for a divorce case between the two parents at this juncture, the Courts would have

jurisdiction if the Father was to file an Application for "separation from bed and board" (much like a Complaint for Separate Support provided for in Massachusetts law) and could ask the court to decide of the custody as an accessory to the separation.  To that end, Québec Civil Code Section 3146 provides that Québec authorities have jurisdiction to rule on separation from bed and board when one of the spouses has his domicile or residence in Québec at the time of the institution of the proceedings.

### B. Subject Matter Jurisdiction.

The International Child Abduction Remedies Act ("ICARA), 42 USC 11601 et seq. specifically provides the "courts of the States and the United States district courts shall have concurrent original jurisdiction of actions arising under the Convention." 42 USC 11603.  This Federal regulation places subject matter jurisdiction squarely in the hands of this court.  Father acknowledges he had the right to file his petition in State court but, for a host of reasons, elected not to do so.

There is no requirement that Father file his Hague Petition in State court if there is a pending divorce in state court even if that pending divorce has a custody provision.  Here, the State court divorce action is only in the discovery stage.  Upon information and belief, the US Central Authority sent an Article 16 letter to the divorce judge shortly after Father filed his Hague Petition which should have the effect of staying the child custody portion of the divorce action during the pendency

of this matter in favor of the Hague action moving forward.  Furthermore, to bring the issue of the stay to the attention of the divorce judge, on March 14, 2024, Father's divorce counsel also filed a motion to stay the custody portion of the divorce action which motion is scheduled for hearing on April 24, 2025.  Assuming the custody portion of the divorce action is stayed pending the outcome of this matter, Father's Hague Petition should then be set down for expedited proceedings in order to determine whether the custody dispute should be addressed by the Quebec courts or if the stay of the Massachusetts divorce should be lifted.

### C. Mother's Request for Fees.

Mother acknowledges nothing in the Hague Convention or ICARA entitled Mother to an award for counsel fees in this matter.  Mother cites to Massachusetts State court authority in her bid for an award of legal fees.  In the event Mother is successful in having Father's complaint dismissed, she has the right to bring her request for fees in connection with the divorce action.  Her request for fees in this court should be denied.

### III.    CONCLUSION.

For all of the foregoing reasons, Mother's Motion to Dismiss should be denied along with Mother's request for fees.

Date: April 7, 2025

Respectfully submitted,
**TOMMY GIGUERE**,
By his attorneys,

By: *Wendy O. Hickey*
Wendy O. Hickey, BBO #657457
Brick, Jones, McBrien & Hickey LLP
250 First Avenue, Suite 201
Needham, MA  02494
P: (617) 494-1227
whickey@brickjones.com

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing Opposition to Motion to Dismiss was electronically served on counsel for the respondent, Stacy Tardiff, at his email of record being brian@turcolegal.com on this 7th day of April, 2025.

*Wendy O. Hickey*

UNITED STATES DISTRICT COURT
For The
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 1:25-CV-10468-IT

TOMMY GIGUERE,
       Petitioner

v.

STACY TARDIF,
       Respondent

## PETITIONER'S AFFIDAVIT IN SUPPORT OF OPPOSITION TO RESPONDENT'S MOTION TO DISMISS

I, the undersigned, Tommy Giguere, of my own personal knowledge, on oath depose and state as follows:

1. I am married to the Respondent, Stacy Tardiff ("Stacy").

2. Stacy and I have two (2) children together, MG1 and MG2.

3. Stacy and I were both born in Saint-Georges, Quebec (QC), Canada.

4. On October 16, 2021, Stacy and I were married in Saint-Benoit-Labre, a city neighboring Saint-Georges, QC, Canada.

5. Our children were born in Saint-Georges, QC Canada on April XX, 2020 and April XX, 2022, respectively.

6. Since the beginning of our relationship, through the birth of our children and our marriage, Stacy and I have always lived in Vallée-Jonction, QC, Canada.

7. I worked with my father at Gravière Giguère, a family excavation company located in Vallée-Jonction, QC.  My father and I had different points of view regarding the future of the business, but have worked well together and continue to work well together as I now working for him again.

**Page 1 of 8**

8.  Stacy previously worked with her parents at Transport Dercy, Inc. in Beauceville, QC.

9.  Around July 2021, Stacy informed me of her parents' intention to launch a transport business in the United States.

10. Following this notification, Stacy and I had a lighthearted and hypothetical conversation about what it would be like to move to the United States temporarily to help launch the business with Stacy's parents.

11. I did not at the time and never did in the future have a goal, desire or plan to live permanently in the United States. Our family would talk about how it would be fun and convenient to be able to cross the border more easily for vacations, but we never had any intention to be American.

12. Stacy and I ultimately agreed to move to the United States temporarily and were excited about this new life experience that was, in our minds at the time, more akin to the excitement of going on a vacation to a new locale rather than a permanent move.

13. We decided to take part in launching the project and applied for a non-immigrant visa e2 in 2022, the maximum length of which is five (5) years, with mandatory renewal of the i94 admission numbers every two (2) years, forcing us to leave the US territory at the end of the two (2) years in order to renew the i94 admission numbers, should we wish to extend our stay.

14. As such, prior to our departure, Stacy and I agreed that the children and ourselves would return to Canada at the latest at the end of the five (5) year stay but that we would have a further discussion at the two year visa renewal time. However, it was also agreed upon that we would return to Canada sooner should one of us request it, for any reason whatsoever. Stacy now tries to position this agreement to return to Canada as being limited to whether

the business opportunity was successful or not, but our agreement always extended personal dissatisfaction with the temporary arrangement in the United States as well.

15. In addition to the clear agreement between Stacy and myself that our stay would be temporary, the issuance of ours and the children's visas were conditional on provision of proof of our intention to depart at the end of the duration we were legally authorized to stay.

16. On November 11, 2022, we entered the United States and obtained our i94 numbers, which were to expire on November 10, 2024.

17. We initially lived in Haverhill, Massachusetts in an apartment paid for by Stacy's parents. Stacy's parents agreed to cover this cost for a period of one year. Stacy's parents had a room in our apartment, from which they came and went as they wished, at times without any advance notice to myself or Stacy.

18. We retained our home in Canada and returned frequently to visit family and friends, often timing those meetups with business travel to minimize expense.

19. In January 2023, MG1 began attending daycare part-time, spending two days per week with me.

20. As soon as March 2023, I voiced my wish that the children, Stacy and I return to Canada as our living situation was making it impossible for me to remain in Massachusetts.

21. Stacy's parents lack of regard for myself and our family space in the apartment they provided (by imposing their presence and opinions), made me feel isolated.

22. Following discussion with Stacy, I accepted that we would remain in Massachusetts until the expiration of our i94 admission numbers in November 2024, conditional to us moving into an apartment over which her parents would have no rights and where they could not impose their presence.

23. Following multiple searches, we came to the conclusion that the apartment rental market was very high, making renting a financially bad decision.

24. Although our stay was only to be temporary, we decided to purchase a house in Salisbury, MA, as this would enable us to take advantage of an expected increase in the residential property market when the time would come to sell upon our return to Canada in November 2024.

25. In May 2023, we sold our house in Canada, as Stacy's parents soon would no longer cover our rent in Massachusetts, and we could not afford our mortgage in Canada and additional housing costs in Massachusetts at the same time.

26. Upon the sale of our house in Canada, we packed our belongings, had them shipped to the United States, and stored them in a shipping container in the business yard of Stacy's parents' business. The business covered the storage and shipping costs for us, and we reasoned that, whether we rented or purchased a home in Massachusetts, we wanted our belongings nearby to avoid having to purchase duplicate items. We still were not planning to be in Massachusetts for longer than a year, but needed our belongings in the interim, particularly given the financial strain of potential repurchase.

27. In speaking with friends, I acknowledged that there were positives to living in the United States, but I never said that I didn't want to return to Canada. In fact, I frequently noted that my friends and family in Canada were missing me, and I was missing them.

28. During our time in Massachusetts, we have developed few close relationships, with most of our contact related to work.

29. Although my car was registered in Massachusetts, this was done solely to avoid being ticketed as Stacy warned me would be the case if the police noticed that the car was there for

over a month. I continue to maintain my driver's license in Canada and motorcycle registration in Canada. Stacy has maintained her Canadian driver's license as well.

30. We are registered to vote in Canada and, as recently as this week, received our voter ballots for the upcoming election.

31. Stacy and I enrolled MG1 in Milestones Childcare on August 4, 2024, before Stacy filed for divorce, because her prior daycare was no longer available and I recognized that MG1 would need childcare between August and November 2024 when we returned to Canada.

32. On February 12, 2024, Stacy and I got into an explosive conflict with Stacy's parents. Stacy's mother told us that she had control over our income, our presence in the United States, and that we belong to her. Stacy was crying and stated that she was ready to come back to Canada as her mother's behavior was unacceptable.

33. In March 2024, Stacy and I traveled with the children to Canada to spend time with my family. On the drive back from Canada, Stacy and I discussed my desire to return to Canada. I had spoken to my father about our return to Canada after the fight with Stacy's mother. My father reiterated that I could join him in the family business and ultimately take it over, but I made clear that was not my intention, though I appreciated his offer.

34. The plan I proposed with respect to returning to Canda had been that Stacy would work remotely for her parents' business. She would have the ability to continue to work for her parents' business while we lived in Canada. We had agreed to help start her parents' business, but we were not owners and there had been no concrete plan about purchasing it or having it transferred to us by her parents and her uncle. I had planned to return to Canada to start my own business and to be closer to family. What Stacy characterizes as our joint plan to remain in Massachusetts is simply untrue.

35. Further, Stacy seems to suggest that because the business was experiencing success that was a reason to stay beyond the timeframe to which we had committed. What Stacy does not underscore is that the business was not ours and, notwithstanding any purported success of the business, Stacy and I were struggling to pay our bills each month such that remaining in Massachusetts would not be financially sustainable for us.

36. We had further discussions about our return to Canada in August 2024. Stacy suggested that I take a week for myself to go to Canada and see if my business venture would be viable. She wanted to stay in Massachusetts and have me travel back and forth from Canada to Massachusetts to spend time with the family on weekends. I was not in agreement with this proposal. It did not make sense to me, particularly where there was more opportunity for our family in Canada where the cost of living is lower, we have the support of extended family and friends, we have the ability to receive government support to help defray child-related expenses, and we have permanent status as Canadian citizens (as opposed to temporary visas in the United States without any guarantee of being able to live there permanently, even if we wanted to, which I did not).

37. On August 20, 2024, I left our house in Massachusetts with the intent to come back and honor the agreement Stacy and I had reached about remaining in Massachusetts until November 2024. When I left, I took my house key with me but left her all the business-related items as I would not need them in Canada. Though I was planning to return to Massachusetts, I did want to actively plan for our return to Canada in the next few months and thus took some personal items with me as well.

38. On August 23, 2024, without any advance notice to me, Stacy withdrew approximately $10,000 from our joint account in Canada and deposited it into her personal Canadian bank

account. This action on Stacy's part indicated to me that our partnership was ending, and I needed to take more affirmative steps to ensure the children's return to Canada.

39. The following day, August 24, 2024, Stacy relayed to me a phone call she received from a member of my family about Stacy and me divorcing. I let Stacy know that some people had asked why I was in Canada without our family, and I shared that we were having some issues. I did not mention divorce to my family, but miscommunication in repeating the conversation appeared to have resulted in Stacy getting the wrong message.

40. When I returned to our house in Massachusetts on August 26, 2024, Stacy had packed my belongings and left them in the garage. Though there was evident tension between me and Stacy, I was anxious to see and spend time with our children.

41. That evening, I asked Stacy about the funds she withdrew from our joint account. Her response was that it was her money and there was nothing to argue about. When I left Massachusetts on August 27, 2024, Stacy was to return to Canada with the children on Friday, August 30, 2024 for the weekend. Stacy called me on August 28, 2024 to advise me she would not be honoring that plan.

42. I have consistently shared my desire for us to return to Canada, as was our plan from the outset. I shared with Stacy, as one example, that I didn't want to wait until my parents are in poor health to return but instead to return now while we can enjoy this time with family. Stacy has now spun this to say that I lied about my parents' health, which is not the case.

43. Stacy has also resorted to fabricating allegations of alcoholism. I have never had an issue with drinking. I drink beer on occasion and very rarely drink wine or spirits. This purported concern was not raised previously, and, in fact, Stacy had no problem with my parenting the children independently, driving with them to Canada, and spending overnights with them nor did she take issue with my driving the commercial vehicle for her parents' business. I

worry that Stacy is willing to say anything to keep the girls in Massachusetts and away from me.

Signed under the pains and penalties of perjury this 4 day of April, 2025.

> *Tommy Giguere*
> ID 3QCDRR/D9x3pthUG82CWQ1ox

Tommy Giguere

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Petitioner's Affidavit in Support of Opposition to Motion to Dismiss was electronically served on counsel for the respondent, Stacy Tardiff, at his email of record being brian@turcolegal.com on this 7 day of April, 2025.

*Wendy O. Hickey*

**Page 8 of 8**

# eSignature Details

**Signer ID:**         **3QCDRRfD9x3pthUG82CWQ1ox**
Signed by:            Tommy Giguere
Sent to email:        tommgiguere1991@gmail.com
IP Address:           207.134.122.26
Signed at:            Apr 4 2025, 1:25 pm EDT

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

TOMMY GIGUÈRE,                           *
                                         *
        Petitioner,                      *
                                         *
        v.                               *          Civil Action No. 1:25-cv-10468-IT
                                         *
STACEY TARDIF,                           *
                                         *
        Respondent.                      *
                                         *

MEMORANDUM & ORDER

May 5, 2025

TALWANI, D.J.

Petitioner Tommy Giguere filed this matter against Respondent Stacy Tardif pursuant to

the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980,

T.I.A.S. No. 11,670, 1343 U.N.T.S. 89 ("Hague Convention"), and the International Child

Abduction Remedies Act ("ICARA"), 22 U.S.C. §§ 9001–11, which implements the Hague

Convention. Pending before the court are Giguere's Motion to Restrain Respondent from

Registering the Parties' Child for School in Massachusetts [Doc. No. 7] and Tardif's Motion to

Dismiss the Verified Complaint [Doc. No. 8] for lack of subject matter jurisdiction and failure to

state a claim.

## I.      Motion to Dismiss for Lack of Subject Matter Jurisdiction

"Federal courts are obliged to resolve questions pertaining to subject-matter jurisdiction

before addressing the merits of a case." Acosta-Ramirez v. Banco Popular de Puerto Rico, 712

F.3d 14, 18 (1st Cir. 2013). Giguere asserts jurisdiction based on the Hague Convention, to

which the United States and Canada are both signatories, and which applies "to any child who

was habitually resident in a Contracting State immediately before any breach of custody or

access rights[,]" Hague Convention, art. 4; and ICARA, which provides that "[t]he courts of the States and the United States district courts shall have concurrent original jurisdiction of actions arising under the [Hague] Convention[,]" 42 U.S.C. § 11603(a). Giguere asserts that he is entitled to relief under the Hague Convention because "the Parties temporarily relocated to Massachusetts in 2022," at which time "the habitual residence of the Parties and their two [children] was Quebec, Canada," and the children "were wrongfully retained by [Tardif] in Massachusetts without [Giguere's] consent" on or about August 28, 2024. Compl. ¶¶ 1.5–1.6 [Doc. No. 1].

Tardif challenges the court's subject matter jurisdiction first on the ground that "there has been no 'wrongful removal' or 'wrongful retention,' and therefore, neither the Hague Convention nor ICARA applies[.]" Mot. to Dismiss at 6 [Doc. No. 8]; see also Respondent's Aff. [Doc. No. 8-1]. These arguments (and evidence) as to the children's habitual residence go to the merits (or lack of merit) of Petitioner's claim, but do not undermine the court's subject matter jurisdiction to determine those merits. See Sánchez–Londoño v. Gonzalez, 752 F.3d 533, 539–40 (1st Cir. 2014) (setting forth elements of claim for return of children under Hague Convention).

Tardif also challenges the court's subject matter jurisdiction based on a divorce action she commenced in Massachusetts state court prior to the filing of the instant action; she characterizes the Complaint here as a collateral attack on the state court's jurisdiction. Mot. to Dismiss at 12–15 [Doc. No. 8]. She argues further that a Quebec court would not have jurisdiction over child custody determinations in Massachusetts. Id. at 15–17.

The divorce proceedings have no bearing on this court's subject matter jurisdiction. The parties' domestic disputes are not before this court. And neither a state proceeding concerning child custody in Massachusetts nor the asserted lack of jurisdiction of a Quebec court is a bar to

this court's jurisdiction. Indeed, "a decision relating to custody [that] has been given in or is entitled to recognition in the requested State shall not be a ground for refusing to return a child under [the Hague] Convention." Hague Convention, art. 17.

Tardif has identified no authority requiring that a petition under the Hague Convention be filed in state court if a divorce action is pending there. Nor has she suggested that a duplicative petition under the Hague Convention has been filed.

Tardif's argument about the jurisdiction of Quebec courts is similarly unpersuasive. She argues that a divorce proceeding cannot lie in Canada because it must be initiated in a province where "either spouse has been habitually resident . . . for at least one year immediately preceding the commencement of the proceeding." Mot. to Dismiss at 15 (quoting Canada Divorce Act § 3(1)) [Doc. No. 8]. But that the parties may not be able to initiate divorce proceedings (or ancillary child custody proceedings) in Canada does not undermine this court's subject matter jurisdiction under the Hague Convention.

Tardif adds that the family is no longer subject to the Quebec Civil Code because it provides, for example, that "[c]hange of domicile is effected by a person establishing his residence in another place with the intention of making it his principal establishment. The proof of such intention results from the declarations of the person and from the circumstances of the case." Id. at 16 (quoting Quebec Civil Code § 76). Again, however, whether the family is subject to the Quebec Civil Code is not material to whether this court has subject matter jurisdiction over the dispute.

Accordingly, the court finds that it has subject matter jurisdiction over this matter arising under the Hague Convention. Tardif's motion to dismiss for lack of subject matter jurisdiction is DENIED.

II.     **Motion to Dismiss for Failure to State a Claim**

A.     **Standard of Review**

In evaluating a motion to dismiss for failure to state a claim, the court assumes "the truth of all well-pleaded facts" and draws "all reasonable inferences in the plaintiff's favor." Nisselson v. Lernout, 469 F.3d 143, 150 (1st Cir. 2006). To survive dismissal, a complaint must contain sufficient factual material to "state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations . . . [f]actual allegations must be enough to raise a right to relief above the speculative level . . . ." Id. at 555 (internal citations omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

"Exhibits attached to the complaint are properly considered part of the pleading for all purposes, including Rule 12(b)(6)." Trans-Spec Truck Service, Inc. v. Caterpillar Inc., 524 F.3d 315, 321 (1st Cir. 2008) (internal citations and quotations omitted). In ruling on a motion to dismiss, "a judge can mull over 'documents incorporated by reference in [the complaint], matters of public record, and other matters susceptible to judicial notice.'" Lydon v. Local 103, Int'l Bhd. of Elec. Workers, 770 F.3d 48, 53 (1st Cir. 2014) (quoting Giragosian v. Ryan, 547 F.3d 59, 65 (1st Cir. 2008)) (alteration in original). If other materials outside the pleadings are presented, the court may exclude such materials or may treat the motion as one for summary judgment, with all parties given a reasonable opportunity to present all the material that is pertinent to the motion. Fed. R. Civ. P. 12(d).

The court may not consider the Respondent's Affidavit [Doc. No. 8-1] on a motion to dismiss for failure to state a claim.

4

93

### B.    Facts as Alleged in the Complaint

Giguere alleges as follows:

Giguere and Tardif are the parents of two minor children who were born in Canada in April 2020 and April 2022, respectively, are Canadian citizens, and have Canadian passports. Compl. ¶¶ 4.2–4.4 [Doc. No. 1]. Giguere and Tardif were also born in Canada and married in October 2021. Id. ¶¶ 3.1, 3.2. The family lived together in Quebec, Canada, until December 27, 2022. Id. ¶¶ 3.1, 3.2, 4.1.

Around July 2021, Tardif informed Giguere of her parents' intention to launch a transport business in the United States. Id. ¶ 4.7. Giguere and Tardif decided to take part in launching the business. Id. In 2022, they applied for non-immigrant E-2 visas, which cover a maximum stay of five years and require visa holders to renew their I-94 admission numbers by leaving the United States at least every two years. Id. "The parties agreed that they and the [children] would return to Quebec, Canada[,] at the latest at the end of five (5) years. However, it was also agreed upon by the parties that the [children] would return to Quebec, Canada[,] sooner should one of the parties make such a request, for any reason whatsoever." Id. ¶ 4.8.

On December 27, 2022, Giguere, Tardif, and the children entered the United States on their E-2 visas. Id. ¶ 4.10. While in the United States, Giguere and Tardif have continued to hold Quebec-issued driver's licenses; the family maintains Quebec medical insurance cards and has traveled to Quebec for every long weekend and holiday during their time in Massachusetts. Id. ¶ 4.11. For their first nine months in the United States, the family lived in a Haverhill, Massachusetts apartment leased by Tardif's parents' company. Id.

Beginning in March 2023, Giguere voiced his wish that the family return to Canada. Id. ¶ 4.12. Giguere nonetheless agreed that he and the children would remain with Tardif in Massachusetts "until November, 2024[.]" Id. The couple sold their property in Canada and, in

September 2023, purchased and moved into a home in Salisbury, Massachusetts. Id. ¶¶ 4.11, 4.12 n.4. The sale and purchase of the homes was for financial reasons. Id.

Giguere communicated to Tardif multiple times, including on August 17, 19, and 27, 2024, that he wanted the children to return with him to Quebec. Id. ¶¶ 4.13, 4.14. On August 26, 2024, Giguere "moved back to Quebec, Canada . . . and expected [Tardif] and the [children] to join him in Quebec for Labor Day weekend." Id. ¶ 4.14. On August 28, 2024, Tardif informed Giguere "that she wanted to remain in the United States and that neither she nor the [children] would be returning to Quebec at that time." Id. Giguere contends that since then, Tardif has wrongfully retained their children in the United States, id. ¶ 5.1, and has "actively attempted to restrict [Giguere's] time with the [children] and limit the [children's] travel back to . . . Quebec, Canada[,]" id. ¶ 4.14.

In September 2024, Tardif initiated divorce proceedings in Massachusetts state court. Id. ¶ 4.15. Tardif only permitted Giguere to spend time with the children by entering into stipulations in September and November 2024 allowing Giguere "regular parenting time . . . every other weekend, one weekend in Canada and one in Massachusetts each month." Id. ¶¶ 4.15, 4.17. Giguere filed an answer and counterclaim in those proceedings seeking removal of the children to Quebec, Canada. Id. ¶ 4.16.

On November 2, 2024, without Giguere's consent, Tardif renewed the I-94 admission numbers for herself and the children. Id. ¶ 4.19.

On January 21, 2025, Giguere filed an Application under the Hague Convention to the Central Authority in Quebec, Canada, which was transmitted to the Central Authority in the United States on February 14, 2025. Id. ¶ 4.21; see generally Compl., Ex. 5 [Doc. Nos. 1-7, 1-8, 1-9, 1-10, 1-11, 1-12]. This Complaint followed.

C.    Discussion

"Removal [of a child] under the Hague Convention is only appropriate if the child is being retained in a country other than his or her place of habitual residence. . . . The question of habitual residence is a highly fact-specific inquiry that turns on the particular circumstances of each unique case. In discerning the parties' intentions, this court will look 'specifically to the last moment of the parents' shared intent.'" Mendez v. May, 778 F.3d 337, 344 (1st Cir. 2015) (citations omitted).

Giguere's position is that he and Tardif agreed upon a temporary relocation from Canada to Massachusetts and that Tardif's remaining with the children beyond the agreed-upon duration constitutes "wrongful retention" of the children in violation of the Hague Convention. See Compl. ¶¶ 5.1, 5.2 [Doc. No. 1]. Tardif argues the Complaint fails to state a claim because Giguere's actions are inconsistent with the conclusion that the children's place of habitual residence was Canada at the time of her alleged "wrongful retention," and so there could not have been a wrongful retention under the Hague Convention.

On a motion to dismiss for failure to state a claim, the court must take as true the facts alleged in the Complaint and must draw all reasonable inferences in Giguere's favor. See Nisselson, 469 F.3d at 150. Applying this standard, the court finds plausible Giguere's allegations that the family moved to Massachusetts for business purposes, and that both the parties' shared intent and the nature of their non-immigrant visas made this move temporary. Compl. ¶¶ 4.7, 4.8, 4.10 [Doc. No. 1]. Giguere plausibly alleges that, for financial reasons, they sold their home in Quebec and purchased one in Massachusetts rather than renting after the first nine months. Id. ¶¶ 4.11, 4.12 n.4. He plausibly alleges that, despite selling the house in Canada, the family maintains driver's licenses and medical insurance in Canada. Id. ¶ 4.11.

Tardif challenges these inferences. She characterizes the family's relocation to the United States not as "temporary" but "for an indefinite period of time." Mot. to Dismiss at 8 [Doc. No. 8]. She asserts that "the parties lived their life in Massachusetts for nearly two years before [Giguere] had a change of heart and returned, on his own, to Canada" and he "could not have had a realistic expectation that the rest of his family would abandon their home, life, and livelihood with no planning or preparation at a moment's notice as he demanded." Id. at 9. She asserts that because the sale of the Canada home and purchase of the Salisbury home occurred several months after Giguere began expressing his desire to return to Canada in March 2023, these transactions are inconsistent with his position that the relocation was temporary. Id.

But while Tardif's interpretations of the alleged facts are quite plausible, see Opp. to Mot. to Dismiss at 4 (Giguere "acknowledg[ing] there are factors which point in both directions") [Doc. No. 11], they raise questions of fact inappropriate for resolution on a motion to dismiss.

The court finds that Giguere has plausibly stated a claim for the return of his children from Massachusetts to Canada under the Hague Convention on the ground that they were habitual residents of Canada who have resided in Massachusetts only temporarily. These allegations may well be undermined once evidence is considered. He is, however, entitled to an opportunity to prove the merits of his claim with competent evidence, which Tardif may rebut with competent evidence at summary judgment or at trial. Tardif's motion to dismiss for failure to state a claim is DENIED.

### III.    Motion to Restrain

Giguere's <u>Motion to Restrain Respondent from Registering the Parties' Child for School in Massachusetts</u> [Doc. No. 7] seeks an order prohibiting Tardif from registering their older child for kindergarten in Salisbury, Massachusetts, for the upcoming school year "pending the

outcome of this action." Id. ¶ 1.1. The motion makes no attempt to address the elements that must be established for a temporary restraining order or preliminary injunction under Federal Rule of Civil Procedure 65. Giguere only contends as follows: "By definition, enrolling a child in school bolsters the argument that a child's habitual residence has shifted from one jurisdiction to another. [Tardif] ought not to be able to enhance her position by enrolling the child in public school in Massachusetts during the pendency of this action." Id. ¶ 2.4.

That enrolling the child may or may not bolster the parties' arguments on the merits is not a reason for a restraining order. Whether the children are ultimately ordered returned to Canada (if Giguere prevails in this action) or not (if Tardif prevails), Giguere has identified no harm that would result from enrollment at this time. Giguere's motion is DENIED.

## IV.    Conclusion

For the foregoing reasons, Giguere's Motion to Restrain Respondent from Registering the Parties' Child for School in Massachusetts [Doc. No. 7] and Tardif's Motion to Dismiss the Verified Complaint [Doc. No. 8] are DENIED.

IT IS SO ORDERED.

May 5, 2025                           /s/ Indira Talwani_____
                                     United States District Judge

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

### CIVIL ACTION NO. 1:25-CV-10468-IT

TOMMY GIGUÈRE,
              Petitioner
      v.
STACY TARDIF,
              Respondent

## RESPONDENT'S RESPONSE TO
## PETITIONER'S VERIFIED COMPLAINT
## FOR RETURN OF MINOR CHILDREN TO CANADA

Respondent, Stacy Tardif (hereinafter "Mother"), through counsel undersigned, hereby files her Response to the Verified Complaint for Return of Minor Children to Canada (hereinafter "Complaint") filed by Petitioner, Tommy Giguere (hereinafter "Father"), and admits, denies, and alleges as follows:

**1.0  JURISDICTION AND VENUE.**

1.1    Mother admits the definitions of the Convention on the Civil Aspects of International Child Abduction (hereafter "Convention") as stated in Paragraph 1.1 of Father's Complaint, but denies any wrongful removal and retention of the minor children from Canada that would invoke application of the Convention.

1.2    Mother admits that the United States and Canada are signatories to the Convention at all relevant times as alleged in Paragraph 1.2 of Father's Complaint.

1.3    Mother admits the definitions of the International Child Abduction Remedies Act (hereafter "ICARA") as stated in Paragraph 1.3 of Father's

**Mother's Response to Complaint for Return of Children**                    **Page 1 of 16**

Complaint, but denies its applicability to the instant matter as there has been no wrongful removal or retention of the minor children from Canada.

1.4    Paragraph 1.4 of Father's Complaint is a request for the Court to take judicial notice of the ICARA Regulations, to which Mother takes no position.

1.5    Mother admits that the parties relocated to assist Mother's parents with a business endeavor as alleged in Paragraph 1.5 of Father's Complaint, but denies that the relocation was temporary, and alleges that the relocation was for an undefined period of time. Mother admits that prior to the family's relocation to Massachusetts that the habitual residence of the children was Quebec, Canada. Mother denies Father's asserted legal conclusion that the habitual residence of the children did not change after their relocation to Massachusetts, and denies that their habitual residence continues to be Quebec, Canada. Mother neither admits nor denies that the children returned to Quebec no less than thirty-four (34) times between December 2022 and August 2024 as Paragraph 1.5 does not define if this number includes both children together, the sum of each child's visits, or simply border crossings, which may or may not have involved travel to Quebec, Canada, therefore Mother has insufficient information to all her to respond. Mother denies that the family used "every opportunity to return to Canada" as alleged in Paragraph 1.5. Mother alleges that many holidays were spent in the United States, and family frequently visited the family in Massachusetts.

1.6    Mother denies that the children were wrongfully retained in Massachusetts on or about August 28, 2024, or on any date, without the Father's

consent as alleged in Paragraph 1.6 of Father's Complaint. Mother denies that she "unilaterally renewed the children's I-94 numbers" as alleged. Mother further denies that Father "made clear his objection to the children remaining in Massachusetts after his permanent return to Quebec," and alleges that there was absolutely no planning by Father for the children to actually return to Canada. Mother further alleges that Father never objected to, or even mentioned, renewal of the parties' or the children's I-94 numbers.

1.7    Mother denies that she continues to wrongfully retain the parties' children in Massachusetts, and alleges that the parties entered into an Agreement for Temporary Orders in the parties' pending Massachusetts divorce action (Docket No. ES24D1750DR) on or about November 21, 2024 whereby Father agreed that Mother would have primary physical custody of the children as well as sole use and occupancy of the marital home in Salisbury, MA.

1.8    Mother denies that Father's actions as alleged in Paragraphs 1.6 and 1.7 of his Complaint meet the "one-year jurisdictional requirement" as this term is not defined within Father's Complaint. Mother further responds that the parties relocated to the United States in or about December 2022, and the children have resided in the United States continuously since that time.

1.9    Mother again denies that the children were wrongfully retained in the United States, and admits that Father has exercised his parental rights (including agreed-upon parenting time pursuant to the Massachusetts divorce action) both before and after August 26, 2024. Mother admits that both parties provided care for

the children while the parties lived in Quebec prior to December 27, 2022 and from said date until on or about August 26, 2024 in Massachusetts, where the children continue to reside with Mother. Mother further alleges that she was always the primary caregiver for the children.

1.10    Mother admits that the venue is proper in Massachusetts due to the presence of the children in their home at 207 Beach Road, Unit D-1, Salisbury, MA.

## 2.0    SUMMARY OF RELIEF REQUESTED.

2.1    Mother admits the allegations of Paragraph 2.1 of Father's Complaint as to the ages and birthdates of the children, but denies that the children were wrongfully retained in the United States and denies that Father is entitled to the relief requested.

2.2    Mother takes no position as to the jurisdiction requests of Father in paragraph 2.2 of his Complaint, and asks that Father's requested relief be denied.

## 3.0    PARTIES.

3.1    Mother admits the allegations of Paragraph 3.1 of Father's Complaint, but neither admits nor denies Father's current address though she has no reason to believe the address stated is incorrect.

3.2    Mother admits the allegations of Paragraph 3.2 of Father's Complaint, except with regard to the characterization of her move to the United States as temporary in nature. Mother alleges that her move to the United States was for an undetermined period of time.

**4.0    FACTUAL BACKGROUND.**

4.1    Mother admits the allegations of Paragraph 4.1 of Father's Complaint, but denies that she lived in Canada until December 27, 2022. Mother alleges that she lived in Kissimmee, Florida for less than one year as a teenager from 2011 to 2012.

4.2    Mother admits the allegations of Paragraph 4.2 of Father's Complaint as to the ages and birthplaces of their children.

4.3    Mother admits the allegations of Paragraph 4.3 of Father's Complaint as to both children being born in Saint-Georges, QC, Canada.

4.4    Mother admits the allegations of Paragraph 4.4 of Father's Complaint as to the children having Canadian passports.

4.5    Mother admits the allegations of Paragraph 4.5 of Father's Complaint as to their residence in Canada until on or about December 27, 2022.

4.6    Mother admits the allegations of Paragraph 4.6 of Father's Complaint regarding both Mother and Father providing care for the children and exercising their custodial rights, but alleges that she was the primary caregiver for the children.

4.7    Mother denies the allegations of Paragraph 4.7 of Father's Complaint and alleges that the Mother and Father approached her parents about moving to the United States to assist with their transport business. Mother neither admits nor denies the immigration process as described in Paragraph 4.7.

4.8    Mother denies that the parties agreed that the children would return to Canada no later than at the end of five (5) years as alleged in Paragraph 4.8 of Father's Complaint, and alleges that the parties had no agreement regarding returning to Canada within any specific time period. Mother denies that there was any agreement by the parties to return to Canada at the request of either party for any reason whatsoever as alleged in Paragraph 4.8. Mother denies that the children's I-94 admission numbers were subject to the consent of both parties. Mother denies that the issuance of the parties' and the children's visas were conditional on providing proof of the parties intention to depart at the end of the duration they were legally authorized to stay, and alleges that they could legally extend their visas prior to the initial five (5) year term.

4.9    Mother admits that the parties and the children entered the United States and obtained their I-94 numbers on November 11, 2022 as alleged in Paragraph 4.9 of Father's Complaint. Mother admits that the parties and their children relocated to Massachusetts on December 27, 2022, but denies that the relocation was temporary. Mother alleges that the move to the United States was for an undetermined period of time.

4.10    Mother denies that the family's entry to the United States on December 27, 2022 was temporary in nature as alleged in Paragraph 4.10 of Father's Complaint. Mother denies that there was any agreement as to the relocation being temporary in nature. Mother denies that the five (5) year length of stay of a non-immigrant visa evidences that their relocation was temporary in nature, and alleges

that there are other options for legally remaining in the United States for employment.

4.11   Mother denies the characterization of the parties' move to the United States with their children as temporary in nature as alleged in Paragraph 4.11 of Father's Complaint. Mother denies Father's legal conclusion that the parties' habitual residence remained Quebec after the family relocated to the United States. Mother denies that the other allegations in Paragraph 4.11 evidence that their move to the United States was temporary in nature. Mother specifically denies that the marital home purchased in Salisbury, MA was a temporary residence, and denies that the marital home was purchased strictly as an investment property as alleged by Father. Mother denies that the children have maintained close ties with friends in Quebec and also denies that the children have made only minimal ties to Massachusetts. Mother alleges that the children have made close friends in Massachusetts and have established significant ties to Massachusetts.

4.12   Mother neither admits nor denies the allegation that Father expressed a desire to return to Canada in March 2023 as alleged in Paragraph 4.12 of his Complaint. Mother denies any agreement to return to Canada in November 2024 as alleged. Mother denies that there were any conditions under which the parties agreed to remain in the United States, and alleges that the parties planned to, and did, find their own residence within their first year of living in the United States. Mother denies that Father stated any opposition to renewing the children's I-94

numbers and denies any agreement to return to Canada if Father wanted to in November 2024.

4.13   Mother denies that Father "reiterated his position" about the family returning to Canada before the end of 2024 as alleged in Paragraph 4.13 of Father's Complaint. Mother alleges that the parties had general conversations about Father considering buying his father's business in Canada, but they also had general conversations about buying her parents' transport business in Salisbury, Massachusetts, including direct discussions with mother's parents. Mother denies that she tried to talk Father into 'changing his mind' and staying in the United States because Father never explicitly asked Mother to return to Canada until August 2024. Mother denies that Father told her that he wanted her and the children "to return to Quebec, Canada with him immediately" as alleged.

4.14   Mother neither admits nor denies that Father's "wish to return to Quebec" was relayed to her multiple time leading up to and during August 2024 as alleged in paragraph 4.14 of Father's Complaint because the allegation is not sufficiently specific for her to take a position. Mother admits that Father moved back to Canada on or about August 26, 2024, and cannot admit nor deny Father's expectations with regard to Labor Day weekend. Mother admits that she notified Father that she would not be returning to Canada for Labor Day weekend on or about August 28, 2024. Mother denies that she has "actively attempted to restrict the Father's time with the children" as alleged. Mother alleges that both she and

Father did not want the children to travel back and forth to Canada every-other weekend.

4.15   Mother admits that she filed a Complaint for Divorce in Massachusetts on September 4, 2024 as alleged in Paragraph 4.15 of Father's Complaint. Mother admits that she and Father entered into several stipulations for Father's parenting time and other matters in the divorce proceedings. Mother denies that Father had no choice but to participate in the Massachusetts divorce proceedings, and alleges that Father knowingly and willingly accepted service of the divorce summons, and that Father did not object to the jurisdiction of the Massachusetts Probate and Family Court over the divorce matter. Mother admits that the parties entered into a stipulation dated September 19, 2024, and further admits that she filed a Motion for Temporary Orders on or about October 7, 2024. Mother admits that Father had parenting time on or after October 11, 2024, and alleges that the parties agreed on terms and conditions for such visits. Mother further alleges that Father was supposed to visit the children on the weekend of September 7, 2024, prior to any written or formal agreement, however, Father did not show up for his visit.

4.16   Mother admits that Father filed an answer and counterclaim seeking removal of the children back to Quebec, Canada on or about October 22, 2024 as alleged in paragraph 4.16 of Father's Complaint. Mother lacks sufficient information to respond as to Father's legal knowledge relative to divorce and custody proceedings, or as to the Convention.

**Mother's Response to Complaint for Return of Children**          **Page 9 of 16**

4.17   Mother admits that Father filed a motion in the divorce proceeding on or about October 23, 2024 as alleged in Paragraph 4.17 of Father's Complaint. Mother denies that she refused to allow Father to see the children over Facetime on a regular schedule or otherwise ignored or refused his Facetime requests. Mother alleges that she made good faith efforts to accommodate Father's communication with the children. Mother admits that the parties entered into a further stipulation on or about November 21, 2024, but denies the characterization of the divorce proceedings as "Mother's divorce action," because Father filed his counterclaim for divorce on or about October 22, 2024, whereby both parties maintained divorce actions against the other. Mother admits that the parties agreed on Father having parenting time every-other weekend. Mother neither admits nor denies any request by Father for regular Facetime calls.

4.18   Mother admits that Father "reiterated his wish that the children return" to Canada in October 2024 to the extent that Father's counterclaim for divorce was filed on or about October 22, 2024. Mother denies that the children's habitual residence was Quebec, Canada as of October 2024 as alleged in Paragraph 4.18 of Father's Complaint. Mother neither admits nor denies Father's satisfaction with his legal options or actions at such time.

4.19   Mother admits that the children's I-94 number were renewed on or about November 2, 2024, but denies that Father's consent was necessary as alleged in Paragraph 4.19 of Father's Complaint. Mother denies that the children have ever been wrongfully retained in the United States at any time.

4.20  Mother cannot admit nor deny Father's "continued […] research" into having the children returned to Quebec, but denies any agreement to return with the children to Canada, and denies that the family's relocation to Massachusetts was temporary in nature as alleged in Paragraph 4.20 of Father's Complaint. Mother can neither admit nor deny Father's understanding of the Convention.

4.21  Mother neither admits nor denies that Father filed an Application to the Central Authority in Quebec, Canada on January 21, 2025, but admits that Father's application is signed with that date as alleged in Paragraph 4.21 of Father's Complaint. Mother neither admits nor denies the alleged transmission date of Father's application to the United States Central Authority of February 14, 2025.

4.22  Mother denies that she has violated the Convention and ICARA and denies that Father is entitled to the relief requested.

## 5.0  CURRENT CONTROVERSY.

5.1  Mother denies that she wrongfully retained the children in the United States as alleged in Paragraph 5.1 of Father's Complaint. Mother further denies violation of, or the existence of, any agreement to return to Quebec, Canada. Mother admits that she renewed the children's I-94 numbers without the advance knowledge of Father, but denies that his consent was required.

5.2  Mother admits that both Father and Mother exercised custody of the children for all of the children's lives as alleged in Paragraph 5.2 of Father's Complaint.

5.3    Mother denies that she is wrongfully retaining the children in the United States as alleged in Paragraph 5.3 of Father's Complaint. Mother admits that she and the children continue to reside in the marital home in Salisbury, Massachusetts pursuant to the terms of the parties' Agreement for Temporary Orders dated November 21, 2024.

5.4    RESERVED.

5.5    Mother denies that she has restricted Father's time with the children as alleged in Paragraph 5.5 of Father's Complaint. Mother denies that she has restricted the children's travel to Quebec, Canada. Mother alleges that both parties voluntarily entered into an agreement whereby the children may travel to Canada for one weekend per month with Father. Mother denies that the habitual residence of the children is Quebec, Canada.

5.6    Mother denies that her conduct constitutes wrongful retention of children within the meaning of Article 3 of the Convention, and denies that she has wrongfully retained the children in the United States as alleged in Paragraph 5.6 of Father's Complaint.

**6.0  IRREPARABLE HARM.**

6.1    Mother denies that she has wrongfully retained the children in the United States, and denies that their habitual residence is Quebec as alleged in Paragraph 6.1 of Father's Complaint. Mother denies that the children or Father have suffered harm, or more specifically, irreparable harm as alleged by Father.

6.2    Mother denies violation of the convention and denies that she has attempted to divest the courts of Quebec, Canada of their jurisdiction over issues of the children's legal and physical custody as alleged in Paragraph 6.2 of Father's Complaint. Mother denies that the courts of Quebec have jurisdiction over the instant matter, and alleges that Father has voluntarily agreed to jurisdiction over the issues of custody by the Probate and Family Court of Massachusetts.

6.3    Mother denies that any conduct by her caused, or continues to cause, irreparable harm to both the children and Father as alleged in Paragraph 6.3 of Father's Complaint..

6.4    Mother denies wrongfully retaining the children in Massachusetts as alleged in Paragraph 6.4 of Father's Complaint, and denies that she has interrupted or minimized the children's time with their Father. Mother further denies attempting to sever the relationship between the children and Father.

6.5    Mother neither admits nor denies the procedural steps as alleged by Father in Paragraph 6.5 of his Complaint.

## 7.0    THE LAW OF QUEBEC, CANADA RELEVANT TO THIS MATTER.

7.1    Mother denies the applicability of the laws of Quebec, Canada to the instant matter as alleged in Paragraph 7.1 of Father's Complaint. Mother denies that the children's habitual residence was Quebec, Canada in August 2024. Mother denies the allegations that she unilaterally kept the children in the United States, and alleges that Father left the family in the United States and returned to Canada at his own discretion. Mother denies the definition of habitual residence as alleged

by Father in paragraph 7.1 and alleges that this term is conflated with the legal residence, domicile, or family residence as defined in the Quebec Civil Code.

## 8.0  FATHER'S RELIEF REQUESTED.

8.1    Mother denies that Father is entitled to the relief requested in Paragraphs 8.1 through 8.9.

## 9.0  AFFIRMATIVE DEFENSES.

9.1    As and for affirmative defenses, Mother alleges, in addition to all of the above, that Father consented to and/or acquiesced in the removal of the children from Canada to Massachusetts, as well as the retention of the children in Massachusetts.

## 10.0  MOTHER'S REQUESTED RELIEF.

Pursuant to the above, Mother respectfully requests that this Honorable Court:

10.1  Dismiss Father's Verified Complaint for Return of Children to Canada;

10.2  Deny the relief requested in Father's Verified Complaint for Return of Children to Canada;

10.3  Find that the habitual residence of the minor children is the United States;

10.4  Deny Father's request for an Order that all matters related to the custody, care, control, access, abuse prevention, and visitation be heard in Quebec, Canada;

10.5   Vacate or otherwise lift the stay of the proceedings in the pending Massachusetts divorce action;

10.6   Order that Father be prohibited from commencing legal action related to the care or custody of the children, division of the marital estate, or any other matter that is to be addressed in the Massachusetts divorce proceeding in any other forum in the United States or Canada;

10.7   Deny Father's request to restrain Mother from initiating any further action in a United States or Massachusetts court;

10.8   Order that Mother may extend or renew passports, visas, work authorizations, I-94 records, and the like on behalf of the children and in accordance with any relevant order of the Massachusetts Probate and Family Court;

10.9   Deny Father's request for an award of attorney's fees, expenses, and costs;

10.10 Order Father to pay Mother's reasonable expenses, costs, and legal fees incurred in her defense of Father's Complaint; and

10.11 Order any and all other relief as the Court deem fair and just.

Respectfully submitted,

Date: July 7, 2025

Brian Waller, BBO #685672
Turco Legal, P.C.
29 Water Street, Suite 301
Newburyport, MA 01950
(978) 225-9030
brian@turcolegal.com

**Mother's Response to Complaint for Return of Children**          **Page 15 of 16**

## CERTIFICATE OF SERVICE

**The undersigned hereby certifies** that a true copy of the within Respondent's Response To Petitioner's Verified Complaint For Return Of Minor Children To Canada was this day served upon Petitioner by electronic mail to Wendy Hickey and Stephanie Curtin, Attorneys for Petitioner, of Brick, Jones, McBrien & Hickey LLP, 250 First Ave., Suite 201, Needham, MA 02494 wendy@brickjones.com and stephanie@brickjones.com.

SIGNED under the penalties of perjury.

Dated: July 8, 2025

_____

Brian Waller

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

TOMMY GIGUÈRE,                                     *
                                                  *
        Petitioner,                               *
                                                  *
        v.                                        *          Civil Action No. 1:25-cv-10468-IT
                                                  *
STACEY TARDIF,                                    *
                                                  *
        Respondent.                               *
                                                  *

JUDGMENT

TALWANI, D.J.

    After consideration of all the evidence including testimony and exhibits and all

reasonable inferences drawn therefrom, and as set forth in detail in the court's Findings of Fact

and Conclusions of Law [Doc. No. 56],  the court concludes that Respondent Stacy Tardif's

conduct constitutes a wrongful retention of the minor children MG1 and MG2 (the "Children")

in the United States within the meaning of Article 3 of the Hague Convention on the Civil

Aspects of International Child Abduction. At the time of the wrongful retention, Petitioner

Tommy Giguere was exercising lawful rights of custody under the laws of Quebec, Canada.

Respondent did not prove that Petitioner consented to or acquiesced to the Children remaining in

Massachusetts beyond August 28, 2024.

    Accordingly, the court enters this Judgment, effective immediately, for the return of the

Children to Canada for a custody adjudication to proceed in the appropriate Canadian court.

- No later than September 2, 2025, Respondent shall return the Children to Quebec,

    Canada, or shall provide Petitioner with the Children's passports and allow him to take

    temporary custody of the Children so that he may return the Children to Quebec, Canada,

where either party may file an action to address custody of the Children on a temporary
and permanent basis.

- Until further orders are entered by a Canadian court of competent jurisdiction, neither
  party shall apply for or facilitate the issuance of any passports or other immigration
  related paperwork for the Children or remove the Children from Canada.

- The proceedings in Essex Probate and Family Court, Docket No. 24D-1750 DR, which
  have been stayed, shall continue to be stayed pending an order from a court of competent
  jurisdiction in Quebec.

- Respondent is hereby restrained from initiating or maintaining any further legal
  proceedings within the United States concerning the Children, including but not limited
  to proceedings in any Massachusetts court relating to the Children or Petitioner, until
  such time as a court in Quebec has made a custody determination, except that this order
  does not limit Respondent's right to appeal this Judgment.

- Certified copies of this Judgment shall be provided to counsel for Petitioner, who shall
  transmit the same to the U.S Department of State acting as the USA Central Authority
  and Office of Passport Policy and Advisory Services, 1111 19th Street, N.W., Suite 260,
  Washington, D.C. 20522-1705, and to the appropriate Canadian authorities.

- Petitioner's request for fees and expenses, see Affidavit of Fees and Expenses [Doc. No.
  40], remains under advisement.


IT IS SO ORDERED.

August 26, 2025                              /s/ Indira Talwani_____
                                            United States District Judge


2

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

TOMMY GIGUÈRE,                          *
                                        *
        Petitioner,                     *
                                        *
        v.                              *
                                        *        Civil Action No. 1:25-cv-10468-IT
                                        *
STACEY TARDIF,                          *
                                        *
        Respondent.                     *
                                        *

FINDINGS OF FACT AND CONCLUSIONS OF LAW

August 26, 2025

TALWANI, D.J.

On February 26, 2025, Petitioner Tommy Giguère filed a Verified Complaint for Return of Minor Children to Canada Pursuant to the Applicable Hague Convention [Doc. No. 1] against Respondent Stacy Tardif pursuant to the Hague Convention on the Civil Aspects of International Child Abduction ("Hague Convention"), Oct. 25, 1980, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89, and the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. §§ 9001–11, which implements the Hague Convention. Petitioner seeks the return of the parties' two minor children (the "Children") to Quebec, Canada, asserting that Respondent wrongfully retained them in Massachusetts on August 28, 2024. Following limited discovery, the court held a three-day evidentiary hearing on July 16, 17, and 24, 2025, with closing arguments on July 29, 2025. To correct an evidentiary ruling, the court permitted supplementation of the record by the parties' affidavits, limited to the content of private oral conversations between them. See Mem. & Order [Doc. No. 46]; Am. Aff. of Stacy Tardif ("Respondent Aff.") [Doc. No. 53]; Aff. of Tommy Giguère ("Petitioner Aff.") [Doc. No. 49]; see also Elec. Order [Doc. No. 55] (striking affidavits in part).

The court's findings of fact and conclusions of law are set forth below.

## I.     Findings of Fact

### A.     The Parents and Their Young Children are Canadian and Originally Resided in Canada

Petitioner and Respondent are the father and mother of two minor children, MG1 and MG2, for whom both parties cared and exercised custodial rights. Stipulation of Uncontested Facts ("Stip.") ¶¶ 1–2, 12 [Doc. No. 33]. Both Petitioner and Respondent were born in Canada. Id. ¶¶ 3, 6. They married in Quebec in October 2021. Id. ¶ 7. MG1 and MG2 were born in Quebec in April 2020 and April 2022, respectively. Id. ¶ 9. Petitioner, Respondent, and the Children are all Canadian citizens with Canadian passports. Id. ¶ 11.

Petitioner and Respondent owned a home in Quebec, which they lived in prior to December 27, 2022. Id. ¶ 16. Petitioner and Respondent are registered to vote in Canada. Id. ¶¶ 34, 43. To this day, Petitioner maintains his driver's license and motorcycle registration in Canada. Id. ¶ 32. Respondent maintained her Canadian driver's license prior to Petitioner filing the pending petition. Id. ¶ 33.

Petitioner's parents, brother, sister, sister's family, aunts, uncles, cousins, and lifelong friends live in Quebec.[1] Respondent's brother, grandparents, aunts, uncles, and cousins live in Quebec. The Children's cousins and family friends live in Quebec.

Respondent's parents are Canadian citizens who own a home in Quebec. They spend a third of the year in Quebec.

---

[1] Factual findings without citations are based on testimony at the evidentiary hearing.

Respondent's parents own a transportation business, Transport Dercy Inc. ("Dercy"), in Quebec, Canada. Id. ¶ 17. Prior to December 27, 2022, Respondent worked for various employers in Canada, including Dercy. Id. ¶ 15.

Petitioner worked with his father at an excavation company until August 2021. Id. ¶ 13. After he left his father's employ in August 2021, Petitioner went to work as a truck driver and mechanic for Dercy in Canada. Id. ¶ 14.

Respondent's younger brother, Derreck Tardif, has worked as an operation manager for Dercy in Canada since approximately 2019. Derrick Tardif and Respondent had a plan that they would take over their parents' company one day. These conversations began over five years ago—prior to the birth of the Children and prior to Dercy starting a business in the United States.

### B. In 2022, Respondents' Parents Opened Dercy's U.S. Operations and Rented an Apartment in Haverhill, Massachusetts

In 2021, while cloistered in Florida due to Covid, Respondent's father, Michel Tardif, began the process of starting a U.S. business. Michel Tardif started working in Massachusetts in 2022.

On November 4, 2022, Respondent's father and mother signed a one-year lease for an apartment in Haverhill. Hr'g Ex. 2.

### C. In 2022, Petitioner and Respondent Offer to Help with Dercy's U.S. Business and Obtain Non-Immigrant Visas

Michel Tardif did not initially include Petitioner and Respondent in the visa process for the company. Respondent and Petitioner expressed interest in being part of that business sometime in 2022.[2]

---

[2] The court rejects Respondent's claim that she and Petitioner decided to offer to help her parents in the United States in July 2021. First, Respondent acknowledged that they made that decision
        (Continued on next page.)

3

Michel Tardif subsequently initiated the process to acquire E-2 non-immigrant visas for Respondent to be able to work for him in the United States.[3] Respondent, as the primary applicant for the E-2 visa, worked with an immigration attorney to establish her work, knowledge, and what she could do and provide to the company that another employee could not. Petitioner and the Children were Respondent's dependents for purposes of the visa. Petitioner did not interact with the immigration attorney.

As part of the visa application, Respondent attested on May 25, 2022: "I intend to return to Canada upon completion of my authorized temporary period of stay under an E-2 Visa." Hr'g Ex. 4.

On November 10, 2022, Petitioner, Respondent, and their Children were granted E-2 visas. The E-2 visa is valid for up to five years and may be extended further. Stip. ¶ 21 [Doc. No. 33]. To date, their legal status in the United States is only as non-immigrants.

---

about a week *after* her parents told them that they had opened the business, which as noted above was in 2022.

Second, Respondent testified that in preparation for the move, she enrolled their Children in daycare. But MG2 was not born until April 2022, so it seems unlikely that Respondent was inquiring about daycare for MG2 in July 2021, nine months before she was born.

Finally, Respondent testified that, in preparation for the move to the United States to work for Dercy, she sent a June 2021 letter cancelling the Canadian educational account for MG1. See Hr'g Ex. 127. The letter states: "We know there will be fees, but since we are planning to move to the United States, we have no other choice." Id. at 127.002. In June 2021, however, Petitioner was still working for his father, the couple was not yet married, and Michel Tardif had not yet started the U.S. business. Where there is no other evidence in the record of a plan to move to the United States in 2021, the court finds that the claim "we are planning to move to the United States" may have reflected her long-term desire to move, but not a then-present plan.

[3] The E-2 visa is a nonimmigrant classification for a foreign national (1) "when investing a substantial amount of capital in a U.S. business," which requires a showing of at least 50% ownership of the enterprise; or (2) who is a qualifying employee of such a person or organization. USCIS, E-2 Treaty Investors, https://www.uscis.gov/working-in-the-united-states/temporary-workers/e-2-treaty-investors. The E-2 visa is valid for up to five years with the possibility of further extension. Stip. ¶ 21 [Doc. No. 33].

4

Petitioner and Respondent entered the United States on November 11, 2022, to obtain I-94 numbers in connections with their E-2 non-immigrant visas. Stip. ¶¶ 20–21 [Doc. No. 33].[4] The I-94 numbers require renewal every two years, and Petitioner, Respondent, and the Children's original I-94 numbers were set to expire on November 10, 2024. Id. ¶¶ 21, 23.

**D.     Petitioner and Respondent Shared a Plan to Move to the United States on a Trial Basis When They Left Canada in Late December 2022**

Petitioner explained to his family and friends that moving to Massachusetts would be a good experience, a "trial," to help the launch of the business. Petitioner's sister recalled both parties telling her that they would try living in Massachusetts to see if the business would work and if they would be happy. Petitioner's friend, Melanie, recalled him saying that he wanted to start a company in the United States and see if it would work out. The parties' mutual friend, Erika, also recalled them saying they were moving to the United States for a long-term project to start a new company.

Both parties testified that their move to the United States was for a trial period to see if the business was successful and if they liked it or not. They "told each other [they] would try it and if [they] didn't like Massachusetts or if the business wasn't successful, [they] would go back[.]" Respondent Aff. ¶ 11 [Doc. No. 53]; see also id. ¶¶ 5–6.

They packed only what they needed for the first week, leaving their furniture, mattresses, and other belongings in their home in Canada. As Respondent acknowledged, they did not sell their home at that time because they wanted to have a plan if they wanted to go back.

---

[4] The Form I-94 is the Department of Homeland Security's arrival/departure record for certain non-citizens. See U.S. Customs and Border Protection, I-94 Automation Fact Sheet, https://www.cbp.gov/sites/default/files/assets/documents/2021-Jul/I-94_Automation_Fact_Sheet_Jul2021.pdf (July 2021).

5

The parties moved with their Children to Haverhill, MA, on December 27, 2022, when MG1 was 2½ years old and MG2 was 6 months old. Stip. ¶¶ 9, 26–27 [Doc. No. 33]. They moved into the apartment Respondent's parents had rented. See id. ¶ 27.

The parties agreed to stay in this apartment initially because "if for whatever reason, [they] had to return, it would be easier to not have anything of [their] own to take care of putting up for lease or sale." Respondent Aff. ¶ 14 [Doc. No. 53].

### E.    Respondent and Her Parents Limited Petitioner's U.S Integration

On January 19, 2023, Respondent was added to the Haverhill lease as a resident and authorized occupant, but the Children and Petitioner were not, even though the lease specifically stated that other occupants were only permitted for fourteen cumulative nights per calendar year. Hr'g Ex. 2.2 ¶ 1.[5] Petitioner was not provided his own set of keys.

Respondent's parents had keys to the apartment, Stip. ¶ 30 [Doc. No. 33], and occupied the primary bedroom with its separate bathroom. When they were in Massachusetts, they stayed in the apartment. In 2023, they were in Massachusetts every two weeks for 2-3 days at a time.

Respondent determined Petitioner's work assignments for Dercy. Petitioner expected to drive the work truck locally and do mechanic work without having to spend nights away from home. In the first year, Respondent instead sent Petitioner back a few days a week to Quebec, or to a steel shop in New Hampshire, because there was not enough work for him to do in Massachusetts.

---

[5] Although the rent may well have been paid by Respondent's parents' business, see Stip. ¶ 27 [Doc. No. 33], contrary to the parties' stipulation that Dercy leased the apartment, see id., Respondent's parents (and eventually Respondent), and not Dercy, were the signatories to the lease, see Hr'g Ex. 2.10.

When Petitioner did work in Massachusetts, he was paid in a joint bank account Respondent had opened for them in Massachusetts. When he worked in Canada, he was paid in the parties' joint bank account in Canada. Dercy did not pay for Petitioner to have health insurance in the United States.

Petitioner's interactions in English were generally limited to basic conversations or taking orders at restaurants; Respondent handled official communications for the family.

**F.    The Parties Had Different Motivations When They Sold Their Quebec House in May 2023**

In May 2023, the parties sold their home in Canada. Stip ¶ 35 [Doc. No. 33]. They did so with different motivations.

Petitioner did not like sharing the apartment with Respondent's parents. He told his sister that Respondent's parents were always there, always invading their space, and that Respondent's mother was careless with their belongings. For Petitioner, the family needed to live elsewhere to solve problems arising from sharing an apartment with Respondent's parents. They could not afford to maintain both their home in Canada and pay apartment rental costs in the United States. Id. ¶ 31. Petitioner looked at rental options in Massachusetts but was deterred by the cost. He had always owned his own house and did not like the idea of renting; his father told him that rent is spoiled money whereas a house is an investment. He concluded that "it would be a better option to buy a house, even if it's only for a temporary period. In [a] discussion [with Respondent], [he] agreed that [they] should remain in the [United States] until November 2024." Petitioner Aff. ¶ 1 [Doc. No. 49].

Petitioner also wanted a single-story house, and the home they sold in Canada was two stories. See also Hr'g Ex. 38 (text message from Respondent to Petitioner's sister saying "[i]f we ever come back, we'll probably rebuild something smaller, single-story . . .").

7

Respondent claims they decided to sell the house because they "enjoyed [their] new life in the United States and didn't need a longer trial period." Respondent Aff. ¶ 16 [Doc. No. 53]. She testified along the same lines that the sale of the house in Canada meant that they enjoyed life in the United States and had decided to move because they knew they were not going back. The court finds that this describes Respondent's motivations only and does not reflect Petitioner's views or any actual agreement between the parties.

After the sale of the home in Canada, the family's furniture and personal belongings were packed into a shipping container, which was stored at the Dercy business yard in Salisbury, MA. Stip. ¶¶ 36–37 [Doc. No. 33].

The family continued to reside in Respondent's parents' apartment until September 2023. The parties had many neighbors in the six-story building, but did not make friends with those neighbors. While they lived there, MG1 played with random children she saw in common spaces, but did not make friends with them.

### G.    The Parties Bought a Condominium in Salisbury, Massachusetts, as a Short-Term Residence

In September 2023, the parties bought a condominium in Salisbury. Stip. ¶ 40 [Doc. No. 33]. It was not the ideal house for either of them. For Petitioner, it was not single-story, but three stories tall, and did not have a large garage. And within a few months of Petitioner, Respondent, and the Children moving there, Respondent's parents moved into a unit two or three doors down that they had purchased in August 2023. Based on a $20,000 increase in the price of a neighboring property at the time and the condominium's location close to the beach, Petitioner thought that the condominium's value would increase quickly. He did not have a specific plan for earning a profit from the condominium and had not run the numbers in advance, but believed the property would increase by about $20,000 per year.

For Respondent, sometime after this purchase, they "were already discussing [their] next move"; "[they] wanted to move into a house with land . . . instead of in a Townhouse[.]" Respondent Aff. ¶ 31 [Doc. No. 53].

The parties listed themselves as non-immigrant aliens on their mortgage application. Stip. ¶ 41 [Doc. No. 33]. This statement is consistent both with their immigration status and with Petitioner's view that their time in the United States was still a trial period. Respondent's mother provided $45,000 to cover a gap in the parties' down payment. The money was described as a gift, because a loan could not be used to finance the house.[6]

The parties' belongings were removed from the shipping container and moved into the condominium. Id. ¶ 42.

### H.    March 2024: Petitioner Makes Clear That He Does Not Want to Stay Past November 2024

In March 2024, Petitioner expressed to Respondent his unhappiness and his desire that the family return to Canada by November 2024. He told her he wanted to start a new business in Canada with the help of his father, and the parties discussed plans to make it work. Petitioner Aff. ¶ 2 [Doc. No. 49]; Respondent Aff. ¶¶ 36–45 [Doc. No. 53]. Respondent stated that it was still possible to return to Canada but that she did not want to leave everything behind unless she was certain that that was what he really wanted. Respondent Aff. ¶ 40 [Doc. No. 53]. Respondent asked if Petitioner might change his mind if he enjoyed the summer; he responded "that this was

---

[6] Respondent memorialized the gift of $45,000 towards the financing of the property in a Request for Verification of Gift (Gift Letter) that she and her mother signed. Hr'g Ex. 5. In a financial statement later provided to the Massachusetts Probate and Family Court, Respondent listed that $45,000 as a debt to her mother. Hr'g Ex. 6.3. Whether the $45,000 was a gift or a loan is not probative of the issues directly before the court, but the contradictory filings do suggest a lack of candor on legal documents.

9

unlikely, but that [they] could revisit the conversation closer to November 2024." Petitioner Aff. ¶ 2 [Doc. No. 49].

"Over the next few months, [Respondent] regularly raised the topic with [Petitioner] of staying in Massachusetts longer than November. Each time [he] told her [he] had not changed [his] mind and wanted [them] to return when [their] I94 numbers expired." Id. ¶ 3.[7]

## I. Respondent Takes Steps to Give Up the Family's Canadian Residence and Obtain U.S. Residence

### 1. Residence for Tax Filing

Also in March 2024, Petitioner and Respondent completed paperwork to be filed with the Canadian government to determine their residency status for tax year 2023. Either Respondent or her accountant filled out a draft NR73 form in Petitioner's name, and Petitioner subsequently sat down with Respondent to make corrections to the typed draft. See Hr'g Ex. 45A (original French); Ex. 45B (translation). After they handwrote modifications together, Petitioner signed the form and returned it to Respondent to be submitted. The differences between the marked-up version and the version that Respondent (or the accountant she was working with) ultimately submitted are significant:

- In response to the question, "How long do you expect to live outside Canada?" the parties handwrote: "2-5 [years.]" Hr'g Exs. 45A.2, 45B.2. The box for "I am leaving or have left Canada permanently and do not plan to return" is not checked. Id.

---

[7] The court does not find credible Respondent's claim that the parties "had agreed that [they] would renew [their] I-94's when the time would come . . . by the end of October or beginning of November[.]" Respondent Aff. ¶ 51 [Doc. No. 53].

- In the fully-typed version that Respondent or the accountant submitted, the 2-5 years handwritten limitation is missing and the "I am leaving or have left Canada permanently and do not plan to return" box is checked. Hr'g Ex. 109.002.

- In the marked-up version, the box is checked for "I usually live in Canada but I am leaving or have left Canada permanently," but the word "permanently" is crossed out. Hr'g Exs. 45A.2, 45B.2.

  - In the fully-typed version, the same box is checked and the word "permanently" is not crossed out. Hr'g Ex. 109.002.

- In the marked-up version, "visa obligation" is handwritten next to a question regarding expected return. Hr'g Exs. 45A.4, 45B.4.

  - In the fully-typed version, this note is omitted. Hr'g Ex. 109.004.[8]

- In the marked-up version, the question, "Do you intend to return to Canada to live?" is answered "Yes." Hr'g Exs. 45A.6, 45B.6.

  - In the fully-typed version, the response is "No." Hr'g Ex. 109.006.

- In the marked-up version, under a section titled "Ties with Canada," the following items are checked: "I will keep vehicles in Canada that are registered in a province or territory in Canada. . . . I will keep my driver's license from a province or territory in Canada. . . . I will have a guaranteed job available upon my return to Canada." Hr'g Exs. 45A.5, 45B.5.

  - The fully-typed version has none of these checked. Hr'g Ex. 109.005.

---

[8] A similar handwritten note—"Obligation of Return, 5-year Visa" in regard to long-term plans—was rewritten in the fully-typed version as: "However, we will have to come back after 5 years (duration of the work permit to apply again)." Compare Hr'g Ex. 45B.6, with Ex. 109.006.

- In the marked-up version, the box is checked for: "I will have subscriptions for life insurance or general insurance (including health insurance) through a Canadian insurance company." Hr'g Exs. 45A.6, 45B.6.
  - o The fully-typed version has the box unchecked. Hr'g Ex. 109.006.

The parties dispute whether Petitioner signed the fully-typed version. The court finds Petitioner's testimony that he only signed the marked-up version more credible. Accordingly, the court treats the marked-up version, and not the fully-typed version, as representing Petitioner's intentions and state of mind in March 2024, and the fully-typed version as the form that Respondent nonetheless submitted on his behalf.

The answers in the NR73 form Respondent signed on her own behalf are nearly identical to the fully-typed version of the NR73 submitted on Petitioner's behalf. See Hr'g Ex. 119A (original French); Hr'g Ex. 119B (translation). The Canada Revenue Agency later sent Respondent a letter determining that she was a non-resident of Canada as of May 12, 2023, because she "ha[d] not maintained significant residential ties with Canada." Hr'g Ex. 123A (original French); Ex. 123B (translation).

### 2. Vehicle Registration

In April 2024, Respondent encouraged Petitioner to register his car in Massachusetts. She states that she did so because she had just learned that it was mandatory, see Respondent Aff. ¶ 48 [Doc. No. 53], but the court notes that she only raised the issue after submitting the tax forms that left the box for vehicle registration in Canada unchecked.

### 3. Green Card Application

Respondent testified that an attorney submitted a green card application in July 2024, and that the application covered Respondent, Petitioner, and the Children. No evidence of that application is in the record. Respondent's testimony contradicts the parties' stipulation that

"[Respondent] has not applied for any change in her or the Children's immigration status within the United States." Stip. ¶ 25 [Doc. No. 33]. When questioned about this inconsistency on cross-examination, she testified that the family had been on the wait list since July and she had not applied for anything <u>further</u> since Petitioner moved back to Canada.

In December 2024 (after divorce proceedings between the parties had commenced), Petitioner sent text messages to Respondent asking about the green card application:

> [Y]our lawyer told mine that you have already applied for a Green Card and that the girls and I would be included in the application. I need clarification on this. Also, if such an application is in progress, I ask you to provide me with all the information, file changes, and documentation . . . . Because your lawyer reportedly said there were green card applications, and if the girls or I are listed on the document, I have the right to know. . . . I'll clarify the question because my main question wasn't answered yesterday: Have any steps, whatsoever, been taken or planned after November 2022 to change the e2 nonimmigrant status of [the Children] and/or me to any immigrant status? Because, based on what I've learned recently, I have reason to believe that such steps may have been taken without my knowledge, and since I have legal custody of the girls and it's me, you must keep me informed of this.

Hr'g Ex. 41. Respondent testified that she did not directly answer his questions because she did not think it was really relevant.

The record does not show that a green card application for Petitioner, Respondent, or the Children has in fact been submitted to the United States. The court credits Respondent's testimony that she tried to start the process of obtaining a green card for Respondent, Petitioner, and the Children in July 2024, but concludes in light of her lack of candor about having done so, that she did so without Petitioner's knowledge. Respondent's testimony that Petitioner knew that Respondent had sought to start that process for him and the Children in July 2024 is not credible.

### J.    The Family Maintained Their Ties in Canada while Developing Some Relationships in the United States

Between December 2022 and August 2024, the parties primarily spent their weekends alone with their Children, visiting Quebec, or in Massachusetts hosting friends or family from

13

Quebec. They have returned to Quebec for most major holidays. On average, they returned to Quebec about once every three weeks. They also invited family and friends to their condominium in Massachusetts.

In January 2023, the Children were enrolled at a daycare that had four other children. MG2 was enrolled full-time, but for the first two months MG1 was only enrolled three days a week; when she was not in daycare, MG1 would be in the truck with Petitioner while he worked. Neither the daycare director, nor the other children, spoke French. The Children adapted to English, and the daycare director observed no issues with their integration. They can now converse in English and still speak French with Petitioner.

The Children continued at the daycare after the family moved to Salisbury in September 2023, where no other children lived in the neighborhood. The daycare director recalled the family attending three events a year with her and other families from the daycare, including going trick-or-treating with her family in 2023. The Children attended anywhere between 1–2 and 4–5 birthday parties between August 2023 and August 2024.

Respondent made friends, drawn from the other parents of the two or three other children at the Children's daycare. She went to dinner alone with them on some occasions. See, e.g., Hr'g Ex. 113; Respondent Aff. ¶ 20 [Doc. No. 53]. Petitioner did not often go out to socialize while in Massachusetts. Petitioner did not make close friends in the United States.

The Children were required to have health insurance in Massachusetts for their daycare, and were enrolled in February 2023, while still maintaining their health insurance in Quebec. The Children attended a medical examination in Massachusetts as required for daycare enrollment. They also each visited a Massachusetts pediatrician five to six times starting from April 2024. See Hr'g Exs. 107–108 (listing appointments through January 2025). They saw a

doctor in Quebec only once during their time in the United States, in November 2023, for a follow-up dose of a vaccination first received in Quebec. The Children's health insurance in Canada is still active. See Hr'g Exs. 15, 16.

The Children did not acquire public library cards in Massachusetts during this time.

In early August 2024, Respondent told Petitioner that the daycare no longer had space for MG2 and they would need to enroll her in a pre-school, and Petitioner agreed that she would be enrolled in the preschool until November. Petitioner Aff. ¶ 4 [Doc. No. 49].[9] On August 4, 2024, the parties registered MG1 for preschool. Stip. ¶ 46 [Doc. No. 33]; Respondent Aff. ¶ 71 [Doc. No. 53].

### K.    Mid-August to Early September 2024: Petitioner Insists that the Family Move Back to Canada and Respondent Insists that She and the Children Will Stay in the United States

On August 18 or 19, 2024, when Petitioner again told Respondent that he missed his family and friends and wanted to move back to Canada, Respondent asked him to write a letter to her. He wrote and gave her that letter, which she took to her parents' house to read; she did not return home until he put the Children to sleep. The letter began:

> I want you to know first of all that the most important thing for me is that we remain our little united family. I still love the woman I invited to the rock café almost 7 years ago. However, life here really doesn't suit me as much as I would have thought before we were here, it's not the first time I've talked about it, and every time we've talked about it, the thing that always made me keep trying to keep getting used to it was that you always told me that if one day things really didn't go well you would understand and that you would be happy anywhere as long as the 4 of us stayed together[.]

---

[9] The daycare director testified that MG1 moved from her daycare because it was time for her to attend preschool. There is no evidence in the record that Respondent relayed this to Petitioner (rather than claiming that there was not room at the daycare). The record is thus silent as to whether Petitioner would have agreed to move MG1's school for just a few months if he knew they had a choice to stay at the daycare.

15

Hr'g Ex. 32.1. The letter goes on to identify several reasons for wanting to return to Quebec, including: missing family and friends, finding "that working together is killing our relationship," the "[n]eed for independence, even if your parents are mostly easy to live with," and Respondent's "mother's attitude towards [Petitioner]." Id. The letter also states: "Even though I was really motivated when we talked about moving to the USA, the fact that you always told me that a return would always be possible if it didn't work out the way we wanted was always one of the most important things for me because it was still a test." Id. at 32.2. Petitioner explained at the end that "I promise you to continue to try to be better with time because the only thing that really keeps me here is what is most important to me, the 3 women in my life!!" Id. at 32.3.

Petitioner testified that after Respondent read the letter, the parties decided that he would go to Quebec for a week to see people and to try to convince Respondent to change her mind about returning to Quebec. Respondent testified that the purpose of that trip was to see if Petitioner could start a machinery hauling business, and to check with his father if his business plan was viable.[10] See also Respondent Aff. ¶ 57 [Doc. No. 53] (same).

On Tuesday, August 20, Petitioner departed for Canada. Stip. ¶ 47 [Doc. No. 33]; Hr'g Ex. 1.117 (Petitioner's I-94 record). Respondent would later claim that there was "an irretrievable breakdown of the marriage" as of August 20, 2024. See Hr'g Ex. 100.

In addition to job planning, Petitioner confirmed an available spot for MG1 at a Quebec preschool and inquired into cost. He also confirmed with his friend Melanie, who runs a foster home and has experience as a daycare teacher, that she had availability to take care of MG2.

---

[10] Petitioner's fallback plan was to return to working with his father, which he is doing now. Petitioner testified that Respondent could continue to work for Dercy remotely if they returned to Canada, and the only parts she could not do remotely would be conducting job interviews, driving, and helping in the yard.

Melanie had spaces available for both Children. Petitioner believed that the family would return in November 2024, which was when their I-94 numbers expired, Stip. ¶ 23 [Doc. No. 33], and he expected that during the three-month interim they would sell the Salisbury condominium and buy a new home in Quebec.

MG2 joined Petitioner on Friday, August 23. Hr'g Ex. 1.123 (MG2's I-94 record). On August 23, Petitioner also discovered a withdrawal of $10,056.32 from the parties' joint Canadian bank account. This amount was the entirety of their savings and investment account. Hr'g Ex. 29 (August account statement). That money was transferred to an account in Respondent's name and not returned to the joint account. Cf. Hr'g Ex. 30 (September account statement). Petitioner understood Respondent taking the money from their joint account to mean that Respondent was not coming back to Canada.

On August 24, after receiving a phone call from one of Petitioner's family members, Respondent called Petitioner and "asked him why he had told his family [they] were getting divorce without talking to [her] about it first." Respondent Aff. ¶¶ 75–76 [Doc. No. 53]. At the time, Respondent was unaware that Petitioner knew about the money being withdrawn and Petitioner did not tell her he knew. Instead, he "just told [her] that he had changed his mind. He was coming back on Monday the 26th and was going to pack and leave." Id. ¶¶ 58, 77.

On August 26, he returned with MG2 to Massachusetts. Stip. ¶ 49. He brought a trailer with him to move his belongings and work tools. His father came to help with the packing. Petitioner had mentioned to his father seeking mediation with Respondent, but not divorce.

While at the house and after the children had gone to sleep, he "confronted [Respondent] about a $10,000 withdrawal she had made from [their] joint back account in Quebec. She stated it was her money, that she was within her rights to take it, and refused to discuss it further. . . ."

17

133

Petitioner Aff. ¶ 5 [Doc. No. 49]. Petitioner also told Respondent that he needed to go back to Canada because of his parents' health conditions, which came as a surprise to Respondent because this had never come up before. Respondent Aff. ¶¶ 83–86 [Doc. No. 53]. Petitioner offered to help Respondent with the mortgage and daycare payments but Respondent told Petitioner that, because she knew he was leaving, she had already paid the mortgage and the daycare for a month in advance. Id. ¶ 92.

The parties had previously planned for Respondent and the Children to join Petitioner on Labor Day Weekend starting on August 30, 2024. Stip. ¶ 48 [Doc. No. 33]. They had planned to attend a big truck show or festival for people in the trucking business that they had also attended the year before. Respondent "suggested [they] should look into divorce mediation in Canada and . . . [they] made arrangement[s] for the Labor [D]ay weekend that was coming up." Petitioner Aff. ¶ 5 [Doc. No. 49].

Petitioner left for Canada the next day, August 27. Stip. ¶ 50 [Doc. No. 33]. Before he left, he hugged Respondent and the Children, and told them he loved them, and they did the same. Respondent Aff. ¶ 95 [Doc. No. 53]. Petitioner was still expecting Respondent to come up for Labor Day Weekend, and that he would have parenting time with the Children.

Petitioner left his work truck and trailer keys, fuel cards, and keys to the Dercy mechanic yard on the counter. Although he did not formally resign, he stopped working for Dercy.

On August 28 (the following day), Respondent told Petitioner she would not come to Canada for Labor Day. Stip. ¶ 51 [Doc. No. 33]. Even though Petitioner had brought MG2 back to Massachusetts after learning of the missing money, Respondent now told him "she would not visit over the following weekend because she feared [he] might take the girls and keep them in Canada. She stated she had spoken with an attorney in Canada and had been advised that her

case should be handled in the U.S. rather than in Canada, so she no longer wanted to participate in mediation in Canada." Petitioner Aff. ¶ 6 [Doc. No. 49]. She told him she had also "reached out to the embassy, Canadian law force, a Canadian attorney as well as [the] Salisbury police [department] and a [U.S.] attorney." Respondent Aff. ¶ 98 [Doc. No. 53].

On August 28, 2024, MG1 was approximately 4½ years old and MG2 was approximately 2½ years old. See Stip. ¶ 9 [Doc. No. 33].

### L.    September 2024 Onward: Divorce Proceedings

On September 3 (the day after Labor Day) and September 4, 2024, Respondent withdrew all funds from her individual Canadian savings and investment account and transferred $15,000 to her father in $5,000 increments. Hr'g Ex. 31. On September 4, Respondent's attorney filed Respondent's Complaint for Divorce in the Essex County Probate and Family Court for the Commonwealth of Massachusetts. Stip. ¶ 52 [Doc. No. 33]; see Hr'g Ex. 100. The Complaint alleges that the parties had last lived together on August 20, 2024, and that an irretrievable breakdown of the marriage began on that day.

Petitioner learned of the divorce action on September 5 or 6; when he called a lawyer in Canada to learn about the law in Massachusetts, he was informed that there was already a divorce case pending.

Because the Children were with Respondent in Massachusetts at that time, the Children's passports were with Respondent. Cf. Hr'g Ex. 42.3 (October text messages in which Respondent tells Petitioner that "I will provide all necessary documents and passports to travel smoothly" as the parties sorted out custody arrangements). Respondent refused to allow the Children to return

19

to Canada with Petitioner until there was a written agreement between them.[11] She testified that she had a concern the Children would not be allowed to reenter the United States, and that Petitioner's father especially would prevent this.[12]

Petitioner and Respondent entered into an initial custody agreement, which provided Petitioner with a single weekend of parenting time from September 20–22, 2024. Hr'g Ex. 102. Petitioner learned that the weekend after the divorce action had been filed, Respondent and the Children had gone fishing with an individual whom he now knows to be her boyfriend.

Petitioner accepted service of summons in the divorce action on October 11, 2024. Stip. ¶ 53 [Doc. No. 33]; see Hr'g Ex. 101. He filed an answer and counterclaim seeking to remove the Children to Quebec. Stip. ¶ 54 [Doc. No. 33]; see Hr'g Ex. 104. On October 23, he filed a motion for temporary custody orders, and a motion for a speedy hearing and short order notice; the latter motion was denied the next day. Stip. ¶¶ 55–56 [Doc. No. 33].

In November 2024, the parties signed an "Agreement for Temporary Orders," which is currently in effect, providing for shared custody, with Respondent having primary physical custody of the Children and sole use and occupancy of the home in Salisbury. Id. ¶ 57. It begins: "The parties agree that the following shall be a temporary order of this Court . . . ." Hr'g Ex. 103.

---

[11] In a verified motion Petitioner filed in the divorce action in October 2024, he stated that his "ability to have parenting time with the minor children is conditional on him agreeing to all of [Respondent's] demands[,]" that Respondent had not allowed him to stay in their Massachusetts home with the Children when he has had parenting time (even though her parents lived a few doors down), and that Respondent "has unilaterally changed the locks to the marital home denying [Petitioner] access[.]" Hr'g Ex. 105 ¶¶ 8, 10, 13, 16.

[12] Petitioner's father denied having any discussions about blocking the Children from leaving Quebec.

Petitioner believed that both parents' consent was necessary for renewal of the Children's I-94 numbers, but on November 2, 2024, Respondent renewed the Children's I-94 numbers without Petitioner's participation. Stip. ¶ 24 [Doc. No. 33].

In January 2025, Petitioner filed an Application to the Central Authority in Quebec for the return of the Children under the Hague Convention; based on that application, he initiated this federal action on February 26, 2025. Id. ¶¶ 61, 63. In light of this action, the custody portion of the divorce proceeding has been stayed since April 2025. Id. ¶ 60.

## II.    Conclusions of Law

### A.  Legal Standard

#### 1.  Overview

"The Hague Convention on the Civil Aspects of International Child Abduction is . . . intended to combat international child abductions during domestic disputes." Mendez v. May, 778 F.3d 337, 343 (1st Cir. 2015) (citing Abbott v. Abbott, 560 U.S. 1, 8 (2010)). "The Convention's underlying principle is that the courts of a child's country of habitual residence should be the entities to make custody determinations in the child's best interest." Id. (citations omitted).

"A petitioner seeking the return of a child under the Convention must establish the child's wrongful removal by a preponderance of the evidence." Id. at 343 (citing 22 U.S.C. § 9003(e)(1)(A)). "The petitioner must show that he or she (1) seeks to return the child to the child's country of habitual residence, (2) had custody rights immediately prior to the child's removal, and (3) was exercising those rights." Id. (citing Hague Convention, art. 3). "If these three elements are met, and the petitioner has commenced judicial or administrative proceedings within one year of the date of wrongful removal, the Convention commands that the court reviewing the petition 'shall order the return of the child forthwith.'" Id. (quoting Hague

21

Convention, art. 12). Accordingly, ICARA includes the Congressional finding that "[c]hildren who are wrongfully removed or retained within the meaning of the Convention are to be promptly returned unless one of the narrow exceptions set forth in the Convention applies." 22 U.S.C. § 9001(a)(4).

"The Convention's return requirement is a 'provisional' remedy that fixes the forum for custody proceedings. . . . Upon the child's return, the custody adjudication will proceed in that forum." Monasky v. Taglieri, 589 U.S. 68, 72 (2020) (citing Linda Silberman, Interpreting the Hague Convention: In Search of a Global Jurisprudence, 38 U.C.D. L. Rev. 1049, 1054 (2005)). "[I]t is the job of the courts of [the child's habitual residence], not the district court, to 'make the appropriate custodial and family law determinations.'" da Silva v. de Aredes, 953 F.3d 67, 77 (1st Cir. 2020) (quoting Mauvais v. Herisse, 772 F.3d 6, 21 (1st Cir. 2014)); see also Vieira v. De Souza, 22 F.4th 304, 308 (1st Cir. 2022) ("Notably, an order of return pursuant to the Hague Convention is not a final determination of custody rights. It simply ensures that custodial decisions will be made by the courts of the children's country of habitual residence.") (citations omitted).

## 2. Habitual Residence

"Removal under the Hague Convention is only appropriate if the child is being retained in a country other than his or her place of habitual residence." Mendez, 778 F.3d at 344 (citing Sanchez-Londono v. Gonzalez, 752 F.3d 533, 540 (1st Cir. 2014)).

"The Hague Convention does not define the term 'habitual residence.'" Monasky, 589 U.S. at 76. The concept of habitual residence was "well-established … in the Hague Conference" and the standards applied by the Federal Courts of Appeals have "share[d] a 'common' understanding: The place where a child is at home, at the time of removal or retention, ranks as the child's habitual residence." Id. at 77 (citations omitted). A child's "residence in a particular

22

country can be deemed 'habitual,' however, only when her residence there is more than transitory. 'Habitual' implies '[c]ustomary, usual, of the nature of a habit.'" Id. at 76 (quoting Black's Law Dictionary 640 (5th ed. 1979)). The aim of this inquiry is "to ensure that custody is adjudicated in what is presumptively the most appropriate forum—the country where the child is at home." Id. at 79. "To a large extent, '[t]he Convention is based on the principle that the best interests of the child are well served when decisions regarding custody rights are made in the country of habitual residence.'" da Costa v. de Lima, 94 F.4th 174, 185 (1st Cir. 2024) (quoting Abbott, 560 U.S. at 20).

The term "habitual residence" was "deliberately chose[n] . . . for its factual character, making it the foundation for the Convention's return remedy in lieu of formal legal concepts like domicile and nationality." Monasky, 589 U.S. at 79. "Because locating a child's home is a fact-driven inquiry, courts must be 'sensitive to the unique circumstances of the case and informed by common sense.'" Id. at 78 (citation omitted).

"For older children capable of acclimating to their surroundings, . . . facts indicating acclimatization will be highly relevant." Id. Courts have thus considered the following facts in determining whether children have acclimated to their surroundings:

> a change in geography combined with the passage of an appreciable period of time, age of the child, immigration status of child and parent, academic activities, social engagements, participation in sports programs and excursions, meaningful connections with the people and places in the child's new country, language proficiency, and location of personal belongings.

Id. at 78 n.3 (quoting Federal Judicial Center, J. Garbolino, The 1980 Hague Convention on the Civil Aspects of International Child Abduction: A Guide for Judges 67–68 (2d ed. 2015)) (internal quotation marks removed).

Because children depend on their parents as caregivers, "the intentions and circumstances of caregiving parents are relevant considerations[,]" "especially [for] those too young or

otherwise unable to acclimate[.]" <u>Id.</u> at 78.[13] "In discerning the parties' intentions, [the First Circuit has looked] 'specifically to the last moment of the parents' shared intent.' . . . Where a child has moved with a parent from one country to another, the record must evidence the parties' latest settled intention for the child to abandon a former place of habitual residence and acquire a new one." <u>Mendez</u>, 778 F.3d at 344.

The Ninth Circuit has noted that being habitually resident somewhere "need not mean that's where you plan to leave your bones[,]" and "one may effectively abandon a prior habitual residence without intending to occupy the next one for more than a limited period." <u>Mozes v. Mozes</u>, 239 F.3d 1067, 1074 (9th Cir. 2001), <u>abrogated on other grounds by</u> <u>Monasky</u>, 589 U.S. 68 (2020).[14] In <u>Mozes</u>, the Ninth Circuit also observed that there "are cases where the petitioning parent had earlier consented to let the child stay abroad for some period of ambiguous duration. Sometimes the circumstances surrounding the child's stay are such that, despite the lack of perfect consensus, the court finds the parents to have shared a settled mutual intent that the stay last indefinitely. When this is the case, we can reasonably infer a mutual abandonment of the child's prior habitual residence." <u>Id.</u> at 1077 (footnote and citations omitted). The <u>Monasky</u> court has noted further that "[a]n actual agreement between the parents is not necessary to establish an infant's habitual residence." <u>Monasky</u>, 589 U.S. at 71.

In sum, "a child's habitual residence depends on the totality of the circumstances specific to the case." <u>Id.</u> "No single fact . . . is dispositive across all cases." <u>Id.</u> at 78.

---

[13] In his concurring opinion, Justice Thomas offered the following additional factors to consider for whether a residence had become habitual for a child too young to acclimatize: "the presence or absence of bank accounts and driver's licenses, the length and type of employment, and the strength and duration of other community ties." <u>Id.</u> at 86, 88 (Thomas, J., concurring in part).

[14] <u>Monasky</u> abrogated the appellate standard of review applied in <u>Mozes</u> as well as its placement of greater weight on the shared intentions of the parents. <u>Monasky</u>, 589 U.S. at 76.

### 3. Affirmative Defenses

Two of the "narrow exceptions" to return of a child under the Hague Convention, 22 U.S.C. § 9001(a)(4), are consent and subsequent acquiescence. Hague Convention, art. 13(a); 22 U.S.C. § 9003(e)(2)(B). The court "is not bound to order the return of [the children] if [respondent] establishes by a preponderance of the evidence that [petitioner] had consented to or subsequently acquiesced in [respondent's] removal or retention of [the children]." Nicolson v. Pappalardo, 605 F.3d 100, 105 (1st Cir. 2010) (citations and internal quotation marks omitted). The defense of consent "focuses on [petitioner's] intent prior to the child's retention," and can be "evinced by the petitioner's statements or conduct, which can be rather informal." Id. (citation omitted). "[T]he defense of acquiescence pertains only to what happened post-retention" and is an "affirmative defense[] that should be narrowly construed." Darin v. Olivero-Huffman, 746 F.3d 1, 14, 16 (1st Cir. 2014).

### B. Habitual Residence

Because the parties do not dispute that both parties exercised their custodial rights over both Children, see Stip. ¶ 12 [Doc. No. 33], the primary question before the court is the Children's place of habitual residence. See Mendez, 778 F.3d at 343; 22 U.S.C. § 9003(e)(1)(A) (petitioner's burden of proof by preponderance of the evidence). "The place where a child is at home, at the time of removal or retention, ranks as the child's habitual residence." Monasky, 589 U.S. at 77 (emphasis added). Here, the alleged wrongful retention occurred on August 28, 2024. Guided by the factors set forth in Monasky, the court considers the totality of the circumstances as of that date.

### 1. Shared Intent of the Parties

Although the First Circuit's former approach of addressing shared intent as a primary factor no longer controls, Monasky nevertheless highlighted that "the intentions and

25

141

circumstances of caregiving parents are relevant considerations" where "children, especially those too young or otherwise unable to acclimate, depend on their parents as caregivers." Monasky, 589 U.S. at 78. Because MG1 was only about to enter preschool and MG2 was only 2½ years old in August 2024, the parents' intentions are relevant here.

"In discerning the parties' intentions," the First Circuit has looked "'specifically to the last moment of the parents' shared intent.' . . . Where a child has moved with a parent from one country to another, the record must evidence the parties' latest settled intention for the child to abandon a former place of habitual residence and acquire a new one." Mendez, 778 F.3d at 344 (citation omitted).

Although Respondent may have intended to abandon Canada as a place of habitual residence and intended to acquire the United States as a new one, nothing in the record shows that both parties shared this intent.

In December 2022, the parties were clearly tentative when they made their first move, and Respondent testified that they did not initially sell their home because they wanted to have a plan if they wanted to go back.[15] Both parties testified that they initially moved to the United States for a trial period to see if it would work out. Notably, Respondent's parents' Haverhill apartment where Petitioner, Respondent, and their Children lived rent-free for their first nine months in Massachusetts did not even include Petitioner on the lease.

In 2023, when the parties sold their home in Canada and purchased a home in Salisbury, their intentions began to diverge. The parties do not dispute that they could not have afforded to

---

[15] As explained above, the letter Respondent drafted to cancel an education fund the parties had created for MG1 appears unrelated to the move, as it was dated June 2021, well before plans for the move materialized.

maintain their home in Canada while also paying rental costs for an apartment in Massachusetts. For Petitioner, the sale of one home to purchase another (rather than renting a home) was a strictly financial decision—even if that decision was not financially sound or not well planned. He was dissatisfied with the work Respondent was having him perform for Dercy at the time, as well as with the presence of her parents in their living conditions. Importantly, the parties do not dispute that one purpose of the move was to solve the problem of sharing a living space with and under the control of Respondent's parents. For Respondent, however, purchasing the Salisbury home meant a satisfaction with and commitment to settling in the United States. These conflicting views of the move may have been simultaneously true for each of them.

The paperwork completed by the parties in 2024 further demonstrates the conflict in their views. The Canadian NR73 forms the parties filled out for purposes of determining their residency status diverged significantly. The one Respondent signed on her own behalf, and the fully-typed version she or the accountant submitted on Petitioner's behalf, indicated a clear intention to leave Canada permanently and not return to live there, except as obligated by the circumstances of the parties' E-2 visa. This is in stark contrast to the marked-up version that Petitioner testified is the only version he signed, which indicated temporary residence in the United States with the intention of returning to Canada. Furthermore, Respondent claims to have submitted a green card application on behalf of the whole family, of which Petitioner was unaware until after divorce proceedings had been initiated months later.

As late as August 18 or 19, 2024, Petitioner wrote a letter to Respondent explaining his dissatisfaction with the United States and reiterating his desire to return to Canada. He left for Canada on August 20 to work out a plan for the family's return and then learned on August 23 that Respondent had zeroed out their savings account. Even after Respondent suggested divorce

mediation in Canada, and Petitioner packed up his belongings at the Salisbury home and left for

Canada, Petitioner still believed Respondent and the children would return to Canada for the

Labor Day Weekend. Petitioner also believed that the Children would be permanently returned to

Canada at least by November 2024, when their I-94 numbers expired. It was his understanding

that their I-94 numbers could not be renewed without his consent, and he clearly did not consent.

Therefore, on August 28, 2024, when Respondent cancelled her return to Canada for the

Labor Day weekend, the parties did not have a settled intent to abandon Quebec and make

Massachusetts their habitual residence. The "parties' latest settled intention" together, Mendez,

778 F.3d at 344, was to move to Massachusetts for a trial to see if things would work out,

including whether they liked it here, and not just whether Respondent's parents' business was

successful. Their opinions about whether their new lives were working out diverged after they

arrived here.

### 2.  Immigration Status and Employment

The family's immigration status underscores the temporary nature of their relocation.

Notwithstanding Respondent's unilateral efforts to terminate residency status in Canada and to

seek permanent residency in the United States, the parties were legally present in the United

States on nonimmigrant E-2 visas and as of August 28, 2024, the family's I-94 numbers were set

to expire in three months. Respondent attested in her visa application that "[she] intend[s] to

return to Canada upon completion of [her] authorized temporary period of stay under an E-2

Visa." Hr'g Ex. 4.

The E-2 visa status was based on Respondent's work for her parents' company. If

Respondent stops working for Dercy, she and the family would have no basis for legal status in

the United States; and if the parties are divorced, Petitioner will have no legal status in the

United States. And while Respondent appeared to view the E-2 visa as automatically renewable,

the issuance of a renewed visa is within the United States government's discretion, and on renewal, remains a non-immigrant visa.

The family's "temporary visa[] cast[s] considerable doubt on whether they would be allowed to remain here indefinitely even if they wished to." Mozes, 239 F.3d at 1082; see also id. at 1082 n.45 ("While an unlawful or precarious immigration status does not preclude one from becoming a habitual resident under the Convention, it prevents one from doing so rapidly. . . . It is also a highly relevant circumstance where, as here, the shared intent of the parents is in dispute.").

Moreover, the parties' economic base—employment with Dercy—was anchored in Canada. Prior to their move, they worked for the Canadian counterpart of Dercy. While employed by Dercy in the United States, Petitioner was frequently sent back to Canada for work. He also testified that most of Respondent's job for the United States arm of Dercy could be accomplished remotely from Canada.

### 3. Bank Accounts and Driver's Licenses

As to bank accounts, the parties maintained joint bank accounts both in Canada and in the United States. When Petitioner worked in Canada, his pay went into the Canada account; when he worked in the United States, he was paid in the U.S. account.

Both parties maintained their Canadian driver's licenses throughout their time in the United States leading up to August 28, 2024.

### 4. Strength and Duration of Community Ties

As of August 28, 2024, MG1 had spent nearly half her life and MG2 had spent most of her life residing in Massachusetts, and their pediatrician for primary care visits—with the exception of one follow-up vaccination in Quebec—was in Massachusetts.

However, the vast majority of the Children's familial ties, on both parents' sides of the family, was in Quebec. They did not make friends with neighbors in Haverhill, and there were no other children in the neighborhood in Salisbury. They attended a daycare with four other children, but for the first two months, MG1 was enrolled only part-time and spent the remainder of her time with Petitioner in his work truck. As of August 28, 2024, MG1 was leaving that daycare for preschool.

The Children attended some birthday parties with other children from the daycare, and attended one trick-or-treating event with the daycare director's family. They did not acquire public library cards in Massachusetts until after the relevant period.

The parties' community ties are similarly limited. Respondent made a few friends through the community of mothers at the Children's daycare and saw them for dinner alone. Petitioner made no friends. Their social life otherwise consisted of spending weekends alone with the Children, hosting family or friends from Quebec, or visiting family or friends in Quebec.

### 5.  Language Proficiency

The Children arrived in the United States speaking no English but have since adapted and can speak both English and French. Only Petitioner struggled with English due to his limited interactions with English speakers until the divorce action was initiated.

### 6.  Location of Personal Belongings

With the exception of the necessities Petitioner packed up when he left the home in August 2024, the family's possessions are all in the marital home in Salisbury.

### 7.  Conclusion

Looking at the totality of the circumstances, particularly where only one factor (the location of personal belongings) clearly points in Respondent's favor, and recognizing the young

age of the Children, the court finds by a preponderance of the evidence that the Children's habitual residence as of August 28, 2024, was Canada.

### C.    Affirmative Defenses

Respondent asserts two defenses: that Petitioner "had consented to or subsequently acquiesced in the removal or retention" of the Children. Hague Convention, art. 13(a); see also 22 U.S.C. § 9003(e)(2)(B) (respondent's burden of proof by preponderance of the evidence).

#### 1.    Consent

The defense of consent "focuses on [petitioner's] intent prior to the child's retention," and can be "evinced by the petitioner's statements or conduct, which can be rather informal." Nicolson, 605 F.3d at 105 (citation omitted). For the reasons discussed above, Petitioner consented to the family living in Massachusetts temporarily on a trial basis. To the extent a green card application was submitted on the family's behalf, there is no credible evidence that Petitioner was aware of or participated in that application, and so cannot have consented to the family remaining indefinitely on that basis. See Mozes, 239 F.3d at 1082 n.45 ("had [petitioner] helped [respondent] obtain a permanent residence visa for herself and the children, we could infer his consent to a residence of indefinite duration"). Consent prior to the time of retention is therefore no defense for Respondent.

#### 2.    Acquiescence

"[T]he defense of acquiescence pertains only to what happens post-retention" and is an "affirmative defense[] that should be narrowly construed." Darin, 746 F.3d at 14, 16. In Nicolson, the First Circuit considered whether entering into a consent order for temporary custody constituted "a 'clear[ ] and unequivocal[ ]' expression of an agreement by [petitioner] to have final custody determined in a Maine court, . . . [or] 'a convincing written renunciation of rights' to this effect[.]" Nicolson, 605 F.3d at 106, 108 (citations omitted). Because the consent

31

order contained language "contemplat[ing] changes in temporary custody by a non-Maine court," the First Circuit found the agreement was not one "to let the Maine courts determine final custody." Id. at 107–08.

Respondent argues that Petitioner's voluntary participation in a divorce action initiated in Massachusetts, including as to temporary custody arrangements providing that the Respondent has primary physical custody of the Children in Massachusetts, amounts to acquiescence in her retention of the Children here. But nothing in those proceedings indicates that Petitioner clearly and unequivocally agreed to have the Massachusetts court determine final custody or renounced his rights to that effect. See Nicolson, 605 F.3d at 108. The record shows that Petitioner had limited options to see his Children: they and their passports were with Respondent in their Salisbury house, Respondent had changed the locks, and Respondent testified that she refused to let the Children see Petitioner in Canada without a written agreement. The agreements themselves are temporary in nature, and as relevant to physical custody are entered into between the parties themselves rather than by order of the court. The first stipulation only addressed Petitioner's parenting time with the Children over the course of one weekend in September. See Hr'g Ex. 102 ¶ 1. The second stipulation, which currently remains in effect, is titled "Agreement for Temporary Orders" and the paragraphs pertaining to physical custody only address arrangements from November 22, 2024, through the Christmas and New Year's holiday period of 2025. See Hr'g Ex. 103 ¶¶ 2(a), (d). The only portions of the document that are "submitted to [the] court for determination" pertain to the sharing of costs. See id. ¶¶ 2(e), (f), (i), (j). Petitioner also filed a counterclaim in that action seeking removal of the Children to Quebec, Canada. Hr'g Ex. 104.002 ¶ 6(c). Finally, the parties do not dispute that the Massachusetts court stayed custody matters pending this court's determination under the Hague Convention.

Respondent has failed to meet her burden of proving by a preponderance of the evidence that Petitioner's participation in the divorce action constituted "subsequent[] acquiesce[nce] in the . . . retention" of the Children. Hague Convention, art. 13(a).

## III.    Order of Return

For the foregoing reasons, the court grants the Petitioner's <u>Verified Complaint for Return of Minor Children to Canada Pursuant to the Applicable Hague Convention</u> [Doc. No. 1]. The court orders the return of MG1 and MG2 to Canada for a custody adjudication to proceed in the appropriate Canadian court.

- No later than September 2, 2025, Respondent shall return the Children to Quebec, Canada, or shall provide Petitioner with the Children's passports and allow him to take temporary custody of the Children so that he may return the Children to Quebec, Canada, where either party may file an action to address custody of the Children on a temporary and permanent basis.

- Until further orders are entered by a Canadian court of competent jurisdiction, neither party shall apply for or facilitate the issuance of any passports or other immigration related paperwork for the Children or remove the Children from Canada.

- The proceedings in Essex Probate and Family Court, Docket No. 24D-1750 DR, which have been stayed, shall continue to be stayed pending an order from a court of competent jurisdiction in Quebec.

- Respondent is hereby restrained from initiating or maintaining any further legal proceedings within the United States concerning the Children, including but not limited to proceedings in any Massachusetts court relating to the Children or Petitioner, until

33

such time as a court in Quebec has made a custody determination, except that this order does not limit Respondent's right to appeal this court's Judgment.

- The court will enter Judgment in accordance with this Memorandum and Order, and certified copies of this Judgment shall be provided to counsel for Petitioner, who shall transmit the same to the U.S Department of State acting as the USA Central Authority and Office of Passport Policy and Advisory Services, 1111 19th Street, N.W., Suite 260, Washington, D.C. 20522-1705, and to the appropriate Canadian authorities.

## IV.    Attorney's Fees

The Hague Convention provides that courts "may, where appropriate, direct the person who removed or retained the child, or who prevented the exercise of rights of access, to pay necessary expenses incurred by or on behalf of the applicant . . . ." Hague Convention, art. 26. As implemented by ICARA, however, a fee award is mandatory unless "clearly inappropriate":

> Any court ordering the return of a child pursuant to an action brought under section 9003 of this title shall order the respondent to pay necessary expenses incurred by or on behalf of the petitioner, including court costs, legal fees, . . . during the course of proceedings in the action, and transportation costs related to the return of the child, unless the respondent establishes that such order would be clearly inappropriate.

22 U.S.C. § 9007(b)(3).

Petitioner has filed an Affidavit of Fees and Expenses [Doc. No. 40]. Where Respondent bears the burden of establishing that an award of fees would be unwarranted under the statute, Respondent is directed that she may file any opposition to the award of fees within two weeks of entry of this order. Petitioner's response, if any, must be filed within 7 days of Respondent's opposition.

IT IS SO ORDERED.

August 26, 2025                              /s/ Indira Talwani
                                        United States District Judge

34

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSSACHUSETTS

TOMMY GIGUERE

                  PETITIONER

     v.

STACY TARDIF,

                  RESPONDENT

Civil Action No. 1:25-cv-10468-IT

---

## THE RESPONDENT, STACY TARDIF'S, MOTION TO STAY THE JUDGMENT DATED AUGUST 26, 2025 (TALWANI, J.) REQUIRING THE RETURN OF THE MINOR CHILDREN TO CANADA AND SUPPORTING MEMORANDUM OF LAW

NOW COMES the Respondent, Stacy Tardif (hereinafter "Mother") in the above-captioned matter and moves this Honorable Court on an expedited basis to Stay the Judgment dated August 26, 2025 requiring Mother to return the children to Canada pending the adjudication of the Mother's appeal of the Order and Judgment of the Court.

## FACTUAL BACKGROUND

Petitioner ("Father") and Respondent ("Mother") are both Canadian citizens born in Quebec, Canada. Mother and the children reside in Salisbury, Massachusetts. The parties share two minor children, M.G.1 (age 5) and M.G.2 (age 3).

The parties and their children moved to Massachusetts on December 27, 2022. At the time the parties moved to Massachusetts, MG1 was 2 ½ years old, and MG2 was 6 months old.

Initially, the family lived in an apartment in Haverhill, MA. Prior to moving to Massachusetts, the parties owned a home in Quebec, Canada which they sold in May 2023. Upon the sale of their home in Canda, the parties searched for a home to purchase in Massachusetts.

On September 8, 2023, the parties purchased the marital home, a condominium in Salisbury, Massachusetts. At that time, shipped all of their furniture and personal belongings to the United States. All of the parties and the children's personal possessions are in the marital home in Salisbury except for the Father's necessities.

In January 2023, both children began attending daycare at Shelly's Family Daycare in Haverhill, Massachusetts.

MG2 was enrolled full time and MG1 was enrolled three days per week. Neither the daycare director, nor the children, spoke French. The children adapted and the daycare director observed no issues with children's integration.

The children continued to attend the daycare after they moved to Salisbury. The family attended events with the daycare director's family and other families, including trick-or-treating in 2023 and birthday parties of their classmates. Mother made friends with the children's parents.

The parties and children obtained medical insurance in Massachusetts in January 2023. The children have a pediatrician in Massachusetts and have attended numerous appointments.

The parties filed non-resident tax returns in Canada for calendar year 2023. The parties filed federal and state tax returns as residents of Massachusetts for calendar year 2023. The parties opened a joint bank account in Massachusetts, which their income from the business was deposited into.

2

In May 2024, the Father imported and registered his Ford Explorer in Massachusetts. Together, on August 4, 2024, the parties enrolled M.G.1 at Milestones Childcare and Preschool for the 2024-25 school year.

When the children arrived in the US, neither of them spoke English. The children adapted quickly and now speak better English than French.

Father resided in Massachusetts from December 27, 2022 until he left to return to Canada on or about August 27, 2024 after the parties' marriage began to break down. Mother continues to reside in the parties' home in Salisbury with the parties' children.

Mother filed for divorce in Massachusetts on September 4, 2024 in Essex County Probate and Family Court under Docket No. ES24D1750DR. Father voluntarily accepted service of the Summons on Mother's Complaint for Divorce on October 11, 2024.

The Father then filed an Answer and Counterclaim to Mother's Complaint for Divorce on October 22, 2024. In his counterclaim to the Massachusetts divorce the Father specifically requested the Court to grant him custody of M.G.1 and M.G.2, and to allow him to remove the children to Quebec, Canada.

Prior to accepting service of the summons or filing his Answer and Counterclaim, the Father entered into a stipulation whereby he had parenting time with the children in Canada from September 20, 2024 through September 22, 2024.

On November 21, 2024, the parties entered into another Agreement for Temporary Orders in the pending divorce action whereby the parties agreed, in pertinent part, to have shared legal custody of the minor children , with Mother having primary physical custody of the minor

3

children. The parties further agreed Father has parenting time with the children every-other weekend, with one weekend per month to be spent in Canada. The Massachusetts Probate and Family Court issued a Temporary Order on December 2, 2024 (Black, J.) incorporating the Stipulation dated November 21, 2024 into its Order.

Throughout the pendency of the Father's petition, both parties continued to operate under the provisions of the agreements and orders in the Massachusetts divorce action.

On January 21, 2025, Father filed an Application to the Central Authority in Quebec, Canada seeking the return of the children under the Hague Convention. In February 2025, Father's Application was transmitted to the United States, and on February 26, 2025, the Father filed a Complaint for Return of the Minor Children to Canada. The Mother filed a motion to dismiss on March 24, 2025 which was denied on May 5, 2025. The Father filed a motion to restrain the Mother from enrolling the children in Massachusetts which was also denied on May 5, 2025. A three-day evidentiary hearing was held on July 16, 17, and 24, 2025.

On August 26, 2025, a Judgment and Order entered requiring the children be returned to Canada. Mother is now appealing the Judgment and is filing her Notice of Appeal herewith.

## **ARGUMENT**

Mother requests an expedited Stay of the Court's August 26, 2025 Judgment through the conclusion of her appellate proceeding as the Court incorrectly determined Canada was the children's habitual residence and in error failed to find Father consented to or acquiesced to the children residing in Massachusetts

In order to prevail on a motion to stay, the movant must show the following: (1) the likelihood of success on appeal; (2) the threat of irreparable harm if the stay or injunction is not

4

granted; (3) the absence of harm to opposing parties if the stay is granted; and (4) any risk of harm to the public interest. F.T.C. v. Mainstream Marketing Services, Inc., 345 F.3d 850, 852 (10th Cir.2003). Ultimately, whether to grant a stay and delay the return of the child is within the Court's discretion. Walsh v. Walsh, 221 F.3d 204, 213 (1st Cir.2000).

The Mother's request for a stay of the judgment requiring the children to return to Canada should be granted as the Mother has a superior likelihood of success on appeal; there is no harm to the Father in granting the stay pending the appeal; and there is extraordinary harm to the children if the stay is not granted if the Mother is successful on her appeal.

I. **The Mother has a superior likelihood of success on appeal**

A. **The Petitioner did not establish Canada was the habitual residence of the children**

Removal under the Hague Convention is only appropriate if the child is being retained in a country *other than* his or her place of habitual residence. Mendez v. May, 778 F.3d 337, 344 (1st Cir. 2015). The place where *a child is at home, at the time of removal or retention, ranks as the child's habitual residence.* Monasky v. Taglieri, 589 U.S. 68, 77 (2020) A child's habitual residence is the place where he or she has been physically present for an amount of time sufficient for acclimatization, and which has a degree of settled purpose from the child's perspective. Darin v. Olivero-Huffman, 746 F.3d 1, 11 (1st Cir. 2014). The required degree of settled purpose does not necessarily entail an intention to stay in the place indefinitely; it may be for a limited period. Id. For example, a settled purpose with respect to residence could be education, business or profession, employment, health, family or mere love of the place. Id.

In Monasky v. Taglieri, 589 U.S. 68 (2020), the Supreme Court clarified the determination of a child's "habitual residence" under the Hague Convention does not depend on

an actual agreement between the parents about where to raise the child. Instead, habitual residence is determined based on the totality of the circumstances, not any parental agreement. Id. The critical factors in making this determination include the child's integration into a family and social environment, the age and maturity of the child, parental intentions, changes in geography, duration of stay, and connections to the location Id. No single fact, however, is dispositive across all cases. Common sense suggests that some cases will be straightforward: Where a child has lived in one place with her family indefinitely, that place is likely to be her habitual residence. Id.

Canada was not the habitual residence of the children from the prospective of the children for numerous reasons. First, the children began living in the Commonwealth on December 27, 2022. MG1 had spent nearly half of her life and MG2 had spent most of her life residing in Massachusetts where their parents purchased a home in Salisbury on September 8, 2023. The establishment of a habitual residence requires an actual change in geography, as well as the passage of an appreciable amount of time and when the child moves to a new country accompanied by both parents, who take steps to set up a regular household together. International Child Abduction Remedies Act, § 4(b), 42 U.S.C.A. § 11603(b); Hague Convention on the Civil Aspects of International Child Abduction, Art. 1 et seq., 1988 WL 411501. Koch v. Koch, 450 F.3d 703 (7th Cir. 2006). The period may also not be long as it was here, which provides even greater support for the fact that Massachusetts is the habitual residence of the children and not Canada. Id.

The First Circuit has also held a new residence can be formed without the intention of staying in the place indefinitely as the Father claimed. Darin v. Olivero-Huffman, 746 F.3d 1, 11 (1st Cir. 2014). For example, a settled purpose can be temporary with respect to residence, and

could be for reasons such education, business or profession, employment, health, family or merely love of the place. Id.   This is precisely the facts presented as the parties arranged for employment, housing, and childcare in Massachusetts.  Id.

The parties also imported their vehicle and registered it in Massachusetts and the parties obtained visas to allow them to live and work legally in the United States.   The parties secured medical care for themselves and the children, who were provided for by a Massachusetts pediatrician. They also opened a joint bank account in Massachusetts and filed both state and federal taxes as Massachusetts residents, while filing as non-residents in Canada.  Critically, the parties sold their home in Canada and moved the contents of their home and their belongings to their new home in Massachusetts. As a result, the facts clearly demonstrate a clear relinquishment of Canadian residence and their intentions to make Massachusetts their habitual residence.

Further, there is strong evidence here of the children's acclimatization to the Commonwealth which precludes the granting of the petition.  International Child Abduction Remedies Act, § 2, 42 U.S.C.A. § 11601.  Neergaard-Colon v. Neergaard, 752 F.3d 526 (1st Cir. 2014).  A child's acclimatization to a location reflected by a change in geography coupled with the passage of a meaningful period of time is a key factor in the habitual-residence analysis. Sanchez-Londono v. Gonzalez, 752 F.3d 533, 542 (1st Cir. 2014).

The children have strong durational ties to Massachusetts as they have lived here the majority of their young lives. Monasky v. Taglieri, 589 U.S. at 78.  MG1 had spent nearly half her life and MG2 had spent the majority of her life residing in Massachusetts.  The children's

daily routines including daycare, schooling, medical care, and social activities are in Massachusetts, demonstrating substantial integration into the local environment. Id.

In January 2023, both children began attending daycare at Shelly's Family Daycare in Haverhill, MA. MG2 was enrolled full time and MG1 was enrolled three days per week. The daycare had four other children attend. Neither the daycare director, nor the children, spoke French.

The children adapted and the daycare director observed no issues with their integration and children continued to attend the daycare after they moved to Salisbury. The children arrived in the United States speaking no English but have since adapted and can speak fluently. Mauvais v. Herisse, 772 F.3d 6, 14 (1st Cir. 2014). In fact, the children now speak better English than they do French. The children have many friends and participate in social activities within the community. The family attended events with the daycare director's family and other families, including trick-or-treating in 2023 and birthday parties of their classmates. Moreover, all of the children's belonging are in the former marital home in Massachusetts.

In Mauvais v. Herisse, 772 F.3d 6, 14 (1st Cir. 2014), the Court found the children were acclimatized to Canada after living there for two years. The children attended daycare, primary school there, attended church, developed Canadian accents, the children spent almost their lives there. The Court could not find that the children were acclimatized to any other country. It can be reasonably inferred from all these pertinent facts that from the perspective of the children – despite the parties' disagreement-- they were acclimatized to the United States. Mauvais v. Herisse, 772 F.3d 6, 14 (1st Cir. 2014). The facts here are strikingly similar and on-point.

8

Furthermore, in certain circumstances, 'a child can lose its habitual attachment to a place even without a parent's consent ... if the objective facts point unequivocally to a person's ordinary or habitual residence being in a particular place....' . <u>Mauvais v. Herisse</u>, 772 F.3d 6, 14 (1st Cir. 2014). Massachusetts was undoubtedly the children's habitual residence for the past three years and as result, there can be no wrongful retention in the United States. Accordingly, the Father failed to establish a prima facie case of improper removal or retention. Therefore, the Court erred in granting the Father's Petition. As a result, the stay should be granted due to the strong likely success of the Mother's appeal. <u>F.T.C. v. Mainstream Marketing Services, Inc.</u>, 345 F.3d 850 (10th Cir. 2003).

### B. <u>Father consented to the removal of the children from Canada and then acquiesced to the retention of the children in Massachusetts</u>

The petition is further precluded because Father both consented to and acquiesced in the children's relocation to Massachusetts. Consent and acquiescence are two separate and analytically distinct affirmative defenses to a petition for return of a wrongfully removed child under the Hague Convention on Civil Aspects of International Child Abduction, and its implementing statute, the International Child Abduction Remedies Act (ICARA). 22 U.S.C.A. § 9003(e)(2)(B). <u>Padilla v. Troxell</u>, 850 F.3d 168 (4th Cir. 2017).

The consent defense addresses whether the petitioner agreed to the child's removal or retention beforehand, while the acquiescence defense concerns whether the petitioner accepted or agreed to it afterward. <u>Padilla v. Troxell</u>, 850 F.3d 168 (4th Cir. 2017). Consent may be evinced by the petitioner's statements or conduct, which can be rather informal. <u>Nicolson v. Pappalardo</u>, 605 F.3d 100, 105 (1st Cir. 2010). Acquiescence tends to require more formality than consent— e.g., testimony in a judicial proceeding, a convincing written renunciation of rights, or a

9

consistent attitude over a significant period of time. <u>Darin v. Olivero-Huffman</u>, 746 F.3d 1, 16 (1st Cir. 2014).

The Court, in error, failed to determine the Father consented to or subsequently acquiesced in the removal of retention of the children. The consent defense involves the petitioner's conduct *prior to* the contested removal or retention, while acquiescence addresses whether the petitioner subsequently agreed to or accepted the removal or retention. <u>Moura v. Cunha</u>, 67 F. Supp. 3d 493, 501 (D. Mass. 2014).

The key inquiry to the consent defense is the petitioner's subjective intent, including the nature and scope of the intent, *prior* to the August 2024 retention. <u>In re Kim</u>, 404 F. Supp. 2d 495, 516 (S.D. N.Y. 2005).

In <u>In re Kim</u>, the District Court held in order to establish a consent defense, respondent must establish by a preponderance of the evidence that petitioner had the subjective intent to permit Respondent to remove and retain the child for an indefinite or permanent time period. <u>Id.</u> The focus must be on the parents conduct *prior* to August 2024. <u>Darin v. Olivero-Huffman</u>, 746 F.3d at 15.

Consent is an inquiry that may be evinced by the petitioner's statements or conduct, which can be rather informal. <u>Nicolson</u>, 605 F.3d at 105. As the Third Circuit has held, in examining a consent defense, it is important to consider what the petitioner actually contemplated and agreed. <u>Baxter v. Baxter</u>, 423 F.3d 363, 371 (3d Cir.2005).

The Father claims the alleged wrongful retention occurred in August 2024. The objective and undisputed facts surrounding the family's relocation to the United States need not be repeated. However, it is important to note that Father does not contend that any of those actions

10

were taken against his will.  But strikingly to the contrary, he was an active participant in the relocation process from Canada to the United States from 2022 until 2024 and only objected after he alone returned to Canada and the Mother filed for divorce.

The Father actively facilitated the relocation to Massachusetts.  He participated in arranging housing, employment, daycare, medical care, and legal documentation necessary for the family to reside in Massachusetts.  He imported the family vehicle, registered it locally, and took part in opening bank accounts and filing taxes as a Massachusetts resident.  It was not until the marriage between the parties started to breakdown that the Father no longer consented to living in the United States and sought to relocate back to Canada. These actions clearly demonstrate his prior consent.  Nicolson v. Pappalardo, 605 F.3d 100, 105 (1st Cir. 2010)

Further, the parties moved together as a family unit and lived together for two years even selling the former marital home and purchasing a new one.  Thus, this matter is not one where one party moved with the children without the other parent. *See* Nicolson, 605 F.3d at 106.

The Court found here Father explained to his family and friends that moving to Massachusetts would be a "good experience."  The Court found Father told his sister and his friend Melanie that he wants to start a company in the United States and see if the business would work. The Court found a mutual friend recalled the parties discussed a "long term project" in the US.

Moreover, it would have been impossible for Mother to unilaterally move the family to another country without Father's active cooperation and participation. Father both participated in and helped plan for the move.  The parties applied for E-2 visas and the family was granted E-2 visas on November 10, 2022.  As part of their preparation for the move, the parties jointly

entered the US the next day on November 11, 2022, to obtain their I-94 numbers in connection with their visas. A consent inquiry focuses on the time prior to the retention and the focus must be on the parties' conduct prior to Father's relocating back to Canada and filing this petition. Darin v. Olivero-Huffman, 746 F.3d 1, 15 (1st Cir. 2014). All the Father's actions prior to the breakdown of the marriage evidenced his consent to living and raising the children here.

Father was employed in the United States for nearly two years, and he does not claim that he was compelled to do so or that his employment was anything other than voluntary.

It was only after Father was confronted with the topic of divorce by Mother, that he claimed Mother had wrongfully retained the children in Massachusetts. Given these facts, it is implausible and illogical to assert that Father did not consent to the family's relocation to the United States. Therefore, any reasonable analysis of Father's actions and conduct, he consented to the parties relocating to Massachusetts. Nicolson, 605 F.3d at 105.

In addition, the defense of acquiescence pertains only to what happens "post-retention." Baxter, 423 F.3d at 371. The relevant period that must be considered is August 2024 to the time the Father filed his petition to return the child, on February 26, 2025. Id.

Acquiescence tends to require more formality than consent—e.g., testimony in a judicial proceeding, a convincing written renunciation of rights, or a consistent attitude over a significant period of time. Id. When attempting to characterize ambiguous conduct as a basis for inferred acquiescence, courts employ a pure subjective intent inquiry Id.

Father further acquiesced by fully participating in litigation in Massachusetts. Larbie v. Larbie, 690 F.3d 295 (5th Cir. 2012). Consent for a tribunal to make a final custody determination, which may be established by entry of a temporary custody order, is sufficient to

establish an affirmative defense under the Convention. <u>Larbie v. Larbie</u>, 690 F.3d 295, 298 (5th Cir. 2012). The Father gave clear and unequivocal consent for the Massachusetts court to make a final custody determination, and also for the Mother to continue to have primary physical custody of the children in Massachusetts. <u>Id</u>.

The Court in <u>Larbie v. Larbie</u>, 690 F.3d 295 (5th Cir. 2012), found the Mother gave clear and unequivocal consent for Texas court to make final custody determination as mother answered divorce suit in Texas and filed counterpetition seeking affirmative relief. <u>Id</u>.

Likewise, the Father here gave clear and unequivocal consent for the Massachusetts court to make a final custody determination. <u>Larbie v. Larbie</u>, 690 F.3d 295, 298 (5th Cir. 2012). He filed an answer and counterclaim, sought his own temporary orders, and engaged with the Massachusetts courts regarding the children's custody and care. By voluntarily invoking the jurisdiction of Massachusetts courts and litigating in the Massachusetts Probate Court, the Father manifested his acceptance of the children's presence and residence in the Commonwealth. Therefore, the Father in filing this petition is essentially engaging in international forum shopping which the Convention seeks to prevent. <u>Larbie v. Larbie</u>, 690 F.3d 295, 298 (5th Cir. 2012).

Further, the Father also willfully, knowingly, and voluntarily agreed to several temporary custody orders which were made orders by the Probate Court.[1] There was nothing ambiguous about the agreements entered into by the parties, and both parties have had the benefit of legal counsel at all relevant times in the divorce proceedings. The parties had equal bargaining power at the time the Stipulation was executed, and Father's signing was completely voluntary and

---

[1] The Court mischaracterizes these orders within the judgment as the Stipulation was entered by the Probate and Family Court as an Order.

13

uncoerced.  Darin v. Olivero-Huffman, 746 F.3d at 17.  Within these orders, the Father

specifically agreed Mother would continue to have primary physical custody of the minor

children.  The Stipulation was also executed by the parties and entered by the Probate Court as

an Order.  Thus, the Stipulation itself is evidence of Father's agreement for Mother to continue to

have custody of the minor children within the Commonwealth of Massachusetts.   A clear and

formal consent order by the non-U.S. parent agreeing to let a state court decide final custody

would, both linguistically and for policy reasons, warrant treatment as acquiescence under the

Hague Convention. Nicolson, 605 F.3d at 107.  This is precisely the affirmative conduct by the

Father here.

     Moreover, not only did the Father recognize and obey the orders entered by

Massachusetts, but he did not seek any relief from any court in Canada.  In fact, the Father

sought relief to remove the children from their home state in Massachusetts to Canada. There is

nothing in the record to reflect that Father disagreed that Massachusetts was not the proper

forum.  Larbie v. Larbie, 690 F.3d 295, 309 (5th Cir. 2012)  Notably, Father filed his petition

before this Court *after* he had already agreed to allow Mother to continue to have custody and

after he filed his counterclaim for divorce.

     In addition, Father entered into a Stipulation with Mother for parenting time rather than

pursue his own motion for parenting time before the Probate and Family Court. Further, the

Father continued to have parenting time with the children in Massachusetts during the pendency

of the petition.

     The Father's agreement to temporary orders and filing of his own counterclaim for

custody and divorce reflects Father's voluntary submission to the jurisdiction of Massachusetts

for determination of child custody, and this Court erred in holding otherwise.  The petition filed

14

by Father is nothing more and nothing less than impermissible forum shopping and wrongful use of the principles of the Hague Convention. <u>Kufner v. Kufner</u>, 519 F.3d 33, 38 (1st Cir.2008). Therefore, for the reasons outlined herein, the Mother has a strong likelihood of success on appeal such that a stay of the order to return the children to Canada pending the Mother's appeal should be granted.

**II.**     <u>**There is extraordinary harm to Mother and children if the stay is not granted, and little harm to Father**</u>

In the absence of a stay, the children will leave this country with their Father and be forced to return to a place they haven't lived in in almost three years, the majority of their young lives.

Returning the children to Canada and thereby removing them from their place of residence would certainly cause irreparable injury to both the children and the Mother. A forced move at this time would cause disruption in the children's lives and Mother's life.

Further, Father would not suffer irreparable harm if a stay if granted, as by his own agreement, as he may continue to have parenting time every other weekend with the children from Friday at 4:00 pm until Sunday at 4:00 pm with one weekend being in Canada, which he has had and may continue to have during the pendency of the appeal, which is the temporary order for parenting time and which may remain in place throughout the pendency of Mother's appeal.

**III.**     <u>**There is no harm to the public interest in granting the stay**</u>

Finally, to the extent the public interest could be affected by this request to stay, no harm would be done by continuing the current state of affairs pending the Mother's appeal. The

Father already has parenting time with the children every other weekend, which would continue to remain in place throughout the pendency of the appeal.

Further, the public interest would be harmed if the children were removed from Massachusetts and returned to Canada despite the Father's consent to the jurisdiction of the Massachusetts Probate and Family Court and agreement as reflected in the Stipulation and Temporary Order that Mother has primary physical custody of the children.

For all these reasons, Mother respectfully requests the Judgment and Order to return the Children to Canada be stayed during all appellate proceedings and the temporary orders for custody remain in effect pending her appeal.

## REQUEST FOR HEARING

The Mother submits that a hearing may assist the Court in resolving the issues raised herein and therefore, requests an opportunity to be heard by oral arguments in support hereto.

## L.R. 7.1(a)(2) CERTIFICATION

Consistent with L.R. 7.1(a)(2), Mother asserts the parties have conferred and been unable to resolve the issues raised herein.

Dated: August 29, 2025                    Respectfully Submitted,

                                          STACY TARDIF,
                                          By her Attorney,


                                          */s/ Matthew P. Barach*
                                          Matthew P. Barach (BBO # 630245)
                                          *Attorney for the Respondent*
                                          Barach Law Group LLC
                                          40 Speen Street, Suite 205
                                          Framingham, MA 01701
                                          P: 617-694-9700 / F: 508-318-6329
                                          mbarach@barachfamilylaw.com




### CERTIFICATE OF SERVICE

I certify that on August 29, 2025, a true and correct copy of the foregoing was served upon all parties of record via the Court's CM/ECF system and via email.


Dated: August 29, 2025                    */s/ Matthew P. Barach*
                                          Matthew P. Barach (BBO # 630245)
                                          Attorney for the Respondent
                                          Barach Law Group LLC
                                          40 Speen Street, Suite 205
                                          Framingham, MA 01701
                                          P: 617-694-9700 / F: 508-318-6329

**From:** ECFnotice@mad.uscourts.gov <ECFnotice@mad.uscourts.gov>
**Sent:** Friday, August 29, 2025 5:06 PM
**To:** CourtCopy@mad.uscourts.gov <CourtCopy@mad.uscourts.gov>
**Subject:** Activity in Case 1:25-cv-10468-IT Giguere v. Tardif Order

[ORIGINATED OUT OF FIRM]

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

**United States District Court**
**District of Massachusetts**

**Notice of Electronic Filing**

The following transaction was entered on 8/29/2025 at 5:06 PM EDT and filed on 8/29/2025

| | |
|---|---|
| **Case Name:** | Giguere v. Tardif |
| **Case Number:** | 1:25-cv-10468-IT |
| **Filer:** | |
| **Document Number:** | 62(No document attached) |

**Docket Text:**

**Judge Indira Talwani: ELECTRONIC ORDER entered. The return of the children, see Judgment [57], is temporarily stayed for one week to allow the court time to consider Respondent's Motion to Stay Pending Appeal [58]. Petitioner shall file any opposition to the Motion to Stay by September 3, 2025. (FGD)**

**1:25-cv-10468-IT Notice has been electronically mailed to:**

Wendy O. Hickey    whickey@brickjones.com, rsaksik@brickjones.com

Stephanie L. Curtin    scurtin@brickjones.com

Brian T. Waller    brian@turcolegal.com, brian@sequellaw.com, bw34@recap.email

**1:25-cv-10468-IT Notice will not be electronically mailed to:**

UNITED STATES DISTRICT COURT
For the DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 1:25-CV-10468-IT

TOMMY GIGUERE,
     PETITIONER

v.

STACY TARDIF,
     RESPONDENT

## PETITIONER'S OPPOSITION TO RESPONDENT'S "MOTION TO STAY THE JUDGMENT DATED AUGUST 26, 2025 (TALWANI, J.) REQUIRING THE RETURN OF THE MINOR CHILDREN TO CANADA AND SUPPORTING MEMORANDUM OF LAW"

NOW COMES Tommy Giguére, Petitioner (hereinafter "Father") in the above captioned matter, and respectfully requests, that this Honorable Court **deny** the Respondent's, Stacey Tardif, (hereinafter "Mother's") Motion to Stay the U.S. District Court's August 26, 2025 Judgment pending her appeal.

On August 26, 2025 the US District Court entered a Judgment (Talwani, J.), which required the Mother to return the minor children, MG1 and MG2, to Quebec, Canada no later than September 2, 2025 or to provide Father with the Children's passports and allow him to take temporary custody of the Children so that he may return the Children to Quebec.

In light of the order, Father registered MG1 for Kindergarten in Quebec

where she is due to start school on September 2nd. Father also filed a custody petition with the court in Quebec on August 29, 2025, in accordance with the Judgment. What the Court did not know at the time of entering the Judgment was that, under the parties' existing temporary parenting plan in the now-stayed Massachusetts divorce action, Father was scheduled to have parenting time with the Parties' children in Canada this weekend beginning on August 29, 2025 at 4 PM. As Father understands the Judgment, regardless of whether Mother returns the children to Canada on September 2nd, or earlier, once the children are back in Canada, "[u]ntil further orders are entered by a Canadian court of competent jurisdiction, neither party shall apply for or facilitate the issuance of any passports or other immigration related paperwork for the Children **or remove the Children from Canada.**" (Emphasis supplied). In other words, but for the one-week stay issued by the Court on August 29, 2025, at 5:08 PM the Judgment had already been essentially complied with.

Mother sought an expedited stay of the Judgment at 3:56 PM on the Friday before Labor Day Weekend. Her timing was unfortunate. Had she filed just one day earlier, Father would have had time to respond before the Court issued the one-week stay. In her motion, Mother neglected to inform the Court that the children would be in Canada this weekend. As a result, the eleventh hour one-week stay

will cause MG1 to miss her first day of kindergarten in Quebec and potentially result in her briefly starting kindergarten in Salisbury, only to potentially return to Quebec to begin school there.

Adding insult to injury with her poor timing, Mother's motion fails to meet the requisite legal standard for such a successful motion to stay. The four-part test for a motion for stay is as follows: "(1) whether the stay applicant has made a strong showing that [she] is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure other parties interested in the proceeding; and (4) where the public interest lies." Chafin v. Chafin, 568 US 165, 133 S.Ct.1017, 1027 (2013), citing Hilton v. Braunskill, 481 U.S. 770, 776-77, 107 S.Ct. 2113, 95 L.Ed.2d 724 (1987).

## I.  Whether the stay applicant has made a strong showing of likelihood of success on appeal.

Mother has failed to establish a strong showing of likelihood of success on the merits of her appeal. Mother's burden is high because the standard of review on appeal is one of clear-error, see Monasky v. Taglieri, 140 S. Ct. 719, 730, 589 U.S. 68, 84 (2020). Mother's motion to stay selectively presented only the facts she believed supported her position, while disregarding the majority of the trial judge's findings, which were based on Father's evidence. Likewise, she ignores

all of the findings where her evidence was found to be lacking in credibility and instead reiterates her evidence almost as if the trial never happened and the judge had made no findings.

Despite Mother's assertion in her motion to stay, the court did in fact find[1] the Children's habitual residence to be Canada at the time of their wrongful retention in the US. In support of this conclusion, the Court found the following facts, among others:

(a) The Parties and Children were all born in and continue to be citizens of Canada and were/are only in the US on temporary non-immigrant visas (FF[2], pp. 2, 5).

(b) All of the Parties extended families and thus the Children's extended families live in Quebec[3] (FF, p. 2).

(c) The Parties agreed to move to the US on a temporary basis to assist with Mother's parents' company and determine if they liked living here and if

---

[1] It is worth noting Mother did not include one citation to the Court's Findings of Fact in her Motion to Stay, instead choosing to continue to assert the facts she wanted the court to find while ignoring the actual findings.

[2] The Court's August 26, 2025 Findings of Fact and Conclusions of Law are abbreviated as FF followed by the page on which the finding was made.

[3] Mother's parents live in Florida 6 months of the year with the other 6 months mostly in Quebec but also in MA as needed.

not they would go back (FF, p. 5).

(d) The Family returned to Quebec for every major holiday and approximately every three weeks while living here. When they were not in Canada, they were often hosting family and friends from Canada. Neither Father nor the children made friends in the US up until the time of their wrongful retention in August, 2024. (FF, p. 14).

(e) The Parties continued to have bank accounts in Canada and Mother opened an account for them in Massachusetts to which she added Father's name (FF, p. 7).

(f) The children did not make friends when living in Haverhill (FF, p. 8). There are no children in Salisbury in their neighborhood (FF, p. 14).

(g) The Children attended a very small in-home daycare with only four other children (FF, p. 14).

(h) The Children attended a few birthday parties (somewhere between 1-2 or 4-5) during their time here (FF, p. 14).

(i) In March, 2024, Father expressed his unhappiness and desire for the family to return to Canada when their i94 numbers expired in November 2024 (FF, p. 9). Mother acknowledged it was possible to return to Canada but didn't want to leave unless she was certain that is what he

Page 5

really wanted (FF, p. 9).

(j) Over the next few months Mother regularly raised the topic of staying in Massachusetts longer than November and Father reiterated each time that he wanted the family to return to Canada when their i94 numbers expired in November (FF, p. 10).

(k) The Parties did not import their car to the US until April, 2024 when they learned it was mandatory to do so (FF, p. 12).

(l) Father never imported his motorcycle (FF, p. 2).

(m)    Both parties maintained Canadian driver's licenses during the relevant period of time (FF, p. 2).

(n) The Children maintained health insurance in Canada and got health insurance in the US because it was required for daycare.  They had a pediatrician in the US and in Canada.  (FF, p. 14-15)

(o) Meanwhile, the court also found during the time Mother was leading Father to believe they would all return if he continued to be unhappy, she was taking steps to give up the family's Canadian residence. Specifically, Mother and/or her accountant typed up the NR73 tax form and Mother presented it to Father for his signature.  He did not sign because he did not agree with the typed responses and the parties sat

together and made hand changes at which point the Father signed the document with the handwritten changes. Thereafter Mother or her accountant submitted the typed version to the tax authorities in Canada which contained the same statements Father had refused to sign and omitted other checked boxes Father had checked, the details of which are laid out in the Findings of Fact (FF, pp. 10-12).

(p) Father agreed to enroll MG1 in Preschool in August 2024 until returning to Canada in November because Mother told him the daycare did not have room for her to stay there (FF, p. 15).

(q) Father stipulated to temporary parenting plans in connection with the Mother's divorce action because Mother would not let Father see the children without written stipulations at a time when she had unilaterally changed the locks on their Townhouse and had possession of the children's passports (FF, pp. 19-20).

The Court's findings make it abundantly clear that portions of Mother's evidence was either not credible, lacked candor, was less credible than Father's evidence, or contradictory to the stipulated facts (See, FF pp. 3, 9, 10-12, 13). Findings of credibility, or lack thereof, are determinations left to the discretion of the trial judge and will not be disturbed on appeal unless clearly erroneous. "In

Page 7

actions that are tried to the court, the judge's findings of fact are to be honored unless clearly erroneous, paying due respect to the judge's right to draw reasonable inferences and to gauge the credibility of witnesses. A corollary of this proposition is that, when there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous. . . . [W]hen a case has been decided on the facts by a judge . . . an appellate court must refrain from any temptation to retry the factual issues anew." Johnson v. Watts Regulator Co., 63 F.3d 1129, 1138 (1st Cir. 1995) citing Adelson v. Hananel, 652 F.3d 75, 86 (1st Cir. 2011).

Based on the evidence before the Court, the finding that **Canada was the Children's habitual residence** at the time of the wrongful retention is appropriate. "Because locating a child's home is a fact-driven inquiry, courts must be "sensitive to the unique circumstances of the case and informed by common sense." Monasky v. Taglieri, at 727 citing Redmond v. Redmond, 724 F. 3d 729, 744 (7th Cir. 2013). "For older children capable of acclimating to their surroundings, courts have long recognized, facts indicating acclimatization will be highly relevant." Id. For younger children, such as MG1 and MG2, acclimatization "depends on their parents as caregivers, making the intentions and circumstances of caregiving parents … relevant considerations." Monasky v. Taglieri, at 727. In this instance,

Page 8

the trial Judge heard the evidence, weighed credibility of that evidence, reviewed the totality of the circumstances as <u>Monasky</u> instructed. The Judge found that these young children, whose entire extended family live in Quebec, who regularly travel back and forth to Quebec, and whose parents came here on a temporary basis had not abandoned their habitual residence of Quebec as of August, 2024.

There is no question that Father consented to the children remaining in Massachusetts until August, 2024, but withdrew his consent in August, 2024. Father's actions after August, 2024, speak to whether or not he acquiesced to their remaining here. After learning of Mother's divorce, Father immediately took all of the steps he knew to be available to him to secure the children's return to Quebec. Along the way, when faced with either spending no time with the children or conceding to temporary parenting plans, he consented to temporary measures in order to avoid losing touch with his young children completely. Despite Mother's claims to the contrary, Father did file a verified motion seeking time with the children and a motion for speedy hearing and short order of notice to get in front of a judge more quickly – his motions were denied (FF, p. 20). Faced with limited options, Father consented to temporary orders, but at no point did he relent on his claim that the children should return to Quebec. Mother is trying to conflate Father's limited cooperation with acquiescence, when in reality his position has

always been that Massachusetts is not the children's habitual residence but rather Quebec is. To hold otherwise, would penalize Father for attempting to maintain a relationship with his children under extremely restrictive circumstances, while simultaneously undermining the purpose of the Hague Convention's protections against wrongful retention.

Mother's defense is that Father waived his right to seek relief under the Hague Convention when he participated in her divorce action and filed a counterclaim to remove the Children back to Quebec rather than moving to dismiss that case for lack of subject matter jurisdiction. However, the divorce case remains open and in the discovery phase and the custody components have been stayed pending the outcome of this case. Father was under no obligation to pursue a course of action preferred by Mother and is fully entitled to seek relief under the Hague Convention in this Court prior to any final custody determination by the family court.

Father did not give up his pursuit for a path for the Children's return to Quebec and actively pursued alternative avenues even after executing the stipulation for temporary orders. His efforts eventually lead to his discovery of the Hague Convention on Civil Aspects of International Child Abduction and to counsel versed in this process.

Page 10

"[T]he defense of acquiescence pertains only to what happens post-retention."  Darin v. Olivero-Huffman, 746 F.3d 1,16 (2014).  "The exceptions are 'narrow' and must be narrowly construed."  42 U.S.C. § 11601(a)(4).  In this case, Father expressed his objection to the Children remaining in Massachusetts in his answer and counterclaim wherein he sought permanent removal of the Children back to Quebec.  And, once his Petition in this Court was filed, he sought a stay of the custody component of the Divorce action in the Probate and Family Court which has been stayed pending the outcome of this matter.  Father's signing of the stipulation for temporary orders provided only for temporary custody and ought not to be read as if it was a permanent acquiescence to the Children remaining in Massachusetts or a waiver of Hague Convention rights.  Nicholson v. Pappalardo, 605 F.3d 100, 106-107 (2010).  Much like Nicholson, this is a case of temporary custody.  "Permanent custody is a different almost certainly of greater importance to the parents and not one that would necessarily be addressed in any way in a consent order providing for temporary protection and custody."  Id at 108.

Accordingly, like in Nicholson, "we do not have a 'clear and unequivocal' expression of an agreement by [Father] to have final custody determined in a Massachusetts court, nor a 'convincing written renunciation of rights' to this effect."  Id. at 108-109.

## II.   Whether the Applicant Will Be Irreparably Injured Absent A Stay.

Mother will not be irreparably harmed absent a stay of the Judgment because even if the Children are returned to Canada during the pendency of the appeal, the appeal itself is not moot and a re-return order can be entered.  See, Chafin v. Chafin, 133 S.Ct. 1017, 568 U.S. 165 (2013).  "Even if [Canada] were to ignore a re-return order, this case would not be moot.  The US courts continue to have personal jurisdiction over [Father] and may continue to command [he] take action under threat of sanctions." Chafin at 1020 citing Nken v. Holder, 556 U.S. 418, 434, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009).  This is even more true in the instant matter because there is still an open divorce case pending in the Essex Probate and Family Court in which Father is required to participate.  In the event of a re-return order, Father would have no choice but to comply or risk facing negative consequences in the divorce action.

Mother cannot claim irreparable harm to herself, as she is literally the only family member on either side of this extended family living in Massachusetts and certainly the only one asserting the need or desire to remain here.  The Court found Mother has the ability to work remotely in her current role from Quebec so she could easily return home with the children even on a temporary basis pending the final outcome of her appeal and continue her same job.  Mother's entire extended

Page 12

family reside in Quebec (aside from her parents who reside in Florida in the winter) and her parents' Quebec home is only occupied by her parents when they are in Quebec. Mother had no issue living with her parents in Haverhill so there should be no issue living with them, even if temporarily in Quebec during the pendency of her appeal.

Finally, it should not be overlooked that Mother's presence in Massachusetts continues to be on a non-immigrant E-2 visa which is nearly three years into the five year term of validity at this point.

### III. <u>Whether Issuance of the Stay Will Substantially Injure Other Parties Interested in the Proceeding</u>

The record is clear that essentially all of the Children's family ties, on both Petitioner and Respondent's side of the family including grandparents, brothers, sisters, aunts, uncles, cousins, and lifelong friends live in Quebec. The Parties and children did not form meaningful friendships in the US during the relevant period and there are no other children in the neighborhood. During the relevant timeframe, their social life consisted of spending weekends with their parents, hosting family and friends from Quebec, or visiting family or friends in Quebec. There are childcare / school options for both children in Quebec which they could seamlessly slide into. The Children are fluent in French, and the natural objects of their affections are in Quebec. There is no injury to the Children if the motion to

Page 13

stay is denied.

MG1 has not yet started elementary school.  Even after next week, MG2 remains too young for elementary school and continues in a daycare in Massachusetts which at capacity can accommodate 6 children.  MG1 will start kindergarten on September 2nd and, upon information and belief, is registered in both Quebec and Salisbury MA.  Either way we have reached a critical time period where she will be harmed by issuance of even this one-week temporary stay given the fact that Mother has not made a strong showing of a high likelihood of success on the merits of her appeal.  In other words, it is more harmful to MG1 to grant the stay.

### IV.  <u>Where the Public Interest Lies.</u>

The public interest would not be served by issuing a stay which would essentially condone Mother's wrongful retention of the Minor Children, and would also be violative of the Convention, the terms of which call for the Minor Children to be returned to Canada.  Indeed, stays conflict with the Convention's mandate of prompt return to a child's country of habitual residence and allowing routine stays for a losing parent will only serve to encourage more appeals thus undermining the goals of the Convention.  <u>Chafin</u> at 1027.  Granting a stay in this case would not

only delay justice for these Children but would also signal to other litigants that delay tactics can effectively undermine the Convention's purpose. This Court ought not to accept Mother's invitation to issue a routine stay just because she wants another bite at the proverbial apple.

WHEREFORE, the Father requests that this Honorable Court **deny** the Mother's Motion to Stay and order Mother to pay his reasonable legal fees and costs associated this emergency response over the Labor Day Holiday weekend.

Father also requests the court deny Mother's request for a hearing and, instead, rule on the papers. Father's lead counsel is continuing with an ongoing trial next week and has already lost a day of trial preparation time in having to respond to Mother's Motion to Stay. The earliest date on which Father's counsel can participate in a hearing on the Motion to Stay is the week of September 8th thus creating further delay if Mother's request for hearing is allowed. Father's co-counsel is on maternity leave with a three week old baby and thus unable to argue the motion.

Date:  August 31, 2025

Respectfully submitted,
**Tommy Giguére,**
By his attorneys,

/s/ *Wendy O. Hickey*
Wendy O. Hickey, #657457
Brick, Jones, McBrien & Hickey, LLP
250 First Avenue, Suite 201
Needham, MA  02494
(617) 494-1227
whickey@brickjones.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true copy of the within Opposition to Motion for Stay was this day served upon Respondent's counsel, Matthew Barach, via the Court's CM/ECF system and email to mbarach@barachfamilylaw.com this 31st day of August, 2025

/s/ *Wendy O. Hickey*
Wendy O. Hickey, #657457
Brick, Jones, McBrien & Hickey, LLP
250 First Avenue, Suite 201
Needham, MA  02494
(617) 494-1227
whickey@brickjones.com

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

TOMMY GIGUÈRE,            *
                           *
       Petitioner,        *
                           *
        v.                *      Civil Action No. 1:25-cv-10468-IT
                           *
STACEY TARDIF,           *
                           *
       Respondent.      *

<u>ORDER DENYING MOTION TO STAY</u>

September 1, 2025

TALWANI, D.J.

Pending before the court is Respondent Stacy Tardif's <u>Motion to Stay the Judgment</u> [Doc. No. 58]. For the following reasons, the motion is DENIED.

## I.       Background

On August 26, 2025, the court entered <u>Judgment</u> [Doc. No. 57] granting Petitioner Tommy Giguère's <u>Verified Complaint for Return of Minor Children to Canada Pursuant to the Applicable Hague Convention</u> [Doc. No. 1]. The Judgment required the return of the parties' minor children, MG1 and MG2 ("the Children"), to Canada for a custody adjudication to proceed in the appropriate Canadian court and that, "[n]o later than September 2, 2025, Respondent shall return the Children to Quebec, Canada, or shall provide Petitioner with the Children's passports and allow him to take temporary custody of the Children so that he may return the Children to Quebec, Canada, where either party may file an action to address custody of the Children on a temporary and permanent basis." <u>Judgment</u> 1–2 [Doc. No. 57]. The Judgment left in place through September 2, 2025, the temporary custody arrangements agreed to by the parties in the proceedings initiated by Respondent in Essex Probate and Family Court, No. 24D-1750 DR.

At 3:51 p.m., on Friday, August 29, 2025, Respondent filed the pending motion and shortly thereafter filed her Notice of Appeal [Doc. No. 61] of this court's Judgment. Respondent's motion made no mention of any scheduled parenting time for the Labor Day Weekend. Just after 5:00 p.m., the court directed Petitioner to file a response and temporarily stayed the return of the Children for one week to allow the court time to consider the motion. Elec. Order [Doc. No. 62]. On August 31, 2025, Petitioner filed his Opposition [Doc. No. 63]. Petitioner opposes the motion on the merits of a stay, and states further that: he filed a custody petition with the court in Quebec, Canada, on August 29, 2025; he was scheduled to have parenting time with the children in Canada on August 29, 2025, at 4 p.m.; and MG1 is registered to start Kindergarten in Quebec on September 2, 2025. Id. at 1–2.

## II.    Standard of Review

In a case under the Hague Convention, the "the well-being of a child is at stake," and the court must therefore "apply the four traditional stay factors in considering whether to stay a return order. Chafin v. Chafin, 568 U.S. 165, 179 (2013) (citing Nken v. Holder, 556 U.S. 418, 434 (2009)). In determining whether the circumstances warrant a stay, courts consider: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." Nken, 556 U.S. at 434 (internal citations omitted). "A stay is not a matter of right, even if irreparable injury might otherwise result," and "[t]he party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion." Id. at 433–434 (internal citations omitted).

"The first two factors . . . are the most critical. It is not enough that the [applicant's] chance of success on the merits be better than negligible." Id. at 434 (internal quotations and citation omitted). Similarly, "simply showing some possibility of irreparable injury fails to satisfy the second factor." Id. at 434–35 (internal quotations and citation omitted). Courts assess the harm to other interested parties and weigh the public interest "[o]nce an applicant satisfies the first two factors[.]" Id. at 435.

### III.    Discussion

### A.    Respondent Has Made No Showing of a Likelihood of Success on Her Appeal

Following an evidentiary hearing, the court issued its 34-page Findings of Fact and Conclusions of Law [Doc. No. 56], making numerous factual findings (including credibility determinations) based on the parties' stipulations, hearing exhibits, and testimony. See id. at 2–21. Respondent's motion ignores those findings, and instead recites her version of events, even where the court resolved those facts against her.

Based on its factual findings, and looking at the totality of the circumstances, the court concluded that the Children's habitual residence as of August 28, 2024, was Canada. Id. at 25-31. The court found as to Respondent's affirmative defenses that Petitioner consented to the family residing in the United States only on a trial basis, id. at 31, and that Respondent had failed to meet her burden to demonstrate Petitioner's acquiescence in her retention of the Children in the United States, id. at 31–33. Respondent's motion does not argue that the court applied the wrong legal standard and simply asserts that the court's findings are in error.

In sum, Respondent has made no showing that she is likely to succeed on appeal.

### B.    Respondent Will Not Be Irreparably Injured Absent a Stay

Respondent argues that there will be "extraordinary harm to [herself]" absent a stay and that a "forced move at this time would cause disruption in . . . [her] life." Mot. 15 [Doc. No. 58].

3

Respondent has made no showing of irreparable injury. Respondent is a citizen of Canada with only non-resident status in the United States. See Findings & Conclusions 2, 4 [Doc. No. 56]. Respondent's extended family resides in Canada, and she has returned to Quebec for most major holidays and returned on average once every three weeks prior to the improper retention of the Children in August 2024. See id. at 2, 14. Respondent works for her parents' company, which is based in Canada, id. at 3, and she has not disputed that, should she choose to return to Canada with the Children, she could continue the bulk of her current work remotely from there, see id. at 16 n.10.

In addition, return of the Children neither moots Respondent's appeal of this court's Judgment that a Canadian court should decide custody issues, see Chafin, 568 U.S. at 176, nor decides the custody issues, which will be before a Canadian court, see Mendez v. May, 778 F.3d 337, 343 (1st Cir. 2015) (citations omitted).

Respondent therefore has not shown that she would face irreparable harm absent a stay of the Judgment.

### C.    Issuance of the Stay is Not in the Children's Interest

Respondent also argues that there will be extraordinary harm to the Children absent a stay and that a forced move would cause disruption in their lives. Mot. 15 [Doc. No. 58]. As is the case for Respondent, the Children's extended family (on both sides) resides in Canada, and the Children have returned to Quebec for most major holidays and returned on average once every three weeks prior to the improper retention of the Children in August 2024. See Findings & Conclusions 2, 14 [Doc. No. 56]. In addition, the Children have continued to spend time with Petitioner in Canada since August 2024 pursuant to the parties' Agreement for Temporary Orders. See Hr'g Ex. 103. For these reasons, while the move to Canada will undoubtedly present some disruption to the Children as any move would, Respondent has made no showing that the

4

move is not in the Children's interest. To the contrary, as set forth in Petitioner's opposition, a stay pending appeal will interfere with MG1's scheduled start of Kindergarten in Quebec on September 2, 2025. See Opp. 3, 14 [Doc. No. 63].

### D.    Public Interest

Finally, Respondent does not address the public interest factor. Instead, she references the jurisdiction of the Massachusetts Probate and Family Court and the parties' temporary custody agreement, see Mot. 15–16 [Doc. No. 58], which have no bearing on the consideration before the court. The public interest lies with the "prompt[] return[]" of the Children as required by the Hague Convention and ICARA. See 22 U.S.C. § 9001(a)(4); see also Mendez, 778 F.3d at 343 ("the Convention commands that the court reviewing the petition 'shall order the return of the child forthwith[]'") (citation omitted).

## IV.    Conclusion

For the foregoing reasons, Respondent's Motion to Stay [Doc. No. 58] is DENIED. To ensure no further disruption of MG1's entry to Kindergarten in Quebec, Canada, at the earliest time that the parties can make appropriate arrangements, and in all events no later than September 9, 2025, as previously permitted by the court, see Elec. Order [Doc. No 62], Respondent shall return the Children to Quebec, Canada, or shall provide Petitioner with the Children's passports and allow Petitioner to take temporary custody of the Children so that he may return the Children to Quebec, Canada, where Petitioner has filed an action to address custody of the Children.

IT IS SO ORDERED.

September 1, 2025                    /s/ Indira Talwani
                                    United States District Judge